IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. _____

| | |
|---|---|
| TIMIA CHAPLIN and PAULINO CASTELLANOS, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>WILLIE R. ROWE, in his official capacity as the Sheriff of Wake County; JOHN DOE SURETY, as surety for the Sheriff of Wake County; BRIAN ESTES, in his official capacity as the Sheriff of Lee County; JOHN DOE SURETY, as surety for the Sheriff of Lee County; TYLER TECHNOLOGIES, INC.; and DOES 1 THROUGH 20, INCLUSIVE,<br><br>*Defendants*. | **COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

## I.     NATURE OF THE CASE

1.     As North Carolina transitions its court systems from paper to digital, hundreds of people have been unlawfully detained.

2.     There is broad support for modernizing the state's court system. But the rollout of "eCourts" in four pilot counties—Wake, Lee, Harnett, and Johnston—has been at the expense of North Carolinians' constitutional and other legal rights.

3.     As detailed herein, the eCourts launch has caused people to spend days or weeks longer than necessary in jail. Others have been arrested multiple times on the same warrant— even after their charges have been dismissed by a judge.

4. These and other violations were foreseeable. Over the last decade, similar software implementations by Defendant Tyler Technologies, Inc. ("Tyler Technologies") led to well-documented cases of overdetention, wrongful arrest, and the like. Defendants were aware that the same thing could happen here. But they forged ahead without any failsafe or alternative in place.

5. This class action seeks to remedy past harms and—as eCourts is soon expected to be implemented in North Carolina's remaining counties—prevent future violations.

## II. JURISDICTION

6. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because the claims asserted by Plaintiffs arise under the laws of the United States and seek redress for rights guaranteed by the United States Constitution and deprived under color of state law.

7. Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any and all North Carolina state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

8. This Court also has subject-matter jurisdiction over claims asserted by Plaintiffs and the Class pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed on behalf of a North Carolina statewide class under Rule 23 of the Federal Rules of Civil Procedure; there are likely hundreds of proposed class members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one member of the class of plaintiffs is a citizen of a state different from that of Defendant Tyler Technologies, Inc.

9.      Pursuant to Rule 4 of the Federal Rules of Civil Procedure, personal jurisdiction over Defendant Tyler Technologies, Inc., is conferred upon and vested in this Court by virtue of N.C. Gen. Stat. § 1-75.4(1)(d), as Tyler Technologies is engaged in substantial activity within North Carolina.

### III.     VENUE

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.

### IV.     PARTIES

11.      Defendant Willie R. Rowe ("Sheriff Rowe") is the elected Sheriff of Wake County, North Carolina, and is sued in his official capacity as the Sheriff of Wake County.

12.      Defendant Sheriff Rowe is charged by statute with control and operation of the Wake County Sheriff's Office, including policymaking, training and supervision relating to the employees of the Wake County Sheriff's Office.

13.      Defendant Sheriff Rowe is further responsible for the care and custody of Wake County's detention facilities. The Wake County Sheriff's Office Detention Division manages two detention facilities which house adult detainees in Wake County. The Wake County Detention Center is located at 3301 Hammond Road, approximately halfway between the cities of Raleigh and Garner. The second facility is located at the John H. Baker Jr. Public Safety Center at 330 South Salisbury Street in downtown Raleigh.

14.      Defendant Sheriff Rowe oversees the Judicial Services division of the Wake County Sheriff's Office. The Judicial Services Division is tasked with protecting the Wake County Justice Center and Courthouse and is responsible for ensuring that court papers are properly issued and that court cases are processed efficiently.

15.     The Judicial Services Division also houses the Warrant unit. This unit is responsible for all criminal process including the issuance of criminal warrants. This unit also processes judicial orders pertaining to criminal summons, restraining orders and warrant services.

16.     Upon information and belief, Defendant Sheriff Rowe, through Wake County, had, at the time of Plaintiffs' unlawful detentions, waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participating in a government risk pool or through purchasing commercial insurance that will indemnify him and his agents for any judgment against him or his agents named in this action.

17.     Defendant John Doe Surety, as surety for the Sheriff of Wake County, is named as a party to this action as the entity from whom Defendant Sheriff Rowe purchased a surety bond pursuant to N.C. Gen. Stat. § 58-76-5. Because Sheriff Rowe is covered by this surety bond, he has waived immunity.

18.     Defendant Brian Estes ("Sheriff Estes") is the elected Sheriff of Lee County, North Carolina, and is sued in his official capacity as the Sheriff of Lee County.

19.     Defendant Sheriff Estes is charged by statute with control and operation of the Lee County Sheriff's Office, including policymaking, training and supervision relating to the employees of the Lee County Sheriff's Office.

20.     Defendant Sheriff Estes is further responsible for the care and custody of Lee County's detention facilities.

21.     Upon information and belief, Defendant Sheriff Estes oversees the Judicial Services division of the Lee County Sheriff's Office. Upon information and belief, the Judicial Services Division is tasked with protecting the Lee County Justice Center and Courthouse and is

4

responsible for ensuring that court papers are properly issued and that court cases are processed efficiently.

22.     Upon information and belief, the Judicial Services Division also houses the Warrant unit. This unit is responsible for all criminal process including the issuance of criminal warrants. This unit also processes judicial orders pertaining to criminal summons, restraining orders and warrant services.

23.     Upon information and belief, Defendant Sheriff Estes, through Lee County, had, at the time of Plaintiffs' unlawful detentions, waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participating in a government risk pool or through purchasing commercial insurance that will indemnify him and his agents for any judgment against him or his agents named in this action.

24.     Defendant John Doe Surety, as surety for the Sheriff of Lee County, is named as a party to this action as the entity from whom Defendant Sheriff Estes purchased a surety bond pursuant to N.C. Gen. Stat. § 58-76-5. Because Sheriff Estes is covered by this surety bond, he has waived immunity.

25.     Defendant Tyler Technologies, Inc., is a corporation organized under the laws of Delaware, with its principal place of business located at 5101 Tennyson Parkway, Plano, Texas 75024. Defendant Tyler Technologies, Inc. is a citizen of Texas.

26.     Named Plaintiff Timia Chaplin is a resident of Wake County, North Carolina, and is domiciled in North Carolina.

27.     Named Plaintiff Paulino Castellanos is a resident of Lee County, North Carolina, and is domiciled in North Carolina.

5

# V. FACTUAL BACKGROUND

**A.      North Carolina looks to modernize its antiquated court system.**

28.      Well into the digital age, North Carolina's courts were stuck in the past.

29.      Back in 1996, the state's courts were deemed "at least 10-15 years behind in the use of information technology." *See* Commission for the Future of Justice and the Courts in North Carolina, *Without Favor, Denial or Delay: A Court System for the 21st Century* 57 (Dec. 1996), bit.ly/44lAbjx.

30.      Everything depended on paper. In most counties, "thick manila files [were] moved from place to place, with information manually added time and again." *Id.* There were "multiple opportunities for error" and "few for the useful exchange of information." *Id.* Citizens viewed the courts "as slow and inefficient." *Id.* And lawyers of all stripes longed for "the tools they need[ed] to do their jobs better." *Id.*

31.      Two decades later, little had changed. The federal courts had long-since implemented digital filing and recordkeeping. But in North Carolina, modernization efforts were piecemeal. And those technologies that were adopted soon "aged to the point that the skills required to maintain them ha[d] become scarce." NCCALJ Technology Committee, *eCourts Strategic Technology Plan* 1 (Sept. 29, 2016), bit.ly/3VdYeMV (a true and correct copy is attached hereto as **Exhibit A**).

32.      So in September 2015, Chief Justice Mark Martin convened the North Carolina Commission on the Administration of Law and Justice (the "Commission").

33.      The Commission was asked to review North Carolina's court system and make recommendations for its improvement, including by way of technology.

6

34.     By that time, many of North Carolina's peer states had deployed Integrated Case Management Systems ("ICMS")—single-source, digital applications used to manage all aspects of court administration.

35.     Based on its review, the Commission advised that North Carolina's court system likewise adopt an ICMS. Specifically, the Commission recommended procuring an ICMS that would, among other capabilities:

  a. enable fully electronic case processing "from initiation through dismissal";

  b. move the state's courts away from paper recordkeeping; and

  c. operate seamlessly with secondary applications used for warrants and other criminal processes. *See id.* at 25-26 (**Exhibit A**).

36.     The Commission concluded its work in July 2017.

37.     Then, in early March 2018, the North Carolina Administrative Office of the Courts ("NCAOC") announced that the state's Judicial Branch would partner with the National Center for State Courts to draft a Request for Proposal ("RFP") for an ICMS.

38.     Between March and May 2018, the RFP team held meetings across the state with clerks, judges, magistrates, sheriffs, chiefs of police, attorneys, and other stakeholders.

39.     Based on those meetings, the team developed a "final RFP" document, which included more than 300 pages of detailed business and technical requirements for any ICMS.

40.     The finalized RFP was posted to the public in August 2018, with vendor submissions due in October 2018.

41.     On information and belief, at least seven vendors submitted proposals in response to the RFP.

7

42.     After the submission deadline, and through November 2018, a Vendor Selection Committee (the "Selection Committee") evaluated the proposals.

43.     Finalist vendors were invited to give demonstrations to the Selection Committee in December 2018.

44.     The Selection Committee ultimately recommended that NCAOC partner with Defendant Tyler Technologies to implement an ICMS.

45.     In doing so, however, the Selection Committee advised NCAOC to investigate certain legal claims against and involving Tyler Technologies before making any binding commitments.

**B.     NCAOC contracts with Tyler Technologies for an ICMS and other software applications.**

46.     On June 7, 2019, NCAOC Interim Director McKinley Wooten signed a $100 million contract with Tyler Technologies for a package of new software applications.[1] The package is referred to as "eCourts."

47.     Under the terms of the contract, Tyler Technologies agreed to:

    a.     develop eWarrants—an online warrant repository bespoke to North Carolina;

    b.     implement an ICMS—known by the shorthand "Odyssey"—that would allow courts to electronically process and manage all case types;

    c.     host its software in the cloud, thereby allowing NCAOC to retire its own mainframe; and

    d.     respond to incidents and timely resolve defects in its systems.

---

[1] A copy of the "top sheet" portion of the contract is attached hereto as **Exhibit B** (redactions were in original).

8

48.     The contract anticipates that the configuration and statewide rollout of eCourts will take approximately five years, beginning with four "pilot counties" and followed by all other counties in grouped "tracks/phases." The four pilot counties are: Wake County, Lee County, Harnett County, and Johnston County.

49.     By rule, when Odyssey is implemented in any given county, attorneys *must* file pleadings and other documents through Odyssey. There is no exception to this requirement. And barring "exceptional circumstances," courts must sign and file orders, judgments, decrees, and other documents through Odyssey. *See* General Rules of Practice for the Superior and District Courts, Rules 5(b)(2), (8) (codified Feb. 13, 2023), bit.ly/3omanDs.

**C.     eCourts launches in four pilot counties—and is quickly found defective.**

50.     After several delays, eCourts launched in the pilot counties of Wake, Lee, Harnett, and Johnston on February 13, 2023.

51.     Judges and court staff—who worked diligently to prepare for the transition—expressed serious reservations before the launch.

52.     To assuage their concerns, Chief Justice Newby circulated an email on February 10, 2023. "Obedience is ours," he wrote, but "outcomes belong to the Lord." Travis Fain and Matt Talhelm, *Judicial officials call for patience, prayers as electronic court filing system launches*, WRAL (Feb. 16, 2023), bit.ly/3N7y9Ny.

53.     And on February 16, 2023, then-NCAOC Director Andrew Heath characterized the launch as "squarely within the bounds of what [he] would consider a successful rollout." *Id.*

54.     However, it soon became clear that eCourts was besieged by defects.

55.     Between February 13, 2023 and April 21, 2023, NCAOC logged (and reported to Tyler Technologies) more than 573 software application defects. The defects ranged "from

9

minor configuration issues to errors within application process that cause significant system latency." Ryan Boyce, *Letter in Response to Representative Reives* 3-4 (April 21, 2023).[2]

56.     NCAOC also identified "several high priority defects that must be resolved prior to further expansion." *Id.* (**Exhibit C**).

57.     As a result, the next phase of the eCourts rollout—into Mecklenburg County—has been indefinitely delayed "until such resolutions are validated." *Id.* (**Exhibit C**).

58.     Issues with eCourts were so significant that Harnett County suspended nearly all district court proceedings for a week.

**D.     Problems with eCourts were foreseeable, but Defendants moved forward anyway.**

59.     The impact of these defects is still being understood.

60.     But already—and as Plaintiffs' experiences demonstrate—due to the eCourts transition, some individuals are spending days or weeks longer than necessary in jail, in violation of their legal rights.

61.     Other individuals have been arrested multiple times on the same warrant— sometimes even after their charges have been dismissed by a judge.

62.     Still others have been denied the opportunity to post bond by virtue of being in an eCourts pilot county.

63.     These harms were foreseeable:

        a.     In 2011, Ector County, Texas experienced significant problems during its Odyssey rollout. The defects were so significant that the county withheld payment from Tyler Technologies.

---

[2] A true and correct copy of Mr. Boyce's letter is attached hereto as **Exhibit C**.

b. That same year, Merced County, California experienced a breakdown in communications between its criminal court and its jail after adopting Odyssey.

c. In 2014, Cameron County, Texas struggled to track inmates in its jails after transitioning to Odyssey.

d. In 2016, public defenders in Alameda County, California identified dozens of cases in which individuals had been wrongfully arrested; detained when they should have been released; or incorrectly told that they should register as sex offenders. The problems were so significant that Alameda opted not to use Odyssey for its civil, probate, or family matters. *See* Elizabeth Joh, *Wrongful arrest by software*, Slate (Dec. 13, 2016), bit.ly/40vAJjn.

e. Likewise, a 2016 class action against Shelby County, Tennessee officials, Tyler Technologies, and others alleged that a transition to Odyssey led to overdetention, wrongful arrest, and other harms. That case, which was pending during North Carolina's RFP process, settled in 2021 for a significant sum.

f. In 2021, Lubbock County, Texas officials admitted that the county's switch to Odyssey had caused people to be detained longer than necessary. Camelia Juarez, *Indigent clients held in jail without charges during Lubbock County software transition*, KCBD-11 (Nov. 11, 2021), bit.ly/44leWxW.

g.  And last year—just months before eCourts launched in North Carolina—Marion County, Indiana settled a class action after its sheriff acquired a jail-management software that was incompatible with Odyssey. The software mismatch allegedly caused more than 13,400 individuals to be detained for more than 12 hours after the entry of a release order or the payment of a bond.

64.  Based on the above, Defendants knew or should have known that, if implemented without due care, eCourts could lead to unlawful detentions and unlawful arrests, among other violations of North Carolinians' constitutional and other legal rights.

65.  Nonetheless, Defendants hastily forged ahead with the eCourts roll-out—insisting that attorneys, judges, and court staff utilize the software even as defects were known and should have been known.

**E.  Plaintiff Timia Chaplin**

66.  Plaintiff Timia Chaplin's experience shows how "minor configuration issues" can have real consequences.

67.  On November 23, 2022, Ms. Chaplin was criminally charged in Wake County.

68.  On December 13, 2022, Ms. Chaplin was called to Wake County district court, but failed to appear.

69.  On March 4, 2023, Ms. Chaplin was arrested for failing to appear and released on bond.

70.  On March 16, 2023, Ms. Chaplin was present for a rescheduled court date and appeared in district court. During the hearing, the charges against her were dismissed. Her case was designated in Odyssey as "resolved."

12

71.     However, on April 9, Ms. Chaplin was arrested a second time on the same failure-to-appear warrant, even though her case had been dismissed.

72.     Ms. Chaplin was rearrested because, although her case had been "resolved," Odyssey did not communicate that resolution to eWarrants, in contravention of the software's intended design. As a result, an arrest warrant remained outstanding for Ms. Chaplin nearly a month after her case had been dismissed.

73.     Ms. Chaplin still does not know for sure whether the warrant has been fully expunged from eWarrants and related systems.

74.     In fact, on or about April 17, 2023, Ms. Chaplin was subject to a traffic stop for an unrelated violation. During this stop she asked the officer to check whether any warrants remained outstanding against her. The officer investigated and informed her that the original warrant was still active.

**F.     Plaintiff Paulino Castellanos**

75.     Plaintiff Paulino Castellanos suffers from severe arthritis.

76.     He is often confined to a wheelchair.

77.     On February 10, 2023, Mr. Castellanos was arrested in Lee County and held on a bond that he could not afford to pay.

78.     Because his disability makes any time in jail exceedingly difficult, counsel for Mr. Castellanos endeavored to secure his release that same day.

79.     But Mr. Castellanos's counsel's efforts were thwarted. In anticipation of the February 13, 2023, transition to eCourts, Lee County had already begun digitizing case files. Court staff informed Mr. Castellanos's counsel that, amidst the transition, his case "could not be located in the system."

80. Because the Court had neither a paper nor an electronic record of Mr. Castellanos's case, he was unable to move for a bond reduction.

81. On February 13, 2023, Lee County formally transitioned to eCourts.

82. That same day, a formal indictment was issued against Mr. Castellanos in Lee County Superior Court, which generated a new case number for Mr. Castellanos in Odyssey.

83. Although his initial case was still considered "lost," Mr. Castellanos was able to move for a bond reduction based on this new case number on February 15, 2023—five days after his attorney first tried to obtain his release.

84. The court granted his motion that afternoon, and ordered that he be released with electronic monitoring pending trial.

85. Nevertheless, Mr. Castellanos was not released from jail until February 23, 2023, purportedly because no electronic monitoring device was available.

86. In total, Mr. Castellanos spent 14 days in jail.

87. During that time, he was on lockdown for 23 hours a day. Given his limited mobility, it was nearly impossible for Mr. Castellanos to meet even his most basic needs, such as walking from his bunk to retrieve meals left at his cell door.

88. Had Defendants exercised due care in the adoption and implementation of eCourts, Mr. Castellanos could have moved for and received a bond reduction on the day of his arrest, avoiding spending any longer than a few hours in jail.

14

# VI.   CLASS ACTION ALLEGATIONS

89.     Plaintiffs bring this action pursuant to Rule 23(a) and Rules 23(b)(2), 23(b)(3) and

23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and the following

Class:

> All individuals in the State of North Carolina who, beginning on and
> including February 13, 2023, were unlawfully detained as a result of
> Defendants' adoption and implementation of eCourts.

Excluded from this Class are Defendants and any of their members, affiliates, parents,

subsidiaries, officers, directors, employees, successors, and assigns; government entities; Class

counsel and their employees; and the judicial officers and Court staff assigned to this case and

their immediate families.

90.     While the exact number of Class members cannot be determined, the Class

consists of at least hundreds of individuals, making joinder impractical, in satisfaction of Rule

23(a)(1) of the Federal Rules of Civil Procedure. The exact number of Class members can

readily be ascertained by records maintained by Defendants.

91.     With respect to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are

questions of fact and law common to the Class, including:

   a.     Whether the United States Constitution protects a detainee's right to seek

          release from incarceration by moving for a bond reduction;

   b.     Whether the United States Constitution protects a detainee's right to be

          free from incarceration based upon the same warrant that was previously

          served and satisfied;

   c.     Whether the acts or omissions of the Defendant Sheriffs in connection

          with adopting and implementing eCourts were the proximate cause of the

constitutional deprivations of Plaintiffs and the proposed Class and/or whether these Defendants' failure to properly train and supervise their subordinates with respect to eCourts was the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Class.

d. Whether the Defendant Sheriffs' implementation of their administrative policies amounts to a policy of deliberate indifference and/or inaction to the constitutional rights of Plaintiffs and the proposed Class;

e. Whether Tyler Technologies breached its ordinary duty of care to Plaintiffs and the proposed Class;

f. Whether Tyler Technologies' breach of its ordinary duty of care to Plaintiffs and the proposed Class has proximately caused damages.

92. With respect to Rule 23(a)(3) of the Federal Rules of Civil Procedure, Plaintiffs have the same interests as all other members of the Class and Plaintiffs' claims are typical of those of all members. Plaintiffs' claims are coincident with and not antagonistic to those of other Class members they seek to represent. The damages of each Class member were caused by Defendants' wrongful conduct.

93. With respect to Rule 23(a)(4) of the Federal Rules of Civil Procedure, Plaintiffs have retained competent Class counsel experienced in constitutional, civil rights and class action litigation, and Plaintiffs will fairly and adequately represent the interests of the Class members.

94. Class certification is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants' actions generally apply to the Class as a whole and Plaintiffs seek equitable remedies regarding the Class as a whole.

95. Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' counsel, experienced in constitutional, civil rights and class action litigation, foresee little difficulty in the management of this matter as a class action.

96. The members of the Class are ascertainable from Defendants' records and Defendants possess contact information of Class members for class notice.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983 Against Sheriff Defendants)

97. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

98. Sheriff Rowe is sued in his official capacity as the Sheriff of Wake County.

99. Sheriff Estes is sued in his official capacity as the Sheriff of Lee County.

100. Defendants Sheriff Rowe and Sheriff Estes violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the U.S. Constitution.

101. Plaintiffs had a constitutional right to be free from unlawful search, seizure and detention.

102. The Sheriff Defendants' customs, policies and practices related to the adoption and implementation of eCourts caused Plaintiffs to be searched, seized, and detained without a lawful basis.

103. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the

17

damages herein alleged.

## SECOND CLAIM FOR RELIEF
### (Negligence against Defendant Tyler Technologies, Inc.)

104.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

105.    As a software company specializing in the development and installation of criminal court and jail inmate tracking computer systems, Defendant Tyler Technologies owed a duty of reasonable care to Plaintiffs and the Class to ensure that its eCourts system—which includes Odyssey and eWarrants—would operate properly such that the rights of Plaintiffs and the Class to be free from unlawful detention would and could be honored.

106.    These duties arose when Tyler Technologies undertook to provide services in its contract with the NCAOC for the development and implementation of eCourts.

107.    Tyler Technologies, however, breached its duties with its faulty development and implementation of eCourts in the four pilot counties, including Wake and Lee Counties.

108.    As a direct and proximate result of the negligence of Tyler Technologies, Plaintiffs and the Class have suffered damages, including but not limited to violations of their constitutional rights.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment Against Sheriff Defendants)

109.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

110.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such

18

declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *See* 28 U.S.C. § 2201(a).

111.     Pursuant to this provision, Plaintiffs request a declaration that the Sheriff Defendants, acting under color of state law and with deliberate indifference, have violated the constitutional rights of Plaintiffs and the Class by directly participating in and proximately causing the constitutional violations described herein and by failing to implement remedial measures to rectify these systematic constitutional violations.

112.     Such declaratory judgment by this Court would settle the actual and substantial controversy that exists between Plaintiffs (and the Class) and Defendants.

113.     Such declaratory judgment would serve the further and useful purpose of clarifying the legal relations at issue in this matter and would provide grounds for res judicata as to the ongoing controversy that exists between Plaintiffs (and the Class) and Defendants.

## FOURTH CLAIM FOR RELIEF
### (Injunctive Relief Against Sheriff Defendants)

114.     Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

115.     As alleged herein, Plaintiffs and the Class have suffered and will continue to suffer unconstitutional deprivations of their liberty interests caused by the Sheriff Defendants' adoption and implementation of administrative policies in connection with the ongoing use of the defective eCourts system. Under 42 U.S.C. § 1983, the Sheriff Defendants' administrative policies constitute a policy or custom of inaction and a policy or custom amounting to deliberate indifference to the rights of Plaintiffs and the Class.

116.      The deprivations of liberty interests suffered by Plaintiffs and the Class constitute irreparable injury such that remedies available at law, including monetary damages, are inadequate to fully compensate for such injury.

19

117.     The Sheriff Defendants' unconstitutional administrative policies are a continuing policy and practice and therefore subject Plaintiffs and the Class, as well as the public in North Carolina at large, to ongoing risk of deprivations of their constitutional rights.

118.     Considering the balance of hardships between the parties, and Sheriff Defendants' indifference towards the egregious violations of Plaintiffs' liberty interests, a permanent injunction against the Sheriff Defendants is warranted.

119.     Such a permanent injunction would serve the public interest by preventing the Sheriff Defendants from continuing to subject the public to unconstitutional deprivations of liberty.

120.     The Sheriff Defendants should be permanently enjoined from any further continuation of their policies and practices that have resulted in the violations of Plaintiffs' constitutional rights, including but not limited to the Sheriff Defendants' use of the faulty eCourts system. Further injunctive relief should be entered requiring the Sheriff Defendants to implement and adopt failsafe procedures to ensure a mechanism exists for immediately remedying future violations of the rights of North Carolinians that arise due to use of the eCourts system.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray for the following judgment:

A.     An Order finding in favor of Plaintiffs and the Class on all causes of action alleged herein;

B.     An Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel as Lead Plaintiffs and Class Counsel to

represent the class, and directing that reasonable notice of this action be given by Defendants to all class members;

C. The grant of any reasonable request to amend Plaintiffs' Class Action Complaint to conform to the discovery and evidence obtained in this class action lawsuit;

D. Compensatory damages;

E. Special damages;

F. Equitable relief, including the declaratory and injunctive relief requested herein;

G. An award of attorney's fees and costs and expenses, as provided by law;

H. Pre- and post-judgment interest at the highest rate allowed by law; and

H. Such other and further relief as this Court may deem just, equitable, or proper.

## IX. **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury of the claims asserted in this complaint so triable.

\* \* \* Signatures Appear on Following Page \* \* \*

Respectfully submitted this the 23rd day of May, 2023.

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)
Email: ggupta@tinfulton.com
Abraham Rubert-Schewel (NCSB #: 56863)
Email: schewel@tinfulton.com
Zachary William Ezor (NCSB #: 55070)
Email: zezor@tinfulton.com
TIN FULTON WALKER & OWEN PLLC
115 E. Main Street
Durham, NC 27701
Telephone: (919) 307-8400

*Counsel for Plaintiffs Timia Chaplin and
Paulino Castellanos, on behalf of themselves
and all others similarly situated*