IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-cv-00423-WO-JLW

TIMIA CHAPLIN; SARAH FIELDS; SAYELINE NUNEZ; THOMAS HAYWARD; KEVIN SPRUILL; ROTESHA MCNEIL; QIANA ROBERTSON; YOUSEF JALLAL; MESSIEJAH BRADLEY; DENNIS KEITH LASSITER; PAULINO CASTELLANOS; ROBERT LEWIS; and ALLEN SIFFORD, on behalf of themselves and all others similarly situated,

*Plaintiffs,*

v.

GARY L. MCFADDEN, officially, as the Sheriff of Mecklenburg County; JOHN DOE SURETY, as surety for the Sheriff of Mecklenburg County; WILLIE R. ROWE, officially, as the Sheriff of Wake County; BRIAN ESTES, officially, as the Sheriff of Lee County; THE OHIO CASUALTY INSURANCE COMPANY, as surety for the Sheriffs of Wake County and Lee County; TYLER TECHNOLOGIES, INC; RYAN BOYCE, officially, as the Executive Director of the North Carolina Administrative Office of the Courts; BRAD FOWLER, officially, as the eCourts Executive Sponsor and Chief Business Officer of the North Carolina Administrative Office of the Courts; ELISA CHINN-GARY, individually and officially, as the Mecklenburg County Clerk of Superior Court; BLAIR WILLIAMS, individually and officially, as the Wake County Clerk of Superior Court; SUSIE K. THOMAS, individually and officially, as the Lee County Clerk of Superior Court; and DOES 1 THROUGH 20, INCLUSIVE,

*Defendants.*

**SECOND AMENDED COMPLAINT – CLASS ACTION**

JURY TRIAL DEMANDED

**Style Definition:** Heading 4: Font: (Default) Times New Roman, Not Italic, Font color: Auto, Indent: Left: 0", First line: 0.5", Space Before: 0 pt, Don't add space between paragraphs of the same style, Line spacing: Double, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5", Don't keep with next, Don't keep lines together, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Deleted:** FIRST

**Deleted:** WILLIE R. ROWE, in his official capacity

**Deleted:** in his official capacity

**Deleted:** Sheriff

**Deleted:** as surety for the Sheriff of

**Deleted:** ; NORTH CAROLINA ADMINISTRATIVE OFFICE OF THE COURTS…

**Deleted:** in his official capacity

**Deleted:** in his official capacity

**Deleted:** in his official capacity

**Deleted:** in her official capacity

**Deleted:** JOHN DOE SURETY, as the surety for the Wake County Clerk of Superior Court and the Lee County Clerk of Superior Court; and

**Formatted:** Tab stops: Not at 3.13"

**Deleted:** ¶
¶

**Formatted:** Font: Bold, Underline

## I.  NATURE OF THE CASE

1.  As North Carolina transitions its court systems from paper to digital, hundreds of people have been unlawfully detained.

2.  There is broad support for modernizing the state's court system. But the rollout of "eCourts" across the state has been at the expense of North Carolinians' constitutional and other legal rights.

3.  As detailed herein, the eCourts launch has caused people to spend days or weeks longer than necessary in jail. Others have been arrested multiple times on the same warrant— even after their charges have been dismissed by a judge.

4.  These and other violations were foreseeable. Over the last decade, similar software implementations by Defendant Tyler Technologies, Inc. ("Tyler Technologies") led to well-documented cases of overdetention, wrongful arrest, and the like. Defendants were aware that the same thing could happen here. But they forged ahead without any failsafe or alternative in place.

5.  Defendants even continued the rollout and adoption of eCourts after they were made aware that violations had occurred and would continue, evidencing reckless and intentional disregard for the rights of our state's citizenry.

6.  This class action seeks to remedy past harms and—as eCourts is soon expected to be fully implemented in North Carolina's remaining counties—prevent future violations.

2

**Formatted:** Normal

## II. JURISDICTION

7. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because the claims asserted by Plaintiffs arise under the laws of the United States and seek redress for rights guaranteed by the United States Constitution and deprived under color of state law.

8. Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any and all North Carolina state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

9. This Court also has subject-matter jurisdiction over claims asserted by Plaintiffs and the Class pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed on behalf of a North Carolina statewide class under Rule 23 of the Federal Rules of Civil Procedure; there are likely hundreds of proposed class members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one member of the class of plaintiffs is a citizen of a state different from that of Defendant Tyler Technologies, Inc.

10. Pursuant to Rule 4 of the Federal Rules of Civil Procedure, personal jurisdiction over Defendant Tyler Technologies, Inc., is conferred upon and vested in this Court by virtue of N.C. Gen. Stat. § 1-75.4(1)(d), as Tyler Technologies is engaged in substantial activity within North Carolina.

## III. VENUE

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

3

**Formatted:** Normal

## IV.    PARTIES

12.    Defendant Gary L. McFadden ("Sheriff McFadden") is the elected Sheriff of Mecklenburg County, North Carolina, and is sued in his official capacity as the Sheriff of Mecklenburg County.

13.    Defendant Sheriff McFadden is charged by statute with control and operation of the Mecklenburg County Sheriff's Office, including policymaking, training and supervision relating to the employees of the Mecklenburg County Sheriff's Office.

14.    Defendant Sheriff McFadden is further responsible for the care and custody of Mecklenburg County's detention facilities.

15.    Upon information and belief, Defendant Sheriff McFadden oversees the Courts division of the Mecklenburg County Sheriff's Office. Upon information and belief, the Courts Division is tasked with protecting the Mecklenburg County Courthouse and is responsible for ensuring that court papers are properly issued and that court cases are processed efficiently.

16.    Upon information and belief, Defendant Sheriff McFadden also oversees the Arrest Processing division of the Mecklenburg County Sheriff's Office. This division operates the Arrest Processing Center, which is the centralized entry point for all persons arrested in Mecklenburg County by any law enforcement agency. This division also operates the Mecklenburg County Warrant Repository, which warehouses all orders for arrest, warrants, and restraining orders issued in Mecklenburg County.

17.    Defendant Sheriff McFadden, through Mecklenburg County, had, at the time of Plaintiffs' unlawful detentions, waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participating in a government risk pool or through purchasing commercial insurance that will indemnify him and his agents for

4

any judgment against him or his agents named in this action. Defendant Sheriff McFadden has also waived immunity for the independent reason that he purchased an official bond.

18.     Defendant Willie R. Rowe ("Sheriff Rowe") is the elected Sheriff of Wake County, North Carolina, and is sued in his official capacity as the Sheriff of Wake County.

19.     Defendant Sheriff Rowe is charged by statute with control and operation of the Wake County Sheriff's Office, including policymaking, training and supervision relating to the employees of the Wake County Sheriff's Office.

20.     Defendant Sheriff Rowe is further responsible for the care and custody of Wake County's detention facilities. The Wake County Sheriff's Office Detention Division manages two detention facilities which house adult detainees in Wake County. The Wake County Detention Center is located at 3301 Hammond Road, approximately halfway between the cities of Raleigh and Garner. The second facility is located at the John H. Baker Jr. Public Safety Center at 330 South Salisbury Street in downtown Raleigh.

21.     Defendant Sheriff Rowe oversees the Judicial Services division of the Wake County Sheriff's Office. The Judicial Services Division is tasked with protecting the Wake County Justice Center and Courthouse and is responsible for ensuring that court papers are properly issued and that court cases are processed efficiently.

22.     The Judicial Services Division also houses the Warrant unit. This unit is responsible for all criminal process including the issuance of criminal warrants. This unit also processes judicial orders pertaining to criminal summons, restraining orders and warrant services.

23.     Defendant Sheriff Rowe, through Wake County, had, at the time of Plaintiffs' unlawful detentions, waived governmental or sovereign immunity from the state law tort claims

**Formatted:** Normal

5

in this case pursuant to N.C.G.S. § 153A-435, either by participating in a government risk pool or through purchasing commercial insurance that will indemnify him and his agents for any judgment against him or his agents named in this action. Defendant Sheriff Rowe has also waived immunity for the independent reason that he purchased an official bond.

24.     Defendant Brian Estes ("Sheriff Estes") is the elected Sheriff of Lee County, North Carolina, and is sued in his official capacity as the Sheriff of Lee County.

25.     Defendant Sheriff Estes is charged by statute with control and operation of the Lee County Sheriff's Office, including policymaking, training and supervision relating to the employees of the Lee County Sheriff's Office.

26.     Defendant Sheriff Estes is further responsible for the care and custody of Lee County's detention facilities.

27.     Upon information and belief, Defendant Sheriff Estes oversees the Judicial Services division of the Lee County Sheriff's Office. Upon information and belief, the Judicial Services Division is tasked with protecting the Lee County Justice Center and Courthouse and is responsible for ensuring that court papers are properly issued and that court cases are processed efficiently.

28.     Upon information and belief, the Judicial Services Division also houses the Warrant unit. This unit is responsible for all criminal process including the issuance of criminal warrants. This unit also processes judicial orders pertaining to criminal summons, restraining orders and warrant services.

29.     Defendant Sheriff Estes, through Lee County, had, at the time of Plaintiffs' unlawful detentions, waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participating in a government risk pool

6

**Formatted:** Normal

or through purchasing commercial insurance that will indemnify him and his agents for any judgment against him or his agents named in this action. Defendant Sheriff Estes has also waived immunity for the independent reason that he purchased an official bond.

Formatted: Font: +Body (Calibri)

30. Defendant John Doe Surety, as surety for the Sheriff of Mecklenburg County, is named as a party to this action as the entity from whom Defendant Sheriff McFadden purchased a surety bond pursuant to N.C.G.S. §§ 58-76-5 and 162-8. Because Sheriff McFadden is covered by this surety bond, he has waived immunity.

31. Defendant The Ohio Casualty Insurance Company, as surety for the Sheriff of Wake County and as surety for the Sheriff of Lee County, is named as a party to this action as the entity from whom Defendant Sheriff Rowe and Defendant Sheriff Estes purchased their respective surety bonds pursuant to N.C.G.S. §§ 58-76-5 and 162-8. Because Sheriff Rowe and Sheriff Estes are covered by surety bonds, they both have waived immunity.

32. Defendant Tyler Technologies, Inc., is a corporation organized under the laws of Delaware, with its principal place of business located at 5101 Tennyson Parkway, Plano, Texas 75024. Defendant Tyler Technologies, Inc. is a citizen of Texas.

33. Defendant Ryan Boyce ("Director Boyce") is the Executive Director of the North Carolina Administrative Office of the Courts ("NCAOC"). Defendant Director Boyce is sued in his official capacity.

34. Defendant Brad Fowler is employed as the eCourts Executive Sponsor and Chief Business Officer of the North Carolina Administrative Office of the Courts. Defendant Fowler is sued in his official capacity.

35. Elisa Chinn-Gary ("Clerk Chinn-Gary") is the elected Mecklenburg County Clerk of Superior Court. Clerk Chinn-Gary is sued in both her individual and official capacities.

Formatted: Normal

36.     Blair Williams ("Clerk Williams") is the elected Wake County Clerk of Superior Court. Clerk Williams is sued in both his individual and official capacities.

37.     Susie K. Thomas ("Clerk Thomas") is the elected Lee County Clerk of Superior Court. Clerk Thomas is sued in both her individual and official capacities.

38.     All named Plaintiffs are domiciled in North Carolina.

39.     Named Plaintiff Sarah Fields is a resident of Mecklenburg County.

40.     Named Plaintiff Sayeline Nunez is a resident of the Bronx, New York.

41.     Named Plaintiff Thomas Hayward is a resident of Mecklenburg County.

42.     Named Plaintiff Kevin Spruill is a resident of Wake County.

43.     Named Plaintiff Timia Chaplin is a resident of Wake County.

44.     Named Plaintiff Rotesha McNeil is a resident of Wake County.

45.     Named Plaintiff Qiana Robertson is a resident of Wake County.

46.     Named Plaintiff Yousef Jallal is a resident of Wake County.

47.     Named Plaintiff Messiejah Bradley is a resident of Wake County.

48.     Named Plaintiff Dennis Keith Lassiter is a resident of Harnett County.

49.     Named Plaintiff Paulino Castellanos is a resident of Lee County.

50.     Named Plaintiff Robert Lewis is a resident of Guilford County.

51.     Named Plaintiff Allen Sifford is a resident of Mecklenburg County.

## V.     FACTUAL BACKGROUND

**A.     North Carolina looks to modernize its antiquated court system.**

52.     Well into the digital age, North Carolina's courts were stuck in the past.

53.     Back in 1996, the state's courts were deemed "at least 10-15 years behind in the use of information technology." *See* Commission for the Future of Justice and the Courts in

8

---

**Deleted:** capacity.

**Deleted:** capacity.

**Deleted:** <#>Defendant John Doe Surety, as surety for the Wake County Clerk of Superior Court and as surety for the Lee County Clerk of Superior Court, is named as a party to this action as the entity from whom Clerk Williams and Clerk Thomas purchased their respective surety bonds. Because Clerk Williams and Clerk Thomas are covered by surety bonds, they both have waived immunity.¶

**Moved (insertion) [1]**

**Formatted:** Add space between paragraphs of the same style

**Moved (insertion) [2]**

**Moved (insertion) [3]**

**Moved (insertion) [4]**

**Moved up [3]:** <#>Named Plaintiff Yousef Jallal is a resident of Wake County.¶

**Moved up [1]:** <#>Named Plaintiff Kevin Spruill is a resident of Wake County.¶

**Moved up [2]:** <#>Named Plaintiff Qiana Robertson is a resident of Wake County.¶

**Moved up [4]:** <#>Named Plaintiff Paulino Castellanos is a resident of Lee County.¶

**Formatted:** Normal

North Carolina, *Without Favor, Denial or Delay: A Court System for the 21st Century* 57 (Dec. 1996), bit.ly/44lAbjx.

54.     Everything depended on paper. In most counties, "thick manila files [were] moved from place to place, with information manually added time and again." *Id.* There were "multiple opportunities for error" and "few for the useful exchange of information." *Id.* Citizens viewed the courts "as slow and inefficient." *Id.* And lawyers of all stripes longed for "the tools they need[ed] to do their jobs better." *Id.*

55.     Two decades later, little had changed. The federal courts had long-since implemented digital filing and recordkeeping. But in North Carolina, modernization efforts were piecemeal. And those technologies that were adopted soon "aged to the point that the skills required to maintain them ha[d] become scarce." NCCALJ Technology Committee, *eCourts Strategic Technology Plan* 1 (Sept. 29, 2016), bit.ly/3VdYeMV (a true and correct copy is attached hereto as **Exhibit A**).

56.     So in September 2015, Chief Justice Mark Martin convened the North Carolina Commission on the Administration of Law and Justice (the "Commission").

57.     The Commission was asked to review North Carolina's court system and make recommendations for its improvement, including by way of technology.

58.     By that time, many of North Carolina's peer states had deployed Integrated Case Management Systems ("ICMS")—single-source, digital applications used to manage all aspects of court administration.

59.     Based on its review, the Commission advised that North Carolina's court system likewise adopt an ICMS. Specifically, the Commission recommended procuring an ICMS that would, among other capabilities:

9

**Formatted:** Normal

a.   enable fully electronic case processing "from initiation through dismissal";

b.   move the state's courts away from paper recordkeeping; and

c.   operate seamlessly with secondary applications used for warrants and other criminal processes. *See id.* at 25-26 (**Exhibit A**).

60.   The Commission concluded its work in July 2017.

61.   Then, in early March 2018, the North Carolina Administrative Office of the Courts ("NCAOC") announced that the state's Judicial Branch would partner with the National Center for State Courts to draft a Request for Proposal ("RFP") for an ICMS.

62.   Between March and May 2018, the RFP team held meetings across the state with clerks, judges, magistrates, sheriffs, chiefs of police, attorneys, and other stakeholders.

63.   Based on those meetings, the team developed a "final RFP" document, which included more than 300 pages of detailed business and technical requirements for any ICMS.

64.   The finalized RFP was posted to the public in August 2018, with vendor submissions due in October 2018.

65.   On information and belief, at least seven vendors submitted proposals in response to the RFP.

66.   After the submission deadline, and through November 2018, a Vendor Selection Committee (the "Selection Committee") evaluated the proposals.

67.   Finalist vendors were invited to give demonstrations to the Selection Committee in December 2018.

68.   The Selection Committee ultimately recommended that NCAOC partner with Defendant Tyler Technologies to implement an ICMS.

10

**Formatted:** Normal

69.     In doing so, however, the Selection Committee advised NCAOC to investigate certain legal claims against and involving Tyler Technologies before making any binding commitments.

**B.     NCAOC contracts with Tyler Technologies for an ICMS and other software applications.**

70.     On June 7, 2019, NCAOC Interim Director McKinley Wooten signed a $100 million contract with Tyler Technologies for a package of new software applications.[1] The package is referred to as "eCourts."

71.     Under the terms of the contract, Tyler Technologies agreed to:

    a.     develop eWarrants—an online warrant repository bespoke to North Carolina;

    b.     implement an ICMS—known by the shorthand "Odyssey"—that would allow courts to electronically process and manage all case types;

    c.     host its software in the cloud, thereby allowing NCAOC to retire its own mainframe; and

    d.     respond to incidents and timely resolve defects in its systems.

72.     The contract stated that "Tyler warrants that the Tyler Software [eCourts] will perform without Defects during the [contract] term." *See* **Exhibit B** at 17 (subsection (e)).

73.     The contract anticipated that the configuration and statewide rollout of eCourts will take approximately five years.

---

[1] A copy of the "top sheet" portion of the contract is attached hereto as **Exhibit B** (redactions were in original).

11

74.     eWarrants was implemented statewide in July 2022, prior to the adoption of Odyssey. eWarrants was intended to maintain detailed information about magistrate and other judicial orders, criminal summonses, orders for arrest, release orders and appearance bonds. But problems with eWarrants delayed the statewide launch date by more than a year. As the Mecklenburg County chief information officer stated publicly, "Tyler Technologies continued to struggle with several defects pushing the [launch] date for eWarrants back." Michelle Boudin, *'It's kind of like the rapture'; Concerns ahead of changes at the courts*, WCNC Charlotte (Feb. 8, 2023), https://bit.ly/3QJiFkt.

75.     Odyssey has been rolled out in stages, beginning with four "pilot counties" and to be followed by all other counties in grouped "tracks/phases." The four pilot counties were: Wake County, Lee County, Harnett County, and Johnston County. A fifth county, Mecklenburg, launched eCourts on October 9, 2023.

76.     By rule, when Odyssey is implemented in any given county, attorneys *must* file pleadings and other documents through Odyssey. There is no exception to this requirement. And barring "exceptional circumstances," courts must sign and file orders, judgments, decrees, and other documents through Odyssey. *See* General Rules of Practice for the Superior and District Courts, Rules 5(b)(2), (8) (codified Feb. 13, 2023), bit.ly/3omanDs.

**C.     eCourts launches in four pilot counties—and is quickly found defective.**

77.     After several delays, eCourts launched in the pilot counties of Wake, Lee, Harnett, and Johnston on February 13, 2023.

78.     Judges and court staff—who worked diligently to prepare for the transition—expressed serious reservations before the launch.

**Formatted:** Normal

79.     To assuage their concerns, Chief Justice Newby circulated an email on February 10, 2023. "Obedience is ours," he wrote, but "outcomes belong to the Lord." Travis Fain and Matt Talhelm, *Judicial officials call for patience, prayers as electronic court filing system launches*, WRAL (Feb. 16, 2023), bit.ly/3N7y9Ny.

80.     And on February 16, 2023, then-NCAOC Director Andrew Heath characterized the launch as "squarely within the bounds of what [he] would consider a successful rollout." *Id.*

81.     However, it soon became clear that eCourts was besieged by defects.

82.     Between February 13, 2023 and April 21, 2023, NCAOC logged (and reported to Tyler Technologies) more than 573 software application defects. The defects ranged "from minor configuration issues to errors within application processes that cause significant system latency." Ryan Boyce, *Letter in Response to Representative Reives* 3-4 (April 21, 2023). A true and correct copy of Mr. Boyce's letter is attached hereto as **Exhibit C**.

83.     NCAOC also identified "several high priority defects that must be resolved prior to further expansion." *Id.* (**Exhibit C**).

84.     Issues with eCourts were so significant that Harnett County suspended nearly all district court proceedings for a week.

85.     In June of 2023, nearly five months into the eCourts rollout, NCAOC staff held a meeting to discuss an "Urgent Warrant Resets Correction."

86.     Internal NCAOC email correspondence shows that release orders for 179 warrants were "inadvertently deleted," leaving them in an unserved status.

87.     This meant that individuals who had cleared warrants, or posted bond and been released from jail, were now subject to re-arrest.

**D.      eCourts expands into Mecklenburg County.**

88.      In light of these problems, the next phase of the eCourts rollout—into

Mecklenburg County—was delayed several times, purportedly until proposed "resolutions" to

system defects could be "validated." *Id.* (**Exhibit C**).

89.      But eventually, eCourts launched in Mecklenburg County on October 9, 2023.

90.      Even with the benefit of the Pilot Counties' experiences, issues remain.

91.      For example, a known "integration issue" between eWarrants and Odyssey has

caused many criminal defendants to be "held in custody despite meeting the conditions of

release." Indeed, since October 13, 2023, Tyler Technologies has provided NCAOC with a

"daily report of integration failures," which clerks and magistrates must then manually correct.

*See* Honorable Elizabeth Thornton Trosch, Chief District Court Judge, *Email regarding*

*Procedure for Reconciling Bond Update Discrepancies Between eWarrants and Odyssey* (Oct.

17, 2023). A true and correct copy of Chief Judge Trosch's email is attached as **Exhibit D**.

92.      During the first four days following the launch of eCourts in Mecklenburg

County, and due to these technological defects, approximately 66 people were detained well

beyond the point their conditions of release were satisfied. Prior to eCourts, it would take

anywhere from 2-4 hours for a detainee in Mecklenburg County to be released; but after eCourts,

some people were held for 2-3 *days* despite having satisfied all conditions imposed on them by

the justice system.

14

**E.    Problems with eCourts were foreseeable, but Defendants moved forward anyway.**

93.    The impact of these defects is still being understood.

94.    But already—and as Plaintiffs' experiences demonstrate—due to the eCourts transition, some individuals are spending days or weeks longer than necessary in jail, in violation of their legal rights.

95.    Other individuals have been arrested multiple times on the same warrant—sometimes even after their charges have been dismissed by a judge.

96.    Still others have been denied the opportunity to post bond by virtue of being in an Odyssey county.

97.    These harms were foreseeable:

a.    In 2011, Ector County, Texas experienced significant problems during its Odyssey rollout. The defects were so significant that the county withheld payment from Tyler Technologies.

b.    That same year, Merced County, California experienced a breakdown in communications between its criminal court and its jail after adopting Odyssey.

c.    In 2014, Cameron County, Texas struggled to track inmates in its jails after transitioning to Odyssey.

d.    In 2016, public defenders in Alameda County, California identified dozens of cases in which individuals had been wrongfully arrested; detained when they should have been released; or incorrectly told that they should register as sex offenders. The problems were so significant that Alameda opted not to use Odyssey for its civil, probate, or family matters. *See*

15

Elizabeth Joh, *Wrongful arrest by software*, Slate (Dec. 13, 2016), bit.ly/40vAJjn.

e. Likewise, a 2016 class action against Shelby County, Tennessee officials, Tyler Technologies, and others alleged that a transition to Odyssey led to overdetention, wrongful arrest, and other harms. That case, which was pending during North Carolina's RFP process, settled in 2021 for a significant sum.

f. In 2021, Lubbock County, Texas officials admitted that the county's switch to Odyssey had caused people to be detained longer than necessary. Camelia Juarez, *Indigent clients held in jail without charges during Lubbock County software transition*, KCBD-11 (Nov. 11, 2021), bit.ly/44leWxW.

g. And last year—just months before eCourts launched in North Carolina—Marion County, Indiana settled a class action after its sheriff acquired a jail-management software that was incompatible with Odyssey. The software mismatch allegedly caused more than 13,400 individuals to be detained for more than 12 hours after the entry of a release order or the payment of a bond.

98. Based on the above, Defendants knew or should have known that, if implemented without due care, eCourts could lead to unlawful detentions and unlawful arrests, among other violations of North Carolinians' constitutional and other legal rights.

16

**Formatted:** Normal

99.     Nonetheless, Defendants hastily forged ahead with the eCourts roll-out—insisting that attorneys, judges, and court staff utilize the software even as defects were known and should have been known.

100.    The named Plaintiffs' experiences show how "minor configuration issues" can have real consequences.

*Mecklenburg County Plaintiffs*

F.      **Plaintiff Sarah Fields**

101.    On October 7, 2023, Sarah Fields was arrested.

102.    Ms. Fields was held on bond at the Mecklenburg County Detention Center ("MCDC").

103.    On October 9, 2023, Ms. Fields was taken to the Mecklenburg County Courthouse.

104.    At approximately 12:00 PM, a district court judge ordered her released on an unsecured bond.

105.    Ms. Fields was returned to a holding cell at the MCDC for processing and release.

106.    Ms. Fields was held overnight and was not released until the next day, October 10, 2024, at approximately 1:30 PM.

107.    Ms. Fields was detained for approximately 25.5 hours after the time she was ordered released.

108.    Ms. Fields' overdetention was caused by Defendants' adoption and implementation of eCourts, including an integration defect between Odyssey and eWarrants.

17

**G.     Plaintiff Sayeline Nunez**

109.    On October 9, 2023, Sayeline Nunez was arrested.

110.    Ms. Nunez was held on bond at the MCDC.

111.    On October 10, 2023, Ms. Nunez was taken to the Mecklenburg County Courthouse.

112.    At approximately 11:00 AM, a district court judge ordered her released on an unsecured bond.

113.    Ms. Nunez was returned to a holding cell at the MCDC for processing and release.

114.    Ms. Nunez was held overnight and was not released until the next day, October 11, 2024, at approximately 1:30 PM.

115.    Ms. Nunez was detained for approximately 26.5 hours after the time she was ordered released.

116.    Ms. Nunez's overdetention was caused by Defendants' adoption and implementation of eCourts, including an integration defect between Odyssey and eWarrants.

**H.     Plaintiff Thomas Hayward**

117.    On December 2, 2023, Thomas Hayward was arrested.

118.    Mr. Hayward was held without bond at the MCDC.

119.    On December 4, 2023, Mr. Hayward was taken to the Mecklenburg County Courthouse.

120.    At approximately 10:00 AM, a district court judge ordered that Mr. Hayward would be released if he posted a $2,500 bond.

121.    Mr. Hayward posted bond at approximately 1:00 PM that same day.

18

**Formatted:** Normal

122. Mr. Hayward was returned to a holding cell at the MCDC for processing and release.

123. Mr. Hayward was held overnight and was not released until the next day, December 5, 2024, at approximately 3:41 AM.

124. Mr. Hayward was detained for approximately 14.5 hours after the time he posted bond securing his release.

125. Mr. Haywards' overdetention was caused by Defendants' adoption and implementation of eCourts, including an integration defect between Odyssey and eWarrants.

*Wake County Plaintiffs*

**I.     Plaintiff Kevin Spruill**

126.    Kevin Spruill was arrested pursuant to a warrant on February 11, 2023, for allegedly obtaining property under false pretenses.

127.    He appeared before a Wake County judge on February 15, 2023, and posted bond.

128.    Nevertheless, the warrant for his arrest remained as marked "active" in eWarrants.

129.    On March 4, 2023, a Wake County police officer saw the warrant and pulled Mr. Spruill over.

130.    Mr. Spruill was handcuffed and held in the officer's car.

131.    Mr. Spruill produced his release paperwork, which proved that the warrant was no longer valid.

132.    The officer contacted the Wake County Sheriff's Office to update the system and confirm the warrant was not valid.

133.    The officer then released Mr. Spruill.

**Formatted:** Normal

134.    When Mr. Spruill appeared for his next court date on March 8, 2023, however, he was arrested again on the same warrant by a deputy from the Wake County Sheriff's Department.

135.    Mr. Spruill was shackled and placed in a holding cell based on the purportedly active warrant despite the fact that the warrant had been resolved, as reported by the police officer to the Wake County Sheriff's Department.

136.    Mr. Spruill again provided his release paperwork to prove that his warrant was cleared.

137.    Mr. Spruill was released once his file was reviewed by the Wake County Sheriff's Office and the Wake County Clerk of Court and updated in eCourts.

138.    After being unlawfully detained twice, Mr. Spruill's charges were dismissed.

**J.    Plaintiff Timia Chaplin**

139.    On November 23, 2022, Timia Chaplin was criminally charged in Wake County.

140.    On December 13, 2022, Ms. Chaplin was called to Wake County district court, but failed to appear. The district court then issued a warrant for failure to appear.

141.    On March 4, 2023, Ms. Chaplin was arrested for failing to appear and released on bond.

142.    On March 16, 2023, Ms. Chaplin was present for a rescheduled court date and appeared in district court. During the hearing, the charges against her were dismissed including the warrant for failure to appear. Her case was designated in Odyssey as "resolved."

143.    However, on April 9, 2023, Ms. Chaplin was arrested a second time on the same failure-to-appear warrant, even though her case had been dismissed.

20

144. Ms. Chaplin was rearrested because, although her case had been "resolved," Odyssey did not communicate that resolution to eWarrants, in contravention of the software's intended design. As a result, an arrest warrant remained outstanding for Ms. Chaplin nearly a month after her case had been dismissed. Had Odyssey properly communicated to eWarrants that Ms. Chaplin's warrant was resolved and no longer outstanding—or if the arresting officer were properly trained on where to learn this fact—the arresting officer would not have detained Ms. Chaplin.

145. Ms. Chaplin still does not know for sure whether the warrant has been fully expunged from eWarrants and related systems.

146. In fact, on or about April 17, 2023, Ms. Chaplin was subject to a traffic stop for an unrelated violation. During this stop she asked the officer to check whether any warrants remained outstanding against her. The officer investigated and informed her that the original warrant was still active.

**K.     Plaintiff Rotesha McNeil**

147. In July 2021, Rotesha McNeil received a citation for driving with a suspended license in Wake County.

148. On August 11, 2022, a Wake County arrest warrant was issued for Ms. McNeil due to her alleged "failure to appear."

149. On September 12, 2022, Ms. McNeil pled guilty to driving with a suspended license and paid a fine and restitution.

150. On that same date, the Court noted that the "failure to appear" was entered in error and was stricken.

151. Odyssey reflects that Ms. McNeil's case was "disposed" on September 12, 2022.

21

**Formatted:** Normal

152. Yet on May 29, 2023, Ms. McNeil was arrested by a Sheriff's Deputy with the Johnston County Sheriff's Office ("JCSO") on the August 11, 2022 failure-to-appear warrant which had been stricken.

153. Ms. McNeil informed the deputy that her charges had been resolved and that, as a result, she had no pending warrant.

154. The JCSO deputy contacted the Wake County Sheriff's Office. An employee of the Wake County Sheriff's Office informed the deputy that the warrant was valid.

155. As a result, Ms. McNeil was detained for approximately 5 hours until her release on a $1,000.00 bond.

156. After her release, on May 30, 2023, Ms. McNeil visited the Wake County Court to determine the cause for her wrongful arrest and detention.

157. Ms. McNeil met with an employee of the Wake County Clerk of Court who apologized to Ms. McNeil and explained that the failure to appear warrant should have been recalled from the electronic system.

158. The employee explained that the Wake County Clerk would "escalate" the issue of clearing stale and invalid warrants from Odyssey and eWarrants, but that the employee had no idea if all such warrants had been removed.

159. A few days later, Defendant Wake County Clerk of Court Blair Williams offered Ms. McNeil (through her husband, Jermaine McNeil, who was negotiating on her behalf) $300.00 to resolve all claims against Clerk Williams, his employees, NCAOC, and the State of North Carolina. A screenshot of that release follows:

22

Formatted: Normal



RELEASE

In consideration of the sum of Three Hundred dollars ($300.00), and other good and valuable consideration, the undersigned Jermaine Terel McNeil hereby releases:

- BLAIR WILLIAMS, individually and in his capacity as Wake County Clerk of Superior Court,
- all his predecessors and successors in office,
- all his present and former employees and agents,
- the North Carolina Administrative Office of the Courts, and
- the State of North Carolina and its officers, employees and agents,

from any and all claims which he has or has ever had against them, or any of them, and in particular from any and all claims arising from an order for arrest issued in the matter of *State of North Carolina v. Rotesha*, 21 CR 729161-910 (Wake County).

This the _____ day of June, 2023.

_____
Jermaine Terel McNeil

**L.    Plaintiff Qiana Robertson**

160.    On February 11, 2023, Qiana Robertson was arrested in Wake County on suspicion of driving while impaired.

161.    Ms. Robertson was assigned a first appearance date of March 3, 2023.

162.    Her case was continued to June 26, 2023—a fact reflected in Odyssey, in her attorney's files, and in the District Attorney's files.

163.    Inexplicably, however, Ms. Robertson's court date was moved to May 5, 2023.

164.    Odyssey indicates that the date was "Reset by Court." But no one in the Wake County Clerk's Office or the District Attorney's Office has been able to explain how the date change occurred.

165.    Neither Ms. Robertson nor her attorney were given notice of the date change.

166.    As a result, Ms. Robertson was called and failed to appear on May 5, 2023.

167.    An order for arrest was issued for Ms. Robertson's failure to appear. She was arrested on June 11, 2023, and transported to the Wake County Detention Center.

23

168. Ms. Robertson was made to pay a $2,000.00 bond to secure her release.

169. Her case was dismissed on double-jeopardy grounds.

**M.   Plaintiff Yousef Jallal**

170. On January 12, 2023, Yousef Jallal was issued a citation for misdemeanor possession of marijuana.

171. On June 6, 2023, his case was dismissed.

172. However, his case was incorrectly designated as "called and failed."

173. As a result, on July 3, 2023, an order for arrest for "failure to appear" was issued for Mr. Jallal.

174. On August 10, 2023, Mr. Jallal was arrested for failure to appear by a deputy from the Wake County Sheriff's Office.

175. Mr. Jallal was held at the Wake County Detention Center from approximately 9:00 PM until 3:00 AM when he was released on a $1,000.00 bond.

176. On August 11, 2023—without a new court appearance—Odyssey was updated to indicate that his case was dismissed and disposed.

177. The dismissal document was never entered on Odyssey.

**N.   Plaintiff Messiejah Bradley**

178. In August 2022, Messiejah Bradley was arrested for misdemeanor possession of marijuana in Wake County.

179. On July 20, 2023, after successful completion of the first-offender drug diversion program, his charges were dismissed.

180. Mr. Bradley's dismissal paperwork—although signed by the District Attorney and submitted to the Court—was never reflected in Odyssey.

24

**Formatted:** Normal

181.    Odyssey incorrectly marked his case on July 20, 2023, as "called and failed."

182.    As a result, on August 29, 2023, an arrest warrant for "failure to appear" was issued for Mr. Bradley.

183.    On September 27, 2023, a police officer executed this warrant and arrested Mr. Bradley.

184.    Mr. Bradley was held at the Wake County Detention Center for approximately 5 hours before he was released on a $1,000.00 bond.

185.    On September 28, 2023, Odyssey was updated to indicate that his case was dismissed. The dismissal was dated July 20, 2023.

**O.    Plaintiff Dennis Keith Lassiter**

186.    On March 30, 2023, Dennis Keith Lassiter was arrested and charged in Wake County. He paid a bond to secure his release.

187.    Mr. Lassiter was eventually assigned a court date for July 7, 2023. He went to court that day, answered the roll call and spoke with the Assistant District Attorney assigned to his case.

188.    He was told that he would be notified of his next court date. But Mr. Lassiter never received notice of his next court date.

189.    In late September 2023, Mr. Lassiter called the Wake County Clerk's Office to confirm that his next court date had not yet been scheduled.

190.    The Clerk's Office informed him that, while he had no pending court dates, Odyssey was displaying a "called and failed" for July 7, 2023—again, a date he had been present in court.

25

**Formatted:** Normal

191. Based on that erroneous "called and failed," a magistrate had ordered that Mr. Lassiter's bond be forfeited.

192. Nevertheless, the Clerk's Office assured Mr. Lassiter that no arrest warrant had been issued in relation to the July 7 "called and failed," and that he could still move to strike the notation.

193. Despite the Clerk's Office's assurances, an arrest warrant had been issued in relation to the erroneous July 7 "called and failed."

194. On October 19, 2023, a Wake County Sheriff's deputy executed that warrant, arrested Mr. Lassiter and took him to the Wake County Detention Center for holding.

195. When Mr. Lassiter appeared before a magistrate that same day, he explained that he had been in court on July 7, and that he had therefore been arrested in error.

196. The magistrate refused to release him. In addition to the erroneous "called and failed" from July 7, Odyssey displayed an outstanding "failure to appear" warrant from Johnston County.

197. The "failure to appear" warrant was from 2001—and had been resolved more than twenty years prior.

198. On information and belief, this 2001 warrant was previously resolved but then "revived" during the transition to eCourts. Mr. Lassiter spent time in prison for several years beginning in 2001, completed a term of probation thereafter, and attended mandatory drug treatment. Yet no prison, probation, or judicial official acknowledged the warrant until his most recent arrest.

Formatted: Normal

199. Wake County served the 2001 warrant on behalf of Johnston County. On the "Service without Process" form Mr. Lassiter received, the Wake County magistrate checked the box next to "Criminal process confirmed via Electronic Warrants and/or Odyssey."

200. Mr. Lassiter was held in jail for more than 36 hours, until he could appear before a district court judge for a bond hearing. He was released on an unsecured bond.

201. Mr. Lassiter's 2001 "failure-to-appear" charge was dismissed on November 2, 2023.

### *Lee County Plaintiff*

**P.      Plaintiff Paulino Castellanos**

202.    Paulino Castellanos suffers from severe arthritis and is often confined to a wheelchair.

203.    On February 10, 2023, Mr. Castellanos was arrested in Lee County and held on a bond that he could not afford to pay.

204.    Because his disability makes any time in jail exceedingly difficult, counsel for Mr. Castellanos endeavored to secure his release that same day.

205.    But Mr. Castellanos's counsel's efforts were thwarted. In anticipation of the February 13, 2023, transition to eCourts, Lee County had already begun digitizing case files. Court staff informed Mr. Castellanos's counsel that they had scanned and uploaded his case file into the eCourts system, but that, nevertheless, his case "could not be located in the system."

206.    Because the Defendants had no record of Mr. Castellanos's case, he was unable to move for a bond reduction, or pay his active bond, on February 10, 2023.

207.    On February 13, 2023, Lee County formally transitioned to eCourts.

27

208. That same day, a formal indictment was issued against Mr. Castellanos in Lee County Superior Court, which generated a new case number for Mr. Castellanos in Odyssey.

209. Although his initial case was still considered "lost," Mr. Castellanos was able to move for a bond reduction based on this new case number on February 15, 2023—five days after his attorney first tried to obtain his release.

210. The court granted his motion that afternoon, and ordered that he be released with electronic monitoring pending trial.

211. During his time in jail, Mr. Castellanos was on lockdown for 23 hours a day. Given his limited mobility, it was nearly impossible for him to meet even his most basic needs, such as walking from his bunk to retrieve meals left at his cell door.

212. Had Defendants exercised due care in the adoption and implementation of eCourts, Mr. Castellanos could have moved for and received a bond reduction on the day of his arrest, avoiding spending any longer than a few hours in jail.

### *Statewide Plaintiffs*

**Q.  Plaintiff Robert Lewis**

213. Robert Lewis works as a live-in caretaker for an elderly client in Guilford County.

214. In 2016, his client was misled into taking out a restraining order against him. The restraining order was quickly dissolved.

215. In the fall of 2022, however, local law-enforcement officers were called to resolve an argument between Mr. Lewis and a neighbor.

216. Despite having long since been dissolved, the restraining order was visible in eWarrants. The officers arrested Mr. Lewis for violating the terms of the restraining order, despite his insistence that the order was no longer operational.

28

217. Mr. Lewis spent two days in jail before bonding out.

218. To avoid another arrest, Mr. Lewis managed his client's care remotely for several months—living elsewhere, ordering groceries for delivery, and paying his client's bills online.

219. The District Attorney eventually conceded the error and dismissed Mr. Lewis's case.

**R.    Plaintiff Allen Sifford**

220. In August 2009, an arrest warrant was issued for Allen Sifford in Gaston County.

221. The warrant was never served.

222. In September 2022, Mr. Sifford applied for a commercial driver's license. The North Carolina Division of Motor Vehicles denied his application based on his outstanding warrant.

223. Mr. Sifford hired an attorney to clear his record.

224. On October 25, 2022, his case was dismissed due to its age and the failure to serve the warrant. With his case resolved, he was able to get his commercial driver's license.

225. On July 7, 2023, however, Mr. Sifford was pulled over in Belmont, NC, for having a dark license-plate cover.

226. Officers told Mr. Sifford that his old warrant still appeared "active" in eWarrants.

227. Mr. Sifford was arrested and held for more than 48 hours in the Gaston County jail.

228. Although his case has been formally expunged, he carries his dismissal paperwork everywhere.

29

## VI.    CLASS ACTION ALLEGATIONS

229.    Plaintiffs bring this action pursuant to Rule 23(a) and Rules 23(b)(2), 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following three classes:

> **Overdetention Class**: All individuals in the State of North Carolina who, beginning on and including February 13, 2023, and due to Defendants' adoption, implementation and design of eCourts (including eWarrants), were released from jail more than two (2) hours after the basis for their detention ended. The named representatives for this class are Sarah Fields, Sayeline Nunez, Thomas Hayward, and Paulino Castellanos.
>
> **Wrongful Arrest Class**: All individuals in the State of North Carolina who, beginning on and including July 1, 2022, were arrested or detained pursuant to warrants that would not have been issued but for Defendants' adoption, implementation and design of eCourts (including eWarrants). The named representatives for this class are Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, Dennis Keith Lassiter, and Allen Sifford.
>
> **Injunctive Relief Class**: All members of the Wrongful Arrest Class and the Overdetention Class. All Plaintiffs except Robert Lewis are named representatives for this class.

These classes are referred to as "Class" / "Classes." Excluded from these Classes are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, and assigns; government entities; Class counsel and their employees; and the judicial officers and Court staff assigned to this case and their immediate families.

230.    While the exact number of Class members cannot be determined, the Class consist of at least hundreds of individuals, making joinder impractical, in satisfaction of Rule 23(a)(1) of the Federal Rules of Civil Procedure. The exact number of Class members can readily be ascertained by records maintained by Defendants.

30

231. With respect to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of fact and law common to each of the Classes, including:

Deleted: Class

a. Whether the United States Constitution protects a detainee's right to comply with a preset bond and, thus, be released from confinement;

b. Whether the United States Constitution protects a detainee's right to be released from confinement once ordered released by a judicial official;

c. Whether the United States Constitution protects a detainee's right to seek release from confinement by moving for a bond reduction;

d. Whether the United States Constitution protects a detainee's right to a timely probable cause determination;

e. Whether the United States Constitution protects a detainee's right to be free from confinement based upon a warrant that was entered without probable cause and with no other lawful basis;

f. Whether the United States Constitution protects a detainee's right to be free from confinement based upon the same warrant that was previously served and satisfied;

g. Whether the rights alleged to be protected by the United States Constitution set forth in common questions (a) through (f) above were clearly established.

Deleted: d

h. Whether the acts or omissions of the Defendant Sheriffs in connection with adopting and implementing eCourts—including their policies, practices and procedures regarding issuing and recalling warrants and arresting people based on resolved warrants—were the proximate cause of

Formatted: Normal

31

the constitutional deprivations of Plaintiffs and the proposed Classes, and/or whether these Defendants' failure to properly train and supervise their subordinates with respect to eCourts/warrants was the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Classes.

i.  Whether the Defendant Sheriffs' implementation of their administrative policies amounts to a policy of deliberate indifference and/or inaction to the constitutional rights of Plaintiffs and the proposed Classes;

j.  Whether the acts or omissions of the Defendant Clerks in connection with adopting and implementing eCourts were the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Classes, and/or whether these Defendants' failure to properly train and supervise their subordinates with respect to eCourts was the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Classes.

k.  Whether Defendant Tyler Technologies owed a duty of care to Plaintiffs and the proposed Classes;

l.  Whether Defendant Tyler Technologies breached the duty of care it owes to Plaintiffs and the proposed Classes; and

m.  Whether Defendant Tyler Technologies' breach of its ordinary duty of care to Plaintiffs and the proposed Classes has proximately caused damages.

232.  With respect to Rule 23(a)(3) of the Federal Rules of Civil Procedure, Plaintiffs have the same interests as all other members of the Classes they represent and Plaintiffs' claims

32

are typical of those of all members. Plaintiffs' claims are coincident with and not antagonistic to those of other Class members they seek to represent. The damages of each Class member were caused by Defendants' wrongful conduct.

233.    With respect to Rule 23(a)(4) of the Federal Rules of Civil Procedure, Plaintiffs have retained competent Class counsel experienced in constitutional, civil rights and class action litigation, and Plaintiffs will fairly and adequately represent the interests of the Class members.

234.    Class certification is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants' actions generally apply to the Classes as a whole and Plaintiffs seek equitable remedies regarding the Classes as a whole.

235.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the Classes, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' counsel, experienced in constitutional, civil rights and class action litigation, foresee little difficulty in the management of this matter as a class action.

236.    The members of the Classes are ascertainable from Defendants' records and Defendants possess contact information of members of each Class for class notice.

33

## VII.  CLAIMS AGAINST TYLER TECHNOLOGIES, INC.

### FIRST CLAIM FOR RELIEF
**(Negligence Against Tyler Technologies, Inc.)**

237.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

238.    All Plaintiffs, on behalf of themselves individually as well as any Class to which they belong, bring this claim against Defendant Tyler Technologies.

239.    As a technology company specializing in the development of software that digitizes court systems, Tyler Technologies owed a duty of reasonable care to Plaintiffs and each Class to ensure that its eCourts system—which includes Odyssey and eWarrants—would operate properly such that the rights of Plaintiffs and members of each Class to be free from unlawful arrest and detention would and could be honored.

240.    Tyler Technologies voluntarily assumed these duties when it decided and agreed to develop the eCourts software applications on behalf of North Carolina and its citizenry, including pursuant to its contract with the North Carolina Administrative Office of the Courts. *See* **Exhibit B**.

241.    These duties included:

    a.    The duty to supply accurate information to end-users (or to develop software applications that provide accurate information to end-users);

    b.    The duty to ensure that eWarrants and Odyssey communicated with one another so as to supply accurate information between and among the applications, as well as to end-users of each application;

    c.    The duty to ensure that eCourts and the end-users of eCourts properly utilized any data and information entered into eCourts;

34

**Deleted:** Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Messiejah Bradley, Youssef Jalall, Robert Lewis, Allen Sifford, and Paulino Castellanos, among others

**Deleted:** the

**Deleted:** the

**Deleted:** the

**Formatted:** Normal

d.    The duty to ensure that end-users of eCourts were properly trained on how to use eWarrants and Odyssey;

e.    The duty to ensure that eCourts would be free of defects;

f.    The duty to ensure that end-users were timely notified of any defects; and

g.    In such further ways as may be shown by the evidence.

242.    As Tyler Technologies warranted in its contract with NCAOC: "Tyler warrants that the Tyler Software [eCourts] will perform without Defects during the term of this Contract." *See* **Exhibit B**.

243.    But Tyler Technologies breached its duties. The eCourts software package is replete with defects that led to the unlawful arrests and detentions suffered by Plaintiffs and each Class. Put differently, Tyler Technologies' breach brought about the actions of the governmental actors that wrongfully arrested and detained Plaintiffs and members of each Class. Absent this breach, these wrongful arrests and detentions would not have occurred.

244.    Tyler Technologies knew or should have known that these defects in eCourts would lead to unlawful arrests and detentions; and these defects did lead to the unlawful arrests and detentions alleged herein, including those suffered by Plaintiffs, who should have been released from custody or never taken into custody in the first place.

245.    As a direct and proximate result of Tyler Technologies' negligence, either singularly or in concert with the other Defendants named herein, Plaintiffs and each Class have suffered needless and prolonged arrests and detentions resulting in the damages pled herein.

246.    Tyler Technologies is additionally liable in negligence to Plaintiffs and each Class for the independent reason that it provided inadequate warning under N.C.G.S. § 99B-5. Tyler Technologies acted unreasonably in failing to warn its co-Defendants, those adopting and

35

implementing eCourts, and the general public that eCourts could and would result in unlawful arrests and detentions even if properly utilized by the intended end-users. This failure was a proximate cause of the harms alleged herein. And at the time eCourts left the control of Tyler Technologies, the software package created an unreasonably dangerous condition that Tyler Technologies knew or should have known or became aware would pose a substantial—if not certain—risk of harm to a reasonably foreseeable claimant: namely, Plaintiffs and each Class.

## VIII.   CLAIMS AGAINST SHERIFF DEFENDANTS

### SECOND CLAIM FOR RELIEF
### (Negligence Against All Sheriff Defendants)

247.   Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

248.   Plaintiffs Sarah Fields, Sayeline Nunez, and Thomas Hayward, on behalf of themselves individually and the Overdetention Class, bring this claim against Defendant Sheriff McFadden in his official capacity.

249.   Plaintiffs Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, and Dennis Keith Lassiter, on behalf of themselves individually and the Wrongful Arrest Class, bring this claim against Defendant Sheriff Rowe in his official capacity.

250.   Plaintiff Paulino Castellanos, on behalf of himself individually and the Overdetention Class, brings this claim against Sheriff Estes in his official capacity.

251.   Defendants Sheriff McFadden, Rowe and Estes are collectively referred to as the "Sheriff Defendants."

252.   The Sheriff Defendants have waived immunity for this claim by the purchase of insurance.

36

253. The Sheriff Defendants had the following duties:

    a.    To identify warrants issued in their respective counties and appearing in eWarrants that were invalid;

    b.    To not enforce warrants issued in their respective counties that they had identified as invalid;

    c.    To confirm the validity of warrants in the Odyssey system before arresting individuals on a warrant; and

    d.    To ensure that individuals are not held unnecessarily in the jails and other facilities they supervise.

254. The Sheriff Defendants were negligent and breached duties owed to Plaintiffs in the following respects:

    a.    They failed to identify in the eWarrants system those warrants issued in their respective counties that were invalid;

    b.    They failed to confirm the validity of warrants prior to arresting individuals pursuant to a warrant;

    c.    They repeatedly enforced and executed invalid warrants;

    d.    They failed to implement systems to ensure that individuals ordered released or who had otherwise satisfied conditions of release, would be released in a timely fashion;

    e.    They repeatedly detained individuals for over two hours beyond the time they had been ordered released or otherwise satisfied their conditions of release; and

    f.    In such further ways as may be shown by the evidence.

37

**Deleted:** ensure that the

**Deleted:** valid

**Deleted:** recall or excise from

**Deleted:** and

**Moved (insertion) [5]**

**Formatted:** Font color: Black

**Formatted:** Indent: Left: 1", Hanging: 0.5", Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Formatted:** Normal

255. The Sheriff Defendants, as the principals for their agents, are responsible under *respondeat superior* for negligence committed by their employees or agents in the course and scope of their employment.

256. As a direct and proximate result of the Sheriffs Defendants' negligence, Plaintiffs and members of the Overdetention Class and the Wrongful Arrest Class were wrongfully arrested and detained.

257. As a direct and proximate result of this unlawful conduct, Plaintiffs and members of the Overdetention Class and the Wrongful Arrest Class sustained damages.

**THIRD CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 and *Monell* Against Defendant Sheriff McFadden)**

258. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

259. Plaintiffs Sarah Fields, Sayeline Nunez, and Thomas Hayward, on behalf of themselves individually and the Overdetention Class, bring this claim against Defendant Sheriff McFadden in his official capacity.

260. Sheriff McFadden is responsible for overseeing the operation of the Mecklenburg County Detention Center ("MCDC").

261. In this role, Sheriff McFadden is responsible for compliance with court orders for release of MCDC inmates.

262. Sheriff McFadden, through his policies, customs, practices, omissions, and failures to train, violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United Stated Constitution.

263. Plaintiffs had a constitutional right to be free from unlawful detention and overdetention.

264. Sheriff McFadden was on notice of the likelihood of overdetentions based on

38

lawsuits filed in other states, the rollout of eCourts in the initial four pilot counties in North Carolina, and meetings with stakeholders in Mecklenburg County.

265.    Prior to the rollout of eCourts in Mecklenburg County, Sheriff McFadden in meetings with stakeholders, including the District Attorney and Public Defender, expressed concerns about whether his staff would be able to operate the new electronic system.

266.    Still, Sheriff McFadden failed to implement a failsafe system, such as a paper-based process to notify jail staff of a release order that could be transferred with inmates to the MCDC.

267.    The delays in release began immediately upon the rollout of eCourts in Mecklenburg County.

268.    Sheriff McFadden knew that because of defects in eCourts, many defendants who had been ordered released were continuing to be held in custody.

269.    Specifically, Sheriff McFadden was aware that because of an "integration issue" between eWarrants and Odyssey, orders of release were not being communicated in a timely manner to officials at the MCDC.

270.    Sheriff McFadden was on notice of delays in release of individuals housed at the MCDC no later than October 9, 2023, when Plaintiff Sarah Fields was held for 25.5 hours after the time she was ordered released.

271.    The following day, Plaintiff Sayeline Nunez was ordered released from detention, but was likewise held for roughly 26.5 hours after the time her release was ordered.

272.    During the first four days following the launch of eCourts in Mecklenburg County, and due to these technological defects, approximately 66 people were detained well beyond the point their conditions of release were satisfied.

39

**Formatted:** Normal

273. In an interview just weeks after the roll out, Sheriff McFadden acknowledged that "[t]he wait times are much longer ". . . . We are getting calls from citizens. We're inundated with people from the community worried about when the person is going to be released."[2]

274. Prior to eCourts, it would take, upon information and belief, anywhere from 2-4 hours for a detainee in Mecklenburg County to be released.

275. Sheriff McFadden attributed the delays to inadequate training for his staff as well as glitches and crashes in the system.

276. These delays in release have continued. On December 4, 2023, Plaintiff Thomas Hayward posted bond for his release. Nevertheless, Mr. Hayward was held in detention for approximately 14.5 hours after posting bond.

277. Sheriff McFadden failed to adequately train his employees on the Odyssey and eWarrants systems and how to use those systems to ensure that individuals were timely released from detention.

278. Sheriff McFadden's policies, customs, practices, omissions, and failures to train, as related to the adoption and implementation of eCourts, caused Plaintiffs and members of the Overdetention Class to be detained after the time they were ordered released.

279. As a direct and proximate result of this unlawful conduct, Plaintiffs and members of the Overdetention Class sustained the damages herein alleged.

---

[2] Naomi Kowles, *Wrongfully in jail: Ecourts issues mount in Mecklenburg County*, WBTV, October 27, 2023.

40

Formatted: Normal

**FOURTH CLAIM FOR RELIEF**
**(Violation of 42 U.S.C. § 1983 and *Monell* Against Defendant Sheriff Rowe)**

280. Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

281. Plaintiffs Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, and Dennis Keith Lassiter, on behalf of themselves individually and the Wrongful Arrest Class, bring this claim against Defendant Sheriff Rowe in his official capacity.

282. Sheriff Rowe is responsible for the issuance of criminal warrants in Wake County.

283. Sheriff Rowe, through his policies, customs, practices, omissions, and failures to train, violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United Stated Constitution.

284. Plaintiffs had a constitutional right to be free from unlawful search, seizure and detention.

285. Sheriff Rowe knew that because of defects in eCourts, invalid bond orders and invalid warrants issued in Wake County remained "active" in the eWarrants system.

286. Sheriff Rowe knew of these defects as early as February 13, 2023, the date of the eCourts rollout, when non-plaintiff Christopher Clegg was sentenced to time served but was nevertheless not released from the Wake County jail. Mr. Clegg was returned to court one week later and resentenced on the same charge—again to time served. He was held nearly a month after his initial plea and was not released until March 9, 2023.

287. Prior to his release date, Wake County Public Defenders informed Sheriff Rowe and the Wake County Clerk's office that Mr. Clegg was being over detained as a result of a defect in eCourts.

41

288.    Sheriff Rowe was also on notice that individuals were being unlawfully arrested by law enforcement officers based on invalid Wake County warrants.

289.    Sheriff Rowe knew of wrongful arrests based on invalid warrants no later than March 4, 2023, when Plaintiff Kevin Spruill was wrongfully detained on an invalid Wake County warrant. The wrongful arrests of Plaintiff Timia Chaplin on April 9, 2023, and of Plaintiff Rotesha McNeil on May 29, 2023, also put Sheriff Rowe on notice that Wake County Sheriff's Office deputies and other officers were arresting individuals on invalid Wake County warrants.

290.    By April 2023, the Wake County Public Defender's office had also notified Sheriff Rowe and the Wake County Clerk of Court that individuals were being wrongfully arrested on cleared warrants because of defects in the eCourts software.

291.    Still, Sheriff Rowe failed to institute a policy to identify all invalid Wake County warrants in the eWarrants system.

292.    Sheriff Rowe also had a policy, practice and custom of arresting individuals pursuant to invalid Wake County warrants, without first confirming their validity.

293.    Sheriff Rowe failed to adequately train his employees on the Odyssey and eWarrants systems and how to use those systems to confirm the validity of outstanding Wake County warrants.

294.    The failure to identify invalid Wake County warrants or to confirm the validity of warrants in the eWarrants system caused the illegal arrests and detentions of Plaintiffs Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, Dennis Keith Lassiter, and other members of the Wrongful Arrest Class in Wake County.

295.    Sheriff Rowe's policies, customs, practices, omissions, and failures to train, as

42

related to the adoption and implementation of eCourts, caused Plaintiffs and members of the Wrongful Arrest Class in Wake County to be searched, seized, and detained without a lawful basis.

296.    As a direct and proximate result of this unlawful conduct, Plaintiffs and members of the Wrongful Arrest Class in Wake County sustained the damages herein alleged.

**FIFTH CLAIM FOR RELIEF**
**(Action On Official Bond Against the Sheriff Defendants)**

297.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

298.    At the time of the events alleged herein, the Sheriff Defendants were principals on official bonds.

299.    Defendant Sheriff McFadden was the principal on an official bond issued by Defendant John Doe Surety.

300.    Defendant Sheriff Rowe was the principal on an official bond issued by Defendant The Ohio Casualty Insurance Company in the amount of $20,000 per occurrence.

301.    Defendant Sheriff Estes was the principal on an official bond issued by Defendant The Ohio Casualty Insurance Company in the amount of $25,000 per occurrence.

302.    Defendant John Doe Surety joined with Defendant Sheriff McFadden as the surety on his official bond and thereby undertook to be jointly and severally liable for the failure of Sheriff McFadden to faithfully perform the duties of his office as the Sheriff of Mecklenburg County.

303.    The Ohio Casualty Insurance Company joined with Defendant Sheriffs Rowe and Estes as the surety on their official bonds and thereby undertook to be jointly and severally liable for the failure of these Defendants to faithfully perform the duties of their offices as the Sheriffs of Wake County (Rowe) and Lee County (Estes).

43

304.    The Sheriff Defendants' bonds were in full force and effect when Plaintiffs and the Classes were injured as alleged herein.

305.    Plaintiffs incorporate by reference the following claims for relief against the Sheriff Defendants and bring them independently against the Sheriff Defendants' official bonds as if fully set forth in this the Fifth Claim for Relief:

    a.    The Second Claim for Relief (Negligence Against All Sheriff Defendants);

    b.    The Third Claim for Relief (Violation of 42 U.S.C. § 1983 and *Monell* Against Defendant Sheriff McFadden); and

    c.    The Fourth Claim for Relief (Violation of 42 U.S.C. § 1983 and *Monell* Against Defendant Sheriff Rowe).

306.    At the time of the events alleged herein, the Sheriff Defendants were acting by virtue or under the color of their offices as Sheriffs.

307.    The Sheriff Defendants, Defendant John Doe Surety, and Defendant The Ohio Casualty Insurance Company are jointly and severally liable to Plaintiffs and the Classes, pursuant to N.C.G.S. §§ 58-76-5.

IX.    **CLAIMS AGAINST CLERK DEFENDANTS**

**SIXTH CLAIM FOR RELIEF**
**(False Imprisonment Against Clerk Defendants, Individually)**

308.    Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

309.    Plaintiffs Sarah Fields, Sayeline Nunez, and Thomas Hayward, on behalf of themselves and the Overdetention Class, bring this claim against Defendant Elisa Chinn-Gary, the Mecklenburg County Clerk of Superior Court.

44

Deleted: Class

Deleted: Fourth

Deleted: and

Deleted: The Third

Deleted: Class

Deleted: STATE ACTORS

Moved (insertion) [7]

Deleted: FIFTH CLAIM FOR RELIEF¶
(Action On Official Bond

Moved (insertion) [8]

Formatted: Font: +Headings (Calibri Light)

Formatted: Bullet List, Centered, Level 1

Formatted: Heading 4, Line spacing:  single,  No bullets or numbering

Moved up [6]: Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.¶

Deleted: ¶

Formatted: Normal

310. Plaintiffs Kevin Spruill, Timia Chaplain, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, and Dennis Keith Lassiter, on behalf of themselves individually and the Wrongful Arrest Class, bring this claim against Defendant Blair Williams, the Wake County Clerk of Superior Court.

311. Plaintiff Paulino Castellanos, on behalf of himself and the Overdetention Class, brings this claim against Defendant Susie K. Thomas, the Lee County Clerk of Superior Court.

312. Defendants Elisa Chinn-Gary, Blair Williams and Susie K. Thomas (collectively, "Clerk Defendants") are sued in their individual capacities under this claim.

313. In their respective counties, the Clerk Defendants are responsible for:

    a. Executing all clerical and record-keeping functions of the superior and district courts, including through Odyssey and related software;

    b. Issuing arrest orders and warrants, including for "failures to appear";

    c. Digitizing paper court records;

    d. Ensuring that release orders are properly effectuated;

314. The Clerk Defendants were intimately involved in the adoption of eCourts in their respective counties, working directly with Tyler Technologies, the North Carolina Administrative Office of the Courts, local law-enforcement, and other stakeholders to facilitate the transition from paper to digital records.

315. The Clerk Defendants were aware that the implementation of Odyssey in other states led to unlawful detentions and arrests prior to the roll-out of eCourts in North Carolina.

316. The Clerk Defendants had notice that North Carolina's eCourts system presented similar defects as early as February 13, 2023, and certainly no later than March of that year.

45

317. Clerk Chinn-Gary was also aware of the experiences of the four "pilot" counties—Wake, Lee, Johnston, and Harnett—which adopted eCourts more than six months prior to Mecklenburg County.

318. Nevertheless, the Clerk Defendants failed to maintain accurate electronic case records, identify and or remove invalid warrants from Odyssey and eWarrants, confirm that arrest orders for "failures to appear" were not issued in error, and ensure that release orders were properly effectuated.

319. Shortly after eCourts launched in Mecklenburg County, for example, Clerk Chinn-Gary became aware that release orders were getting "stuck," preventing release orders from being signed and then finalized in the Ecourts systems. Clerk Chinn-Gary failed to rectify this issue, allowing significant delays in release to continue.

320. By this conduct, the Clerk Defendants caused Plaintiffs to be unlawfully detained against their will.

321. The Clerk Defendants acted with recklessness and manifest indifference to the consequences of their conduct, amounting to willful and wanton disregard for Plaintiffs' rights.

322. The Clerk Defendants further acted contrary to their duties and outside the scope of their authority.

323. As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages alleged herein.

324. Routine case management—scanning and filing documents; checking boxes on electronic interfaces; relaying the contents of an order—is nonjudicial behavior that is not normally performed by a judge in North Carolina. Rather, it is administrative and ministerial activity that does not involve the exercise of discretion or judgment.

46

Deleted: of Court
Formatted: Heading 4, None, Line spacing: single, No bullets or numbering
Deleted: County (Williams)
Deleted: Lee County (Thomas).
Deleted: <#>The Clerk Defendants' bonds were in full force and effect when Plaintiffs and the Class were injured as alleged herein.¶
At all times relevant to this Complaint
Deleted: <#>had a duty
Deleted: <#>use the care which a reasonably prudent person, charged with the Clerk of Superior Court's ministerial and administrative duties, would exercise in the same circumstances.¶
¶
¶
¶
¶
Plaintiffs Timia Chaplain, Rotesha McNeil, Messiejah Bradley, Yousef Jallal, and Kevin Spruill, among others, were injured by the negligence of Clerk Williams in the performance of the ministerial and administrative duties of his office in one or more of the following ways:¶
By failing to accurately enter data into
Deleted: <#>;¶
By failing to
Deleted: <#>invalid warrants were recalled, or to prevent the issuance of new warrants, after Plaintiffs' cases had been resolved or Plaintiffs¶
Deleted: <#>authorized;
Moved up [5]: <#>In such further ways as may be shown by the evidence.¶
Deleted: <#>By failing to identify technological defects in eCourts that caused invalid warrants to appear valid;¶
By failing to appropriately train staff in the Wake County Clerk's Office to counteract the significant risk of wrongful detention after becoming aware of said risk; and
Deleted: <#>Plaintiff Paulino Castellanos was injured by the negligence of Clerk Thomas in the performance of the ministerial and administrative duties of her office in one or more of the following ways:¶
By failing to ensure the effective conversion of paper case files to eCourts; and¶ ... [1]
Formatted: Font color: Black
Deleted: were acting by virtue or under the color
Formatted: Heading 4, None, Line spacing: single, No bullets or numbering
Deleted: offices as Clerks
Formatted: Normal

## X.  INJUNCTIVE RELIEF CLAIMS

### SEVENTH CLAIM FOR RELIEF
**(Injunctive Relief Against All Sheriff Defendants, All Clerk Defendants, Defendant Boyce and Defendant Fowler)**

325.  Plaintiffs re-allege and incorporate the preceding paragraphs as if set forth herein.

326.  Defendant Ryan Boyce ("Director Boyce") is the Executive Director of the North Carolina Administrative Office of the Courts ("NCAOC").

327.  Defendant Brad Fowler ("Mr. Fowler") is employed as the eCourts Executive Sponsor and Chief Business Officer of the North Carolina Administrative Office of the Courts.

328.  All Plaintiffs, on behalf of themselves and the Injunctive Relief Class, bring this claim for permanent injunctive relief against the Sheriff Defendants, the Clerk Defendants, Defendant Director Boyce and Defendant Mr. Fowler (collectively, the "Injunctive Relief Defendants").

329.  The Injunctive Relief Defendants are all sued in their official capacities.

330.  As alleged herein, Plaintiffs and the Injunctive Relief Class have suffered and will continue to suffer unconstitutional deprivations of their liberty interests caused by the Injunctive Relief Defendants' adoption and implementation of administrative policies in connection with the ongoing use of the defective eCourts system.

331.  Under 42 U.S.C. § 1983, the Injunctive Relief Defendants' administrative policies constitute a policy or custom of inaction and a policy or custom amounting to deliberate indifference to the Fourth and Fourteenth Amendment rights of Plaintiffs and the Injunctive Relief Class.

47

332.    The deprivations of liberty interests suffered by Plaintiffs and the Injunctive Relief Class constitute irreparable injury such that remedies available at law, including monetary damages, are inadequate to fully compensate for such injury.

333.    The Injunctive Relief Defendants' unconstitutional administrative policies are a continuing policy and practice and therefore subject Plaintiffs and the Injunctive Relief Class, as well as the public in North Carolina at large, to ongoing risk of deprivations of their constitutional rights. This ongoing risk is evidenced, at minimum, by the fact that similar liberty deprivations are now occurring in Mecklenburg County (which adopted eCourts on October 9, 2023), nearly 8 months after the deprivations identified in this Complaint began.

334.    Considering the balance of hardships between the parties, and the Injunctive Relief Defendants' indifference towards the egregious violations of Plaintiffs' liberty interests, a permanent injunction against the Injunctive Relief Defendants is warranted.

335.    Specifically, the permanent injunction should require the Injunctive Relief Defendants to adopt failsafe procedures that would prevent Fourth and Fourteenth Amendment violations akin to those suffered by Plaintiffs and the Injunctive Relief Class as alleged herein.

336.    Such a permanent injunction would serve the public interest by preventing the Injunctive Relief Defendants from continuing to subject Plaintiffs, the Injunctive Relief Class, and the public to unconstitutional deprivations of liberty.

**Deleted:** <#>The Injunctive Relief Defendants should be permanently enjoined from any further continuation of their policies and practices that have resulted in the violations of Plaintiffs' constitutional rights. Further injunctive relief should be entered requiring the Injunctive Relief Defendants to implement and adopt failsafe procedures to ensure a mechanism exists for immediately remedying future violations of the rights of North Carolinians that arise due to use of the eCourts system, including the violations suffered by Plaintiffs and the Class as alleged herein.¶

**Formatted:** Normal

48

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes pray for the following judgment:

A.    An Order finding in favor of Plaintiffs and the Classes on all causes of action alleged herein;

B.    An Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel as Lead Plaintiffs and Class Counsel to represent the Classes, and directing that reasonable notice of this action be given by Defendants to all class members;

C.    The grant of any reasonable request to amend Plaintiffs' operative Class Action Complaint to conform to the discovery and evidence obtained in this class action lawsuit;

D.    Compensatory damages;

E.    Special damages;

F.    Equitable relief, including the injunctive relief requested herein;

G.    An award of attorney's fees and costs and expenses, as provided by law;

H.    Pre- and post-judgment interest at the highest rate allowed by law; and

H.    Such other and further relief as this Court may deem just, equitable, or proper.

## XII.    JURY DEMAND

Plaintiffs and the Classes demand a trial by jury of the claims asserted in this complaint so triable.

49

## XIII.  REQUEST TO AMEND

Should any Defendants move to dismiss this Complaint, and should the Court grant any such motion, Plaintiffs request that such dismissal be without prejudice and that they be granted an opportunity to amend to address the deficiencies identified in the Court's ruling, if possible.

Respectfully submitted this the 26th day of February, 2024.

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)
Email: ggupta@tinfulton.com
Abraham Rubert-Schewel (NCSB #: 56863)
Email: schewel@tinfulton.com
Zachary William Ezor (NCSB #: 55070)
Email: zezor@tinfulton.com
TIN FULTON WALKER & OWEN PLLC
119 Orange Street
Durham, NC 27701
Telephone: (919) 307-8400

Akeeb Dami Animashaun
355 S Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (929) 266-3971
Email: dami@animashaun.me

*Counsel for Plaintiffs on behalf of*
*themselves and all others similarly situated*

Deleted: 27th

Deleted: October, 2023.

Formatted: Normal

50

**CERTIFICATE OF SERVICE**

  The undersigned attorney hereby certifies that the attorney is, and at all times hereinafter mentioned was, more than eighteen (18) years of age; and that on this day, copies of the foregoing will be served on the following by electronic mail or by the Court's Case Management / Electronic Case Filing ("CM/ECF") system:

Robert Lane
WAKE COUNTY SHERIFF'S OFFICE
330 S. Salisbury Street
Raleigh, NC 27602
Telephone: (919) 856-5380
Email: robert.lane@wake.gov

Roger A. Askew
WAKE COUNTY ATTORNEY'S OFFICE
P.O. Box 550
Raleigh, NC 27602
Telephone: (919) 856-5500
Email: roger.askew@wakegov.com

Gregory L. Skidmore
ROBINSON BRADSHAW
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-8144
Email: gskidmore@robinsonbradshaw.com

Hampton Hunter Brown
ROBINSON BRADSHAW
1450 Raleigh Road, Suite 100
Chapel Hill, NC 27517
Telephone: (919) 328-8800
Email: hbruton@robinsonbradshaw.com

*Counsel for Defendant Willie R. Rowe*

James R. Morgan, Jr.
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3710
Email: Jim.Morgan@wbd-us.com

Garrett Steadman
ROBINSON BRADSHAW
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246
Telephone: (704) 377-8179
Email: gsteadman@robinsonbradshaw.com

*Counsel for Defendant Tyler Technologies, Inc.*

Nicholas David Acevedo
WOMBLE BOND DICKINSON (US) LLP
197 Merrimont Drive
Winston-Salem, NC 27106
Telephone: (908) 329-0300
Email: nick.acevedo@wbd-us.com

*Counsel for Defendant Brian Estes*

*\* \* \* Additional Counsel and Signature Block Appear on Next Page \* \* \**

51

Deleted: Rowe→Counsel for Defendant Tyler Technologies, Inc.

Deleted: ¶

Deleted: One West Fourth Street¶

Deleted: 27101

Deleted: 336) 721-3710

Deleted: Jim.Morgan

Formatted: Indent: First line: 0.5"

Formatted: Normal

Frederick M. Thurman, Jr.
SCHUMAKER, LOOP & KENDRICK, LLP
101 S. Tryon Street, Suite 2200
Charlotte, NC 28280
Telephone: 704-375-0057
Email: fthurman@slk-law.com

*Counsel for Defendant The Ohio Casualty Insurance Company*

Elizabeth Curran O'Brien
NORTH CAROLINA DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-0091
Email: eobrien@ncdoj.gov

*Counsel for Defendants North Carolina Administrative Office of the Courts, Ryan Boyce, Brad Fowler, Blair Williams and Susie K. Thomas*

The undersigned attorney certifies under penalty of perjury that the forgoing is true and correct.

This the 26th day of February, 2024.

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)

*Counsel for Plaintiffs on behalf of themselves and all others similarly situated*

52

1.