IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No. 1:23-cv-00423-WO-JLW

| | |
|---|---|
| TIMIA CHAPLIN; SARAH FIELDS; SAYELINE NUNEZ; THOMAS HAYWARD; KEVIN SPRUILL; ROTESHA MCNEIL; QIANA ROBERTSON; YOUSEF JALLAL; MESSIEJAH BRADLEY; DENNIS KEITH LASSITER; PAULINO CASTELLANOS; ROBERT LEWIS; and ALLEN SIFFORD, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>GARY L. MCFADDEN, officially, as the Sheriff of Mecklenburg County; JOHN DOE SURETY, as surety for the Sheriff of Mecklenburg County; WILLIE R. ROWE, officially, as the Sheriff of Wake County; BRIAN ESTES, officially, as the Sheriff of Lee County; THE OHIO CASUALTY INSURANCE COMPANY, as surety for the Sheriffs of Wake County and Lee County; TYLER TECHNOLOGIES, INC.; RYAN BOYCE, officially, as the Executive Director of the North Carolina Administrative Office of the Courts; BRAD FOWLER, officially, as the eCourts Executive Sponsor and Chief Business Officer of the North Carolina Administrative Office of the Courts; ELISA CHINN-GARY, individually and officially, as the Mecklenburg County Clerk of Superior Court; BLAIR WILLIAMS, individually and officially, as the Wake County Clerk of Superior Court Court; SUSIE K. THOMAS, individually and officially, as the Lee County Clerk of Superior Court; and DOES 1 THROUGH 20, INCLUSIVE,<br><br>*Defendants*. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO TYLER TECHNOLOGIES, INC.'s MOTION TO DISMISS** |

# INTRODUCTION

Tyler Technologies, Inc. (hereafter, "Tyler") executed a $100 million contract with North Carolina to design and implement "eCourts," a customized set of software applications intended to modernize the State's court system. In that contract, Tyler guaranteed that eCourts would "perform without defects."

Shortly into the eCourts rollout, however, it became clear that the software was besieged by defects. As recognized by both NCAOC and the Chief Judge of the Mecklenburg County District Court, these defects caused Plaintiffs and other North Carolinians to be overdetained or arrested on invalid warrants. Worse yet, Tyler knew the software was defective as it had previously been sued for causing these same harms when it launched its software in other states. Even so, Tyler failed to correct the defects. For its negligence, Tyler is liable to Plaintiffs and the classes as alleged in the Second Amended Complaint ("SAC").

The SAC plausibly alleges that Tyler owed a duty to Plaintiffs under North Carolina's longstanding "assumption of duty" doctrine. As articulated by the North Carolina Supreme Court in cases like *Council v. Dickerson's, Inc.*, 233 N.C. 472 (1951) and *Toone v. Adams*, 262 N.C. 403 (1964), those who undertake to perform services to another assume a duty to prevent harms to third parties that could foreseeably result from their performance. Put another way, when Tyler promised to design its software free of the defects that caused Plaintiffs' harms, it assumed a duty to do just that. Plaintiffs plausibly allege that those defects proximately caused their overdetentions and wrongful arrests.

Finally, Tyler's motion to dismiss the SAC's class claims is, at a minimum, premature considering the Court's prior orders in this case.

2

Because the SAC properly alleges facts sufficient to establish Tyler's negligence, this Court should deny Tyler's motion to dismiss (ECF 91) and allow Plaintiffs' claims to proceed.

**BACKGROUND**

Prior to adopting eCourts, North Carolina undertook a years-long review of its outdated court system, deciding that it should follow its peer states in adopting an Integrated Case Management System ("ICMS")—a single-source, digital application used to manage all aspects of court administration. SAC at ¶¶ 56-59. In 2018, the North Carolina Administrative Office of the Courts ("NCAOC") promulgated a Request for Proposal ("RFP") with more than 300 pages of detailed technical requirements for any ICMS. *Id.* at ¶¶ 61-64. Tyler's proposal was ultimately selected, but before recommending Tyler, the selection committee pressed NCAOC to investigate certain legal claims against Tyler that arose out of its work designing and implementing ICMS software in other states. *Id.* at ¶ 69; *see also id.* at ¶ 97 (detailing claims made against Tyler in other states).

On June 7, 2019, Tyler signed a $100 million contract to design and implement the bespoke eCourts platform. *Id.* at ¶¶ 70-71. Pursuant to this contract, Tyler agreed to: (i) develop "eWarrants"—an online warrant repository; and (ii) implement an ICMS known as "Odyssey" that would permit courts to electronically process and manage all case types. *Id.* at ¶ 71. The contract stated: "Tyler warrants that the Tyler Software [eCourts] will perform without Defects during the [contract] term." *Id.* at ¶ 72.

The constituent parts of eCourts were launched separately. eWarrants was implemented statewide in July 2022. *Id.* at ¶ 74. eWarrants was meant to launch one year earlier but was delayed as Tyler struggled with several known defects. *Id.* Odyssey launched in four pilot

3

counties (including Wake County) on February 13, 2023; a fifth county, Mecklenburg, was added on October 9, 2023. *Id.* at ¶¶ 75, 77.

While the adoption of eCourts represented an important step in moving the State into the modern era, it quickly became clear that the software was besieged by defects. *Id.* at ¶ 81. In the five weeks following the adoption of Odyssey in the pilot counties, for example, NCAOC logged and reported to Tyler more than 573 application defects ranging from "minor configuration issues to errors within application processes that cause significant system latency." *Id.* at ¶ 82. These and other defects caused "hundreds of people" to suffer harms in the form of unconstitutional confinements.[1] SAC at ¶¶ 1-3, 230. These harms took two forms.

## A. Overdetentions

**First**, people were held in jail long after their conditions of release were satisfied. The SAC alleges negligence against Tyler (Count I) on behalf of three Mecklenburg County Plaintiffs who suffered this indignity. *Id.* at ¶¶ 101-08 (Sarah Fields); 109-16 (Sayeline Nunez); 117-25 (Thomas Hayward). This claim is also brought on behalf of an "Overdetention Class" defined as:

> **Overdetention Class**: All individuals in the State of North Carolina who, beginning on and including February 13, 2023, and due to Defendants' adoption, implementation and design of eCourts (including eWarrants), were released from jail more than two (2) hours after the basis for their detention ended.

*Id.* at ¶ 229.

---

[1] Tyler repeatedly attempts to cast doubt on the scope of harms in this case by criticizing the SAC for "nam[ing] only thirteen plaintiffs (out of thousands of matters) who allegedly experienced issues." ECF 91 at 8, 12. But the allegation that "hundreds" were harmed must be taken as true. Moreover, Plaintiffs direct the Court to Plaintiffs' Opposition to Sheriff McFadden's Motion to Dismiss for additional publicly-available detail on the numbers of people overdetained in Mecklenburg County. *See* ECF 101 at FN 1.

4

In an email sent on October 17, 2023 at 9:56 PM, eight days after Mecklenburg County adopted Odyssey, Chief District Court Judge Elizabeth Trosch explained how a "defect" in Tyler's software was causing criminal defendants to be "held in custody despite meeting conditions of release." *Id.* at ¶ 91; *see also* ECF 77-4 (SAC **Exhibit D)** (Judge Trosch email). As designed, the software requires court personnel to indicate satisfied or updated conditions of release in eWarrants, which "should then push the [modified release order] into Odyssey Case Manager." *See* SAC **Exhibit D** at 2. Odyssey in turn is used by the jail to determine whether a person should be released. *Id.* at 3. The defect relates to a "known integration issue" between eWarrants and Odyssey, whereby the modified release order "does not migrate from eWarrants to Odyssey," leaving the jail in the dark as to who should be released. *Id.* at 2-3. Within the first four days of eCourts launching in Mecklenburg County, approximately 66 people were overdetained due to this technological error, SAC at ¶ 92, including two of the Mecklenburg County Plaintiffs (the third was overdetained a few months later), *id.* at ¶¶ 108, 116, 125.

B.    Wrongful Arrests

*Second*, people were arrested on warrants that were active in eWarrants without probable cause and without judicial sanction. The SAC alleges negligence against Tyler (Count I) on behalf of nine Plaintiffs who were arrested on such warrants: seven in Wake County, *id.* at ¶¶ 126-201 (Wake County Plaintiffs), and two in counties that adopted eWarrants but had not yet adopted Odyssey at the time of the arrests, *id.* at ¶¶ 213-19 (Robert Lewis); 220-28 (Allen Sifford).[2] This claim is also brought on behalf of a "Wrongful Arrest Class" defined as:

---

[2] The thirteenth Plaintiff, Paulino Castellano, has fully dismissed his claims and is no longer a party to this lawsuit. ECF 98 & 99.

Case 1:23-cv-00423-WO-JLW   Document 103   Filed 05/07/24   Page 5 of 23

> **<u>Wrongful Arrest Class</u>**: All individuals in the State of North
> Carolina who, beginning on and including July 1, 2022, were
> arrested or detained pursuant to warrants that would not have been
> issued but for Defendants' adoption, implementation and design of
> eCourts (including eWarrants).

SAC at ¶ 229. The SAC sets forth the eCourts defects that led to these arrests:

- "In June of 2023, nearly five months into the eCourts rollout, NCAOC staff held a meeting to discuss an 'Urgent Warrant Resets Correction.' Internal NCAOC email correspondence shows that release orders for 179 warrants were 'inadvertently deleted,' leaving them in an unserved status. This meant that individuals who had cleared warrants, or posted bond and been released from jail, were now subject to re-arrest." *Id.* at ¶¶ 85-87.

- Resolved warrants dating as far back as 2001 were "revived" during the transition to eCourts, subjecting people to re-arrest. *Id.* at ¶ 198.

- Much like eWarrants fails to push modified release orders to Odyssey, the latter fails to communicate resolved arrest warrants to eWarrants, in contravention of the software's intended design (and thus leading to re-arrests on invalid warrants). *Id.* at ¶ 144.

While Tyler, NCAOC and the public continue to learn more about the defective eCourts software,[3] *id.* at ¶ 93, Tyler nevertheless moved to dismiss Plaintiffs' negligence claim. Tyler

---

[3] Judges and court staff expressed serious reservations before the launch of eCourts. *Id.* at ¶ 78. Those reservations continue. *See* Clayton Henkel, *North Carolina District Attorneys Call for a Pause of Multi-Million Dollar eCourts System*, NC Newsline (Apr. 5, 2024), https://ncnewsline.com/2024/04/05/north-carolina-district-attorneys-call-for-a-pause-of-multi-million-dollar-ecourts-system/.

argues that the SAC does not adequately plead the required elements of duty and proximate causation. ECF 91 at 8-9. Tyler also seeks to dismiss the class claims. *Id.* at 9. But as the extensive allegations in the SAC and detailed herein make clear, the complaint amply satisfies the Rule 12 pleading standard and Tyler's motion should be denied.

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests only "the sufficiency of a complaint." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). In conducting its review, the Court must accept as true all well-pleaded allegations and draw all reasonable inferences in Plaintiffs' favor. *Id.*

While "legal conclusions" and "conclusory statements" do not suffice, a complaint should withstand dismissal if it contains "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

## ARGUMENT

### I.     Plaintiffs' Negligence Claim Is Adequately Pled.

To state a negligence claim against Tyler, Plaintiffs must show "(1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach." *Tise v. Yates Const. Co., Inc.*, 345 N.C. 456, 461-62, 480 S.E.2d 677, 680 (1997). Tyler's central argument is that because it is a software vendor that contracted with NCAOC, and it is that agency and other state actors "[who] actually use the software for daily operations," ECF 91 at 15, Tyler is insulated from any duty to Plaintiffs and could not have proximately caused their harms. But the allegations in the SAC, if taken as true, plausibly allege both duty and proximate causation.

7

### A. Tyler Owes a Duty to Plaintiffs.

#### i. Tyler owes a common-law duty to Plaintiffs because their harms were foreseeable.

Tyler owes Plaintiffs a common-law duty because it was foreseeable that Plaintiffs would be harmed by Tyler's defective software. The touchstone for the creation of a tort duty is foreseeability. This duty arises any time "the defendant might have foreseen that some injury would result from his conduct or that consequences of a generally injurious nature might have been expected." *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010). "Usually the question of foreseeability is one for the jury," meaning that the existence of duty is a fact-intensive inquiry that must be determined based on the specific circumstances of a given case. *Id.* (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928) ("The risk reasonably to be perceived defines the duty to be obeyed")).

Here, Tyler knew that defects in its eCourts software created a foreseeable risk that Plaintiffs would be overdetained or arrested on invalid warrants. People in other states suffered these exact harms after Tyler designed and implemented its court-management software in those states. SAC at ¶¶ 97-99. In 2016, for example, after Alameda County, California adopted Odyssey, "public defenders . . . identified dozens of cases in which individuals had been wrongfully arrested [or] detained when they should have been released." *Id.* at ¶ 97(d). In Shelby County, Tennessee, a class action initiated in 2016 against Tyler alleged that a "transition to Odyssey led to overdetention[s] [and] wrongful arrest[s]." *Id.* at ¶ 97(e). In that lawsuit, some plaintiffs were overdetained because, for example, orders for release were "not in the Computer System." *See Turnage v. Oldham*, 346 F. Supp. 3d 1141, 1148 (W.D. Tenn. 2018). Others were

8

arrested because "the Odyssey System failed to reflect" that arrest warrants "had been recalled." *Id.* at 1149.[4]

Tyler's mishaps in California, Tennessee and the other states detailed in the SAC put Tyler on express notice that the same risks could materialize in North Carolina absent due care.[5] Plaintiffs' harms were foreseeable. Under North Carolina law, this foreseeability gives rise to a common-law duty requiring Tyler to exercise reasonable care in designing and implementing its software. For this reason alone, the negligence claim against Tyler cannot be dismissed for failure to plead duty.

> ii. **Tyler assumed a duty to Plaintiffs when it agreed to design and implement eCourts free of defects.**

Because Tyler owes a common law duty to Plaintiffs under general tort principles, the Court need not consider whether Tyler also assumed a duty to Plaintiffs. Nonetheless, it is clear that Tyler did assume such a duty when it undertook to design and implement eCourts free of defects.

North Carolina has "consistently recognized" the common law "assumption of duty" doctrine. *Lampkin v. Hous. Mgmt. Res.*, 220 N.C. App. 457, 465, 725 S.E.2d 432, 438 (2012). Under this doctrine, one who undertakes to perform services to another assumes a special duty of reasonable care to prevent foreseeable harms to third parties (like Plaintiffs) that could be caused

---

[4] Tyler did not challenge the duty element in the Tennessee lawsuit, recognizing that Tyler can owe duties to people harmed by its defective software. *Id.* at 1151 ("Tyler does not directly challenge the duty, breach, or injury elements of negligence.").

[5] At minimum, the harms to Plaintiffs were foreseeable after the first few days of the eCourts pilot when the software defects became indisputably apparent, after which Tyler nevertheless forged ahead without correcting those defects, subjecting people in additional North Carolina counties like Mecklenburg to the same harms. *See, e.g.*, SAC at ¶¶ 4-5, 75, 88-93, 99, 101-125.

by those services. *Quail Hollow E. Condo. Asso. v. Donald J. Scholz Co.*, 47 N.C. App. 518, 522, 268 S.E.2d 12, 15 (1980).

The doctrine has been adopted and reaffirmed by the North Carolina Supreme Court. In *Council v. Dickerson's, Inc.*, which is binding on this Court, the Supreme Court evaluated a tort claim against a contractor hired by the State Highway and Public Works Commission for injuries caused by the contractor's negligent performance of its contractual agreement to pave a highway. 233 N.C. 472, 474-75, 64 S.E.2d 551, 553 (1951). Although the injured plaintiff was not in privity with the contracting parties, the Court nonetheless imposed a duty on the contractor because "[w]hen the [contractor] undertook to perform the promised work under his contract with the State . . ., the positive legal duty devolved upon him to exercise ordinary care for the safety of the general public traveling over the road on which he was working." *Id.* Stated plainly, the contractor assumed a duty to the general public. As the Court explained:

> The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence. It is immaterial whether the person acts in his own behalf or under contract with another.

*Id.* As the Supreme Court later affirmed, "[i]t is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action . . . in tort if he has been injured as a result of its negligent performance." *Toone v. Adams*, 262 N.C. 403, 407, 137 S.E.2d 132, 135 (1964) (citing *Council v. Dickerson's, Inc.*, 233 N.C. 472, 64 S.E.2d 551).

So too here, Tyler assumed a positive legal duty to Plaintiffs. Tyler participated in an extensive bidding process before agreeing to a $100 million contract with NCAOC to develop a customized software suite for North Carolina, including the bespoke eWarrants platform and an

10

ICMS named Odyssey. SAC at ¶¶ 61-63, 70-71, 240. Crucially, Tyler warranted "that the Tyler Software [eCourts] will perform without Defects during the [contract] term." *Id.* at ¶ 72 (quoting ECF 77-2, **Exhibit B** at 18 (subsection (e))). The State and the general public relied, and had a right to rely, on Tyler's promise to fulfill these contractual obligations. And Tyler knew about the foreseeable risk of harm to Plaintiffs if it failed to exercise reasonable care in ensuring eCourts was free of defects. Accordingly, Tyler assumed a duty of reasonable care to prevent these foreseeable harms from befalling Plaintiffs.[6]

The North Carolina Court of Appeals has also affirmed the "assumption of duty" doctrine. In *Quail Hollow*, the Court examined whether a homeowner's association could sue an architect for negligent design even where no contract existed between the homeowner's association and the architect. 47 N.C. App. at 521-22, 268 S.E.2d at 15. In holding that the architect had a duty to the third-party association, the Court noted that "under certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person, or his property, is subject to liability to the third person, for injuries resulting from his failure to exercise reasonable care in such undertaking." *Id.*

The *Quail Hollow* court, like many North Carolina courts, endorsed and relied upon the Restatement (Second) of Torts § 324A in reaching its decision. *Id.* Consistent with this section of the Restatement, North Carolina courts have held that even in the absence of privity, the rendering of services can give rise to an assumed legal duty of care to a third party. *See, e.g.*,

---

[6] According to Tyler, the SAC alleges "that Tyler's contractual obligations to NCAOC are somehow owed to Plaintiffs," and that it is "unaware of any cases recognizing a special relationship duty under similar circumstances." ECF 91 at 14-15. Tyler misapprehends the import of its contract. Plaintiffs' negligence claim is not based on breach of the contract, but on negligent *performance* of the contract, and that negligence constitutes a breach of duty *imposed by tort law*. "This duty exists independent of the contract." *White v. Collins Bldg., Inc.*, 209 N.C. App. 48, 51, 704 S.E.2d 307, 309 (2011).

11

*Davidson & Jones, Inc. v. Cty. of New Hanover*, 41 N.C. App. 661, 667, 255 S.E.2d 580, 584 (1979) (imposing on architects a duty to prevent foreseeable harms to general contractors despite that architects contract with property owners, not general contractors); *White*, 209 N.C. App. at 51, 704 S.E.2d at 209 ("The lack of privity between a subsequent purchaser of a home and the builder of the home does not bar the purchaser's negligence claim against the builder."); *Mozingo v. Pitt Cty. Mem'l Hosp., Inc.*, 101 N.C. App. 578, 587, 400 S.E.2d 747, 752 (1991) ("The duty of vigilance to prevent injury has its source in the law applicable to human relations rather than in a narrow conception of privity." (quoting 57A Am. Jur. 2d Negligence § 93 (1989))); *Hill v. James Walker Mem'l Hosp.*, 407 F.2d 1036, 1041 (4th Cir. 1969) (holding that North Carolina would not require privity as a prerequisite to a tort action on a service contract); *Watkins v. Ashley*, No. 5:13-CV-221-F, 2014 U.S. Dist. LEXIS 14906, at *7 (E.D.N.C. Feb. 6, 2014) (same); *see also cf. Tuel v. Hertz Equip. Rental Corp.*, 508 F. App'x 212, 216-20 (4th Cir. 2013) (surveying Virginia caselaw to determine that "once [defendant] began to render services under a lease, [it] assumed a duty to foreseeable third parties to exercise reasonable care in performing those services to avoid physical injury.").

The North Carolina Supreme Court's holdings in *Council v. Dickerson's* and *Toone v. Adams* remain good law and are binding on the federal courts. As these cases make clear, even in the absence of privity, those performing services owe a duty of care when there is a foreseeable risk of harm to third parties arising out of the performance. So, too, of the North Carolina appellate cases that followed. As explained above, deprivation of Plaintiffs' physical liberty was

12

a foreseeable risk of Tyler's performance of its contractual obligations with NCAOC. Tyler therefore assumed a duty to Plaintiffs to exercise reasonable care to avoid that risk.[7]

Because Tyler owes Plaintiffs a duty under both general common law principles and North Carolina's longstanding "assumption of duty" doctrine, Plaintiffs' adequately plead this element of negligence against Tyler.

### B. Tyler Proximately Caused Plaintiffs' Harms.

Plaintiffs must also show that Tyler's conduct was the proximate cause of their harms. *Draughon v. Evening Star Holiness Church of Dunn*, 374 N.C. 479, 482, 843 S.E.2d 72, 76 (2020). Tyler argues that the SAC fails in this respect because it "point[s] to the conduct of many state actors – not Tyler," whose role as a mere "software vendor" was "too attenuated." ECF 91 at 20-21. Tyler is wrong.

For starters, Tyler's attempt to divert attention from Plaintiffs' well-pled allegations should not be credited. The SAC sets out extensive allegations against Tyler, including the myriad design defects in its software. *See, e.g.*, SAC at ¶¶ 74, 81-87, 91-92, 142-46, 198. The additional allegations against the state actors do not relieve Tyler of liability because Rule 8 permits pleading multiple theories of liability, even if those theories conflict. Fed. R. Civ. P. 8; *see also* ECF 101 at 10-11 (Plaintiffs' Opposition to Defendant Sheriff McFadden's Motion to Dismiss). Nor can Tyler hide behind its purported role as a mere "software vendor," a

---

[7] Tyler acknowledges that the Restatement (Second) of Torts is instructive in discerning duty under North Carolina law but argues for application of a different section of the Restatement: Section 315. ECF 91 at 16. Tyler's sole argument contesting duty, to which it devotes several pages, is that neither Section 315 nor related caselaw impose any duty to control the conduct of third parties—here, the "various government authorities [who] actually use the software . . . to protect Plaintiffs against third-party harms." *Id.* at 15-16. Tyler's argument is perplexing. Tyler is not obligated to control the government actors upon whom it attempts to shift blame for Plaintiffs' harms. Rather, Tyler is obligated to control *its own conduct* in performing its contractual warranties. Section 315 and related cases are irrelevant.

13

characterization belied by the allegations that Tyler designed a bespoke platform to the specifications of the State's 300-page RFP. SAC at ¶¶ 61-63, 70-71. Even Tyler admits that it "configured [the software] for North Carolina." ECF 91 at 28. It just did so defectively.

These defects were the proximate cause of Plaintiffs' harms. "[T]he test of proximate cause is whether the risk of injury, not necessarily in the precise form in which it actually occurs, is within the reasonable foresight of the defendant." *Martishius v. Carolco Studios, Inc.*, 355 N.C. 465, 479, 562 S.E.2d 887, 896 (2002). "[P]roximate cause is ordinarily a question of fact for the jury." *Estate of Long v. Fowler*, 378 N.C. 138, 150, 861 S.E.2d 686, 696 (2021). Some North Carolina courts have required that the defendant's conduct be "a substantial factor in bringing about the harm." *See, e.g.*, *Seraj v. Duberman*, 248 N.C. App. 589, 598, 789 S.E.2d 551, 557 (2016).

As explained above, Plaintiffs' harms were foreseeable. *See supra* Part I-A(i). Tyler's conduct was also a substantial factor in bringing about those harms. With respect to overdetentions, Chief Judge Trosch explained in exacting detail how the "known integration issue between eWarrants and Odyssey" was a central cause of the Mecklenburg County overdetentions. SAC at ¶ 91 & **Exhibit D**. Tyler suggests that this defect "was a problem only if magistrates and clerks do not update the system, or if the magistrate fails to look under the correct tab." ECF 91 at 25-26. Tyler has it backwards. These contingencies were "*workarounds*" adopted by Chief Judge Trosch "*to correct*" the software defects. *See* SAC **Exhibit D** at 3 (emphasis added). The three Mecklenburg County Plaintiffs allege that this "known integration issue" caused their overdetentions. SAC at ¶¶ 108, 116, 125. But for these defects, these Plaintiffs would have been timely released from detention, as others were prior to eCourts. *Id.* at

14

¶¶ 91-92. Taken as true, these allegations amount to a plausible claim that Tyler's defective product was the proximate, substantial cause of the overdetentions.

The same is true for the wrongful arrests. The SAC alleges that (i) eCourts inadvertently deleted release orders, subjecting people with cleared warrants to rearrest, *id.* at ¶¶ 85-87; (ii) cleared warrants were "revived" during the transition to eCourts, *id.* at ¶ 198; and (iii) Odyssey failed to communicate resolved arrest warrants to eWarrants (which is used by law enforcement), "in contravention of the software's intended design," *id.* at ¶ 144. The SAC alleges that these defects led to the wrongful arrests of the seven Wake County Plaintiffs and two Statewide Plaintiffs. *Id.* at ¶¶ 243-44.

In the case of Plaintiff Timia Chaplin (Wake County), for example, the charges brought against her were dismissed including a warrant for failure to appear, and her case designated in Odyssey as "resolved." *Id.* at ¶ 142. But because Odyssey failed to communicate that resolution to eWarrants, in contravention of the software's intended design, Ms. Chaplin was re-arrested on a warrant that remained active in eWarrants without probable cause. *Id.* at ¶ 144. Similarly, Plaintiff Allen Sifford (Gaston County) was arrested and held for more than 48 hours despite that the underlying charges against him had previously been dismissed. *Id.* at ¶¶ 220-28. The arresting officer informed Mr. Sifford that his old warrant still appeared "active" in eWarrants. *Id.* at ¶ 226. These examples, taken together with the general allegations regarding the warrant-related defects embedded in the eCourts software, make it plausible that every wrongful arrest alleged in the SAC was proximately caused by Tyler.

Recognizing the strength of the allegations regarding defects, Tyler attempts to discredit those allegations as based on "outside statements about eCourts." ECF 91 at 25. That these statements are incorporated into the SAC does not render them insufficient to show that the

software was defective. On the contrary, the statements bolster that showing. Unlike the plaintiff in the case cited by Tyler, Plaintiffs here do not simply recite the elements of their cause of action and "ask[] the court *to assume* that it was defendants' conduct that ultimately caused [the harms]." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013) (emphasis altered). Plaintiffs incorporate correspondence from authoritative sources like Chief Judge Trosch and NCAOC to *show* that it was Tyler's conduct that plausibly caused the harms.

Like in the Tennessee litigation, Plaintiffs' allegations regarding "Tyler's failure to . . . design its software properly is more than a mere 'philosophical cause' of Plaintiffs' [harms]," and thus, these allegations plausibly establish "a sufficient factual basis to establish . . . proximate causation." *Turnage*, 346 F. Supp. at 1155-56. Because the SAC adequately pleads both duty and proximate causation, Tyler's motion to dismiss the negligence claim should be denied.

## II. Tyler's Request to Dismiss the Class Claims Is Premature, and In Any Event, the Class Claims Are Adequately Pled.

Plaintiffs also bring their negligence claim on behalf of two distinct classes. SAC at ¶ 238. The "Overdetention Class" is defined as individuals "who, . . . due to Defendants' adoption, implementation and design of eCourts (including eWarrants), were released from jail more than two (2) hours after the basis of their detention ended." *Id.* at ¶ 229. The "Wrongful Arrest Class" is defined as individuals "who, . . . were arrested or detained pursuant to warrants that would not have been issued but for Defendants' adoption, implementation and design of eCourts (including eWarrants)." *Id.*

In addition to seeking dismissal of Plaintiffs' individual negligence claims, Tyler seeks pre-discovery dismissal of the class claims. ECF 91 at 31-41. Tyler's motion to dismiss the class claims is premature, and in any event, Plaintiffs adequately plead the class claims.

16

As courts in this circuit have made clear—including in the cases cited by Tyler—dismissing class claims prior to discovery is highly disfavored. "[C]lass allegations should generally be struck before the completion of discovery *only* when it is apparent from the face of the complaint that 'the requirements for maintaining a class action *cannot be met*.'" *Williams v. Potomac Family Dining Grp. Operating Co., LLC*, No. GJH-19-1780, 2019 U.S. Dist. LEXIS 181604, at *16 (D. Md. Oct. 21, 2019) (emphasis added). Accordingly, Defendants bear the burden and must show that "plaintiff . . . '*could establish no facts* to make out a class.'" *Id.* at *17; *see also Cty. of Dorchester v. AT&T Corp.*, 407 F. Supp. 3d 561, 565 (D.S.C. 2019) ("[D]efendants have the burden of demonstrating from the face of the plaintiffs' complaint that it will be **impossible** to certify the classes alleged . . . ." (emphasis added)); *Bryant v. Food Lion, Inc.*, 774 F. Supp. 1484, 1495 (D.S.C. 1991) (describing the required showing as a "heavy burden" for defendants). This standard "is consistent with the principle that 'a ruling on class certification should normally be based on more information than the complaint itself affords,'" and therefore imposes a "relatively low bar to proceed to discovery." *Williams*, 2019 U.S. Dist. LEXIS 181604, at *17.

Cognizant of these principles, and mindful of proposed revisions to Local Rule 23.1(b), this Court postponed Plaintiffs' class certification motion deadline until after resolution of all motions to dismiss. Earlier in this litigation, Plaintiffs moved for certification, but only to comply with the timeframes set forth in the prior version of Local Rule 23.1(b).[8] *See* ECF 53 (motion for class certification); 58-62 (oppositions); 72 (reply). During a subsequent status conference, however, the Court granted leave to file the SAC and reset the certification motion

---

[8] That version required plaintiffs to move for class certification "[w]ithin 90 days after the filing of a complaint in a class action."

deadline for *after* entry of an initial pretrial order. *See* ECF Minute Entry & Oral Order (Feb. 27, 2024). During the status conference, the Court noted that the proposed revisions to Local Rule 23.1(b) (which have since been adopted) would similarly postpone class certification deadlines, and the Court reiterated its "general preference . . . to address the class action question after any motion to dismiss is resolved." *See* ECF 36 at 2.

Resolution of Plaintiffs' class claims is therefore premature at this juncture, as indicated by the Court's general preference and related postponement of the class certification deadline. Tyler's motion is also premature because following the Supreme Court's landmark decision in *Wal-Mart Stores, Inc. v. Dukes*, 64 U.S. 338 (2011), precertification discovery has become the norm. *See Gariety v. Grant Thornton*, LLP, 368 F.3d 356, 365 (4th Cir. 2004); *Cty. of Dorchester*, 407 F. Supp. 3d at 568 (explaining that plaintiffs are "generally entitled to pre-certification discovery" (cleaned up)).[9] As another defendant in this lawsuit has noted, "'it is seldom, if ever, possible to resolve class representation questions from the pleadings.'" ECF 58 at 2 (Defendant Sheriff Rowe quoting *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1268 (4th Cir. 1989)). And in this case, there is every indication that the evidence brought forth in pre-certification discovery will confirm the propriety of class certification. At minimum, discovery will better enable this Court to conduct the "rigorous analysis" that Rule 23 requires. *Gariety*, 368 F.3d at 367 (admonishing district court for "defaulting on [its] important responsibility [to] carefully determin[e] . . . class action issues").

---

[9] *See also* 6A Fed. Proc., L. Ed. § 12:268 ("Because the propriety of a class action often cannot be determined without discovery, the better and more advisable practice for a district court to follow is to afford the litigants an opportunity to present evidence as to whether a class action was maintainable.").

18

As Sheriff Rowe rightly puts it, a certification ruling would be "premature" absent "some discovery." ECF 58 at 4.

If the Court does choose to reach the merits of Tyler's motion at this premature stage, Tyler comes nowhere close to meeting the exacting burden of showing that it would be **impossible** to certify the Overdetention and Wrongful Arrest classes. Tyler's principal argument is that Plaintiffs' negligence claim requires individualized inquiries to determine whether each alleged overdetention or arrest was "unlawful." ECF 91 at 33. Tyler miscomprehends the nature of Plaintiffs' class claims. The predominant inquiry involves whether injuries to the class can be traced to a common source—namely, "*[Tyler's] implementation and design* of eCourts (including eWarrants)." SAC at ¶ 229 (emphasis added). And as the class definitions make clear, this predominant inquiry can be answered on a class-wide basis.

Inclusion in the Overdetention Class, for example, turns on whether an individual was released more than two hours after the basis for detention ended. *Id.* at ¶ 229. This inquiry is subject to common proof. Members of the class "posses[] a . . . right to freedom from imprisonment [within] a reasonable time after they were [entitled to release]"—here, two hours. *Berry v. Baca*, 379 F.3d 764, 773 (9th Cir. 2004). This inquiry does not turn on individualized questions of whether a given overdetention was lawful, but rather on how long it should take a jail, as a general matter, to complete the administrative steps attendant to release. Courts have found that this determination is subject to common proof and does not counsel against certification. *See e.g.*, *Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 491 (7th Cir. 2017) (certifying class and finding that "[e]vidence in the record indicates that the average time period to effect . . . a release is 2-4 hours in counties in general"); *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 278-79 (D.D.C. 2011) ("Looking at the evidence" and concluding that the District

19

of Columbia's "release process should take from 2 to 2.5 hours to complete."); *cf. State v. Lemus*, 273 N.C. App. 155, 158, 848 S.E.2d 239, 241-42 (2020) ("[O]nce the conditions of . . . release are satisfied, the [jailer] must immediately release the defendant. This is . . . mandatory, not optional."); N.C. Gen. Stat. § 15A-537 (jailers "must effect . . . release" once conditions have been met).

The Seventh Circuit's recent opinion in *Driver* is instructive. In that case, as here, the named plaintiffs sought to certify a class of people overdetained due to defects in newly-adopted computer software at a county jail. 859 F.3d at 494-95. The class was defined to include "all individuals who . . . were victims of the computer issues spawned by" the software's adoption. *Id.* In reversing the district court's denial of class certification, the Seventh Circuit recognized that evidence adduced during discovery—specifically "evidence of a dramatic increase in detention times in correlation with the implementation of the computer system"—bolstered the case for certification under Federal Rule 23. *Id.* at 494.

Discovery in this case will also adduce the time it should take for a jail to release people whose conditions of release have been satisfied. And like in *Driver* and *Barnes*, this inquiry is subject to common, class-wide proof. Nor are individualized inquiries required into the cause of the overdetentions given that they can all be traced to a common source: defects in Tyler's software including the "known integration issue" identified by Chief Judge Trosch.[10]

Tyler's motion to dismiss the class claims is premature. Even if the motion is ripe, the class claims are adequately pled. For these reasons, and for the additional reasons stated in

---

[10] This same analysis applies to the claim brought by the Wrongful Arrest Class. Membership in the class turns on whether an individual was arrested "pursuant to warrants *that would not have been issued but for* [Tyler's] . . . implementation and design of eCourts (including eWarrants)." SAC at ¶ 229 (emphasis added). This inquiry is subject to common, class-wide proof. Discovery will affirm that software defects caused the issuance of these sham warrants.

Plaintiffs' prior class certification motion briefing incorporated by reference herein, *see* ECF 53 & 72, Tyler's motion to dismiss the class claims should be denied.

## **CONCLUSION**

Plaintiffs have plausibly alleged negligence against Tyler on behalf of themselves and the class. Tyler's motion to dismiss should therefore be denied.

Respectfully submitted this the 7th day of May, 2024.

/s/ Gagan Gupta
Zachary Ezor (NCSB #: 55070)
Email: zezor@tinfulton.com
Gagan Gupta (NCSB #: 53119)
Email: ggupta@tinfulton.com
Abraham Rubert-Schewel (NCSB #: 56863)
Email: schewel@tinfulton.com
TIN FULTON WALKER & OWEN PLLC
119 Orange Street
Durham, NC 27701
Telephone: (919) 307-8400

*Counsel for Plaintiffs on behalf of themselves and all others similarly situated*

## CERTIFICATE OF WORD COUNT

I certify that the foregoing complies with all style and word-count requirements set forth in the Local Rules, including Local Civil Rule 7.3(d)(1). Specifically, the brief does not exceed 6,250 words, as reported by our word-processing software.

/s/ Gagan Gupta
Gagan Gupta

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's CM/ECF

system, which will automatically notify all counsel of record.

This 7th day of May, 2024.

/s/ Gagan Gupta
Gagan Gupta