IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TIMIA CHAPLIN; SARAH FIELDS;     )
SAYELINE NUNEZ; THOMAS HAYWARD; )
KEVIN SPRUILL; ROTESHA MCNEIL;   )
QIANA ROBERTSON; YOUSEF JALLAL; )
MESSIEJAH BRADLEY; DENNIS KEITH  )
LASSITER; PAULINO CASTELLANOS;   )
ROBERT LEWIS; and ALLEN SIFFORD,)
on behalf of themselves and all )
others similarly situated,       )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )        1:23-cv-423
                                 )
GARY L. MCFADDEN, officially,    )
as the Sheriff of Mecklenburg    )
County; JOHN DOE SURETY, as      )
Surety for the Sheriff of        )
Mecklenburg County; WILLIE       )
R. ROWE, officially, as the      )
Sheriff of Wake County; THE OHIO)
CASUALTY INSURANCE COMPANY, as   )
Surety for the Sheriff of Wake   )
County; and TYLER TECHNOLOGIES, )
INC.,                            )
                                 )
          Defendants.            )


<u>**MEMORANDUM OPINION AND ORDER**</u>

**OSTEEN, JR., District Judge**

     Before this court is Defendant Willie R. Rowe's Motion to

Dismiss Second Amended Complaint, (Doc. 88), Defendant Tyler

Technologies, Inc.'s Motion to Dismiss Plaintiffs' Second

Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), (Doc.

90), and Defendant Gary L. McFadden's Motion to Dismiss

Plaintiffs' Second Amended Complaint, (Doc. 95). For the reasons stated herein, Defendant Rowe's motion will be granted, Defendant Tyler Technologies' motion will be denied, and Defendant McFadden's motion will be denied.

I. **FACTUAL BACKGROUND**

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (citation omitted). The facts, taken in the light most favorable to Plaintiff, are as follows.

A. **Background**

This putative class action arises out of a series of alleged problems in the implementation and maintenance of North Carolina's digital court filing system, ("eCourts"). In September 2015, the Chief Justice of the North Carolina Supreme Court asked the North Carolina Commission on the Administration of Law and Justice (the "Commission") to review North Carolina's court system and recommend improvements. (Second Am. Compl. ("SAC") (Doc. 77) ¶ 56-57). The Commission recommended that North Carolina adopt an "Integrated Case Management System" ("ICMS"), a "single-source, digital application[] used to manage all aspects of court administration." (Id. ¶ 58-59.)

- 2 -

In spring 2018, the North Carolina Administrative Office of the Courts ("NCAOC") reported that the North Carolina Judicial Branch would partner with the National Center for State Courts to draft a Request for Proposal ("RFP") for an ICMS. (Id. ¶ 61.) A finalized RFP was posted to the public in August 2018. (Id. ¶ 64.) Vendor-submitted proposals in response to the RFP were due by October 2018. (Id.) A vendor selection committee evaluated those vendor proposals, and ultimately recommended Tyler Technologies, Inc. to implement an ICMS in the North Carolina court system, although "advised NCAOC to investigate certain legal claims involving Tyler Technologies before making any binding commitments." (Id. ¶ 68-69.) According to Plaintiffs, other counties in the country who had contracted with Tyler Technologies for court administration software experienced problems with the software. (See id. ¶ 97.)

On June 7, 2019, NCAOC and Tyler Technologies entered into a contract for a software application package, ("eCourts"). (Id. ¶ 70.) In this contract, Tyler Technologies agreed to

    a. develop eWarrants—an online warrant repository bespoke to North Carolina;

    b. implement an ICMS—known by the shorthand "Odyssey"— that would allow courts to electronically process and manage all case types;

    c. host its software in the cloud, thereby allowing NCAOC to retire its own mainframe; and

- 3 -

d. respond to incidents and timely resolve defects in
        its systems.

(Id. ¶ 71.) Further, Tyler Technologies warranted that "the
Tyler Software will perform without Defects during the term of
this Contract. If the Tyler Software does not perform as
warranted, Tyler will use all reasonable efforts, consistent
with industry standards, to cure the Defect." (Pls.' Ex. B,
Service Level Agreement[1] (Doc. 77-2) at 18.)[2]

        In July 2022, the eWarrants software was implemented
statewide, after delays resulting from "problems with
eWarrants." (SAC (Doc. 77) ¶ 74.) According to Plaintiffs,
"eWarrants was intended to maintain detailed information about
magistrate and other judicial orders, criminal summonses, orders
for arrest, release orders and appearance bonds." (Id.) On
February 13, 2023, Odyssey, the electronic case management
software, was implemented in four "pilot counties" — Wake

─────────────

        [1] "It is well established that a court may 'consider
documents . . . attached to the motion to dismiss, so long as
they are integral to the complaint and authentic.'" Six v.
Generations Fed. Credit Union, 891 F.3d 508, 512 (4th Cir. 2018)
(citation omitted). The contract between Tyler Technologies and
NCAOC is integral to the complaint because it discusses Tyler
Technologies' role in the implementation and maintenance of the
eCourts software, which is at the heart of this dispute.
Further, the parties do not dispute its authenticity.
Accordingly, this court may consider this contract.

        [2] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

                              - 4 -

County, Lee County, Harnett County, and Johnston County. (Id. ¶¶ 75, 77.)[3] After the adoption of Odyssey in a county, attorneys are required to file pleadings and other documents through Odyssey, without exception. (Id. ¶ 76.)

In the weeks following Odyssey's implementation in the pilot counties, "NCAOC logged (and reported to Tyler Technologies) more than 573 software application defects," (id. ¶ 82), including what the NCAOC Director referred to as "several high priority defects that must be resolved prior to further expansion," (Pls.' Ex. C, Ryan Boyce Letter (Doc. 77-3) at 5).[4] In June 2023, NCAOC staff met to discuss an "Urgent Warrants Reset Correction," (id. ¶ 85), related to release orders for 179 warrants being "inadvertently deleted," (id. ¶ 86). According to Plaintiffs, this issue meant that "individuals who had cleared

---

[3] Plaintiffs state in the SAC that "eCourts launched in the pilot counties" on February 13, 2023. (SAC (Doc. 77) ¶ 77.) However, Plaintiffs also state that "eWarrants was implemented statewide in July 2022, prior to the adoption of Odyssey." (Id. ¶ 74.) Plaintiffs have explained that "eCourts" is an umbrella term for a software package that includes both eWarrants and Odyssey. (Id. ¶ 71.) Because eWarrants was implemented statewide in July 2022, this court construes the statement regarding the implementation of eCourts on a later date to mean the remaining program of the eCourts package, Odyssey, was implemented on this date.

[4] This document is integral to the complaint. The letter, written by the Director of NCAOC, acknowledges defects in the eCourts software, which Plaintiffs allege caused their injuries. Further, the parties do not dispute its authenticity. Accordingly, this court may consider it. See supra n.1.

warrants, or posted bond and been released from jail, were now subject to re-arrest." (Id. ¶ 87.)

A fifth county, Mecklenburg County, launched Odyssey[5] months after the pilot counties on October 9, 2023.[6] (Id. ¶ 89.) Plaintiffs allege that during this time, "a known 'integration issue' between eWarrants and Odyssey" existed, which "caused many criminal defendants to be 'held in custody despite meeting the conditions of release.'" (Id. ¶ 91.) According to Plaintiffs, in the "first four days following the launch of

---

[5] Again, Plaintiffs allege that on this date, Mecklenburg County launched "eCourts," but as discussed supra n.3, Plaintiffs have alleged that eWarrants was launched statewide in July 2022, so this court construes the allegation to mean that Odyssey was launched this day.

[6] Plaintiffs allege that "eCourts launched in Mecklenburg County on October 9, 2023." (SAC (Doc. 77) ¶ 89). But Plaintiffs also attach an email, sent on October 17, 2023, from the Mecklenburg County Chief Judge, in which she states: "We are eight days from the launch of Odyssey in Mecklenburg County . . . ." (Pls.' Ex. D, Chief Judge Email (Doc. 77-4) at 2). This email implies that the launch of Odyssey in Mecklenburg County was October 25, 2023. It is not clear to this court whether there was a preliminary launch of Odyssey in Mecklenburg County on October 9 or whether the only launch was October 25. The date is critical, because two of the three Mecklenburg County Plaintiffs allege that they were injured the week of October 9 because of an issue involving Odyssey. (See SAC (Doc. 77) ¶¶ 103-08; id. ¶¶ 111-16.) If Odyssey was not launched until October 25, it could not have been the causal impetus for their injuries. Despite this ambiguity, in "draw[ing] all reasonable inferences in favor of the plaintiff," Ray, 948 F.3d at 226, this court construes, for purposes of this motion and subject to clarification at later stages of this litigation, that Odyssey was launched in Mecklenburg County on October 9, 2023, as alleged by Plaintiffs.

eCourts in Mecklenburg County, and due to these technological defects, approximately 66 people were detained well beyond the point their conditions of release were satisfied." (Id. ¶ 92.) The Mecklenburg County Chief Judge sent an email to many recipients, including Mecklenburg County Sheriff, Defendant McFadden, on October 17, 2023, acknowledging this "integration issue between eWarrants and Odyssey" and suggesting manual procedures for clerks and magistrates to correct discrepancies. (See Pls.' Ex. D, Chief Judge Email (Doc. 77-4) at 2-3.)[7]

**B.    Facts as to the Named Plaintiffs[8]**

**1.    Mecklenburg County**

There are three named Plaintiffs who allege injury in Mecklenburg County.

Plaintiff Sarah Fields was arrested on October 7, 2023, and held on bond at the Mecklenburg County Detention Center

---

[7] This document is integral to the complaint as it acknowledges defects in the eCourts software. The parties do not dispute its authenticity. Accordingly, this court may consider it. See supra n.1.

[8] In Plaintiffs' SAC, named Plaintiff Paulino Castellanos brought claims against Defendant Tyler Technologies, Inc., (SAC (Doc. 77) ¶ 238), Defendant Sheriff Estes and his surety, (id. ¶¶ 250, 301, 328), and Defendant Susie K. Thomas, the Lee County Clerk of Superior Court, (id. ¶ 311). Plaintiff Castellanos has dismissed his claims against Sheriff Estes, (Doc. 98), Tyler Technologies, (Doc. 99), and Susie K. Thomas, (Doc. 100). Because Plaintiff Castellanos has no active claims against any parties to this suit, this court instructs that his case be terminated by the Clerk.

- 7 -

("MCDC"). (SAC (Doc. 77) ¶¶ 101–02.) On October 9, 2023, a Mecklenburg County district court judge ordered her released on an unsecured bond and she was returned to a holding cell at the MCDC for processing and release. (Id. ¶¶ 103–05.) She was not released until the next day, October 10, 2023, at around 1:30 p.m., which was approximately 25.5 hours after the time she was ordered released. (Id. ¶¶ 106–07.)[9] Plaintiff Fields alleges that she was overdetained because of "Defendants' adoption and implementation of eCourts, including an integration defect between Odyssey and eWarrants." (Id. ¶ 108.)

Plaintiff Sayeline Nunez was arrested on October 9, 2023, and held on bond at the MCDC. (Id. ¶¶ 109–10.) On October 10, 2023, a Mecklenburg County district court judge ordered her released on an unsecured bond and she was returned to a holding cell at the MCDC for processing and release. (Id. ¶ 111–13.) She was not released until the next day, October 11, 2023, around 1:30 p.m., which was approximately 26.5 hours after the time she

---

[9] Plaintiffs allege that Plaintiff Fields was ordered released on October 9, 2023, (SAC (Doc. 77) ¶ 103–04), and that she "was not released until the next day, October 10, 2024," (id. ¶ 106). Because Plaintiffs clearly allege that Fields was released the next day, this court understands the reference to 2024 to be a typographical error and construes the complaint to allege that she was released on October 10, 2023.

was ordered released. (Id. ¶ 114-15.)[10] Plaintiff Nunez alleges
that she was overdetained because of "Defendants' adoption and
implementation of eCourts, including an integration defect
between Odyssey and eWarrants." (Id. ¶ 116.)

Plaintiff Thomas Hayward was arrested on December 2, 2023,
and held without bond at the MCDC. (Id. ¶¶ 117-18.) On December
4, 2023, a district court judge ordered Hayward released if he
posted a $2,500 bond. (Id. ¶¶ 119-20.) Plaintiff Hayward posted
bond at about 1:00 p.m. that same day and was returned to a
holding cell at the MCDC for processing and release. (Id. ¶ 121-
22.) He was not released until the next day, December 5, 2023,
around 3:41 a.m., which was approximately 14.5 hours after he
posted bond. (Id. ¶¶ 123-24.)[11] Plaintiff Hayward alleges that he
was overdetained because of "Defendants' adoption and

---

[10] Plaintiffs allege that Plaintiff Nunez was ordered
released on October 10, 2023, (SAC (Doc. 77) ¶ 111-12), and that
she "was not released until the next day, October 11, 2024,"
(id. ¶ 114.) Because Plaintiffs clearly allege that Nunez was
released the next day, this court understands the reference to
2024 to be a typographical error and construes the complaint to
allege that she was released on October 11, 2023.

[11] Plaintiffs allege that Plaintiff Hayward posted bond on
December 4, 2023, (SAC (Doc. 77) ¶ 119-21), and that he "was not
released until the next day, December 5, 2024," (id. ¶ 123).
Because Plaintiffs clearly allege that Hayward was released the
next day, this court understands the reference to 2024 to be a
typographical error and construes the complaint to allege that
he was released on December 5, 2023.

implementation of eCourts, including an integration defect between Odyssey and eWarrants." (Id. ¶ 125.)

### 2. **Wake County**

There are seven named Plaintiffs who allege injury in Wake County.

Plaintiff Kevin Spruill was arrested pursuant to a warrant on February 11, 2023. (Id. ¶ 126.) On February 15, 2023, he appeared before a Wake County judge and posted bond. (Id. ¶ 127.) However, the warrant for his arrest remained "active" in the eWarrants system. (Id. ¶ 128.) On the basis of that warrant, on March 4, 2023, a Wake County police officer pulled Spruill over and handcuffed him and held him in the officer's car until Spruill produced his release paperwork, at which time the officer confirmed with the Wake County Sheriff's Office that the warrant was not valid, requested the system be updated to reflect this, and released him. (Id. ¶¶ 129–33.)

On Plaintiff Spruill's next court date, March 8, 2023, Spruill appeared for court and was again arrested on the same warrant, this time by a Wake County Sheriff's deputy. (Id. ¶ 134.) As a result, Spruill was shackled and put in a holding cell until he provided his release paperwork "to prove that his warrant was cleared." (Id. ¶ 136.) He was released after "his

file was reviewed by the Wake County Sheriff's Office and the Wake County Clerk of Court and updated in eCourts." (Id. ¶ 137.)

Plaintiff Timia Chaplin was criminally charged in Wake County on November 23, 2022, and failed to appear in court on December 13, 2022. (Id. ¶¶ 139–40.) A warrant for failure to appear was issued and Chaplin was arrested on that warrant on March 4, 2023, and released on bond. (Id. ¶ 140–41.) Plaintiff Chaplin appeared at her rescheduled court date on March 16, 2023, where the charges against her were dismissed and her case was designated in Odyssey as "resolved." (Id. ¶ 142.) But on April 9, 2023, Plaintiff Chaplin was again arrested on the failure to appear warrant. (Id. ¶ 143.) According to Plaintiffs, Chaplin was rearrested because "Odyssey did not communicate [the] resolution [of her case] to eWarrants, in contravention of the software's intended design." (Id. ¶ 144.) Plaintiffs allege that this warrant remained outstanding as late as April 17, 2023. (Id. ¶ 146.)

In July 2021, Plaintiff Rotesha McNeil received a citation in Wake County for driving with a suspended license. (Id. ¶ 147.) On August 11, 2022, a Wake County arrest warrant was issued for her due to an alleged "failure to appear." (Id. ¶ 148.) On September 12, 2022, Plaintiff McNeil pled guilty to driving with a suspended license and the court struck the

- 11 -

"failure to appear," explaining it had been entered in error. (Id. ¶¶ 149–50.) On May 29, 2023, however, Plaintiff McNeil was arrested by a Johnston County Sheriff's deputy on that failure to appear warrant. (Id. ¶ 152.) After McNeil informed the deputy that her charges were resolved, the deputy contacted the Wake County Sheriff's Office, but a Wake County Sheriff's Office employee reported the warrant was valid and Plaintiff McNeil was then detained for five hours until her release on a $1,000 bond. (Id. ¶ 153–55.) On May 30, 2023, McNeil met with an employee of the Wake County Clerk of Court, who "explained that the failure to appear warrant should have been recalled from the electronic system." (Id. ¶ 157.) Soon after that meeting, the Wake County Clerk of Court, Blair Williams, "offered McNeil $300 to resolve all claims against Clerk Williams, his employees, NCAOC, and the State of North Carolina." (Id. ¶ 159.)

On February 11, 2023, Plaintiff Qiana Robertson was arrested in Wake County on suspicion of driving while impaired and assigned a first appearance date of March 3, 2023. (Id. ¶¶ 160–61.) Her case was continued to June 26, 2023. (Id. ¶ 162.) But her court date was again changed, without the knowledge of Plaintiff Robertson or her attorney, to May 5, 2023. (Id. ¶¶ 163, 165.) According to Plaintiffs, "no one in the Wake County Clerk's Office or the District Attorney's Office has been able

- 12 -

to explain how the date change occurred." (Id. ¶ 164.) When Robertson did not appear on May 5, 2023, an order for her arrest was issued. (Id. ¶¶ 166–67.) She was arrested on that warrant on June 11, 2023, and held at the Wake County Detention Center until she paid a $2,000 bond to secure her release. (Id. ¶¶ 167–68.)

Plaintiff Yousef Jallal was issued a citation for misdemeanor possession of marijuana on January 12, 2023. (Id. ¶ 170.) His case was dismissed on June 6, 2023, but was "designated" as "called and failed," and as a result, an order for his arrest was issued on July 3, 2023. (Id. ¶¶ 171–73.) He was arrested on August 10, 2023, by a Wake County Sheriff's deputy and held at the Wake County Detention Center from 9:00 p.m. to 3:00 a.m. when he was released on a $1,000 bond. (Id. ¶ 175.) Odyssey was updated on August 11, 2023, to indicate that his case was dismissed and disposed, but the dismissal document was not entered on Odyssey. (Id. ¶¶ 176–77.)

Plaintiff Messiejah Bradley was arrested for misdemeanor possession of marijuana in Wake County in August 2022. (Id. ¶ 178.) His charges were dismissed on July 20, 2023, but his dismissal paperwork "although signed by the District Attorney and submitted to the Court" was not reflected in Odyssey and Odyssey marked his case as "called and failed." (Id. ¶¶ 179–82.)

- 13 -

An arrest warrant for the failure to appear was issued and a police officer executed it and arrested Bradley on September 27, 2023, and Bradley was held at the Wake County Detention Center for five hours before he was released on a $1,000 bond. (Id. ¶ 182-84.) Odyssey was updated to indicate his case's July 20, 2023, dismissal on September 28, 2023. (Id. ¶ 185.)

Plaintiff Dennis Keith Lassiter was arrested and charged in Wake County on March 30, 2023, and paid a bond to secure his release. (Id. ¶ 186.) After appearing in court on July 7, 2023, Lassiter was told he would be notified of his next court date. (Id. ¶¶ 187-88.) When he had not received notice of his next court date by late September, he called the Wake County Clerk's Office to confirm the date had not yet been scheduled. (Id. ¶¶ 188-89.) The Clerk's Office informed him that Odyssey was displaying a "called and failed" designation for July 7, 2023, and as a result, a magistrate ordered his bond be forfeited. (Id. ¶¶ 190-91.) A warrant was issued for this failure to appear, and Plaintiff Lassiter was arrested on October 19, 2023, by a Wake County Sheriff's deputy and taken to the Wake County Detention Center. (Id. ¶¶ 193-94.)

Later that same day, Plaintiff Lassiter appeared before a magistrate and explained that he had appeared in court on July 7, 2023. (Id. ¶ 195.) The magistrate did not release him and

noted that in addition to the July 7 failure to appear, Odyssey
displayed another outstanding failure to appear warrant from
2001. (Id. ¶ 196-97.) According to Plaintiffs, this warrant "had
been resolved more than twenty years prior," but had been
"revived" during the transition to eCourts. (Id. ¶¶ 197-98.)
Wake County served the 2001 warrant, with the magistrate noting
"Criminal process confirmed via Electronic Warrants and/or
Odyssey," and Plaintiff Lassiter was held in jail for more than
36 hours until he could appear before a district court for a
bond hearing. (Id. ¶ 199-200.) On November 2, 2023, his 2001
failure to appear charge was dismissed. (Id. ¶ 201.)

### 3. **Statewide Plaintiffs**

Plaintiff Robert Lewis, a live-in caretaker in Guilford
County, was the subject of a restraining order issued by his
elderly client in 2016 that was "quickly dissolved." (Id. ¶¶
213-14.) However, the restraining order remained visible on
eWarrants, and Plaintiff Lewis was arrested for violating its
terms in the fall of 2022 and spent two days in jail before he
posted bond. (Id. ¶¶ 215-17.) To avoid another arrest, Plaintiff
Lewis "managed his client's care remotely for several months."
(Id. ¶ 218.) Lewis's case was dismissed after the District
Attorney "conceded the error." (Id. ¶ 219.)

- 15 -

In August 2009, an arrest warrant was issued for Plaintiff Allen Sifford in Gaston County but was never served. (Id. ¶¶ 220-21.) In September 2022, Plaintiff Sifford's application for a commercial driver's license was denied by the North Carolina Department of Motor Vehicles, based on the outstanding 2009 warrant. (Id. ¶ 222.) Sifford hired an attorney, and the case was dismissed on October 25, 2022. (Id. ¶ 223-24.) On July 7, 2023, Plaintiff Sifford was pulled over in Belmont, North Carolina, for having a dark license-plate cover and officers informed him that "his old warrant remained 'active' in eWarrants." (Id. ¶ 225-26.) Plaintiff Sifford was arrested and held for more than 48 hours in the Gaston County jail. (Id. ¶ 227.)

C.   **Class Allegations**

Plaintiffs additionally allege the following three putative classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). (SAC (Doc. 77) ¶ 229.)

> **Overdetention Class:** All individuals in the State of North Carolina who, beginning on and including February 13, 2023, and due to Defendants' adoption, implementation and design of eCourts (including eWarrants), were released from jail more than two (2) hours after the basis for their detention ended. The named representatives for this class are Sarah Fields, Sayeline Nunez, Thomas Hayward, and Paulino Castellanos.[12]

---

[12] See supra n.8.

**Wrongful Arrest Class:** All individuals in the State of North Carolina who, beginning on and including July 1, 2022, were arrested or detained pursuant to warrants that would not have been issued but for Defendants' adoption, implementation and design of eCourts (including eWarrants). The named representatives for this class are Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, Dennis Keith Lassiter, and Allen Sifford.

**Injunctive Relief Class:** All members of the Wrongful Arrest Class and the Overdetention Class. All Plaintiffs except Robert Lewis are named representatives for this class.

(Id.)

## II. PROCEDURAL HISTORY

Plaintiffs filed this putative class action on May 23, 2023. (Doc. 1.) Plaintiffs filed their First Amended Complaint on October 27, 2023. (Doc. 30.) Plaintiffs filed their Second Amended Complaint, the operative complaint, on February 28, 2024, (SAC (Doc. 77)).

On May 7, 2024, all named Plaintiffs filed a Stipulation of Voluntary Dismissal as to Defendants Fowler, Thomas, Williams, Boyce, and Chinn-Gary. (Doc. 100.) Also on May 7, 2024, Plaintiff Castellanos, the only named Lee County Plaintiff, filed a Notice of Voluntary Dismissal of claims as to Defendant Estes, Sheriff of Lee County. (Doc. 98). Because no other named Plaintiff brought any claim against Sheriff Estes, he was administratively terminated from the case. (Docket Entry 03/06/2025.) Plaintiff Castellanos also, on May 7, 2024, filed a

- 17 -

Notice of Voluntary Dismissal of its claim against Tyler Technologies, (Doc. 99), however the other named Plaintiffs' claims against Tyler Technologies remain.

On April 9, 2024, Defendant Rowe filed a Motion to Dismiss Second Amended Complaint, (Doc. 88), and a supporting memorandum, (Def. Sheriff Rowe's Mem. in Supp. of Mot. to Dismiss Second Am. Compl. ("Def. Rowe's Mem.") (Doc. 89)). Plaintiffs responded in opposition on May 7, 2024, (Pls.' Resp. in Opp'n to Sheriff Rowe's Mot. to Dismiss ("Pls.' Resp. to Rowe's Mot.") (Doc. 102)). Defendant Rowe replied on June 6, 2024. (Def. Sheriff Rowe's Reply to Pls.' Resp. ("Def. Rowe's Reply") (Doc. 110).)

On April 9, 2024, Defendant Tyler Technologies, Inc. filed a Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), (Doc. 90), and a supporting memorandum, (Mem. of Law in Supp. of Def. Tyler Technologies, Inc.'s Mot. to Dismiss ("Def. Tyler Technologies' Mem.") (Doc. 91)). On May 7, 2024, Plaintiffs responded in opposition, (Pls.' Resp. in Opp'n to Tyler Technologies, Inc.'s Mot. to Dismiss ("Pls.' Resp. to Tyler Technologies' Mot.") (Doc. 103)). Defendant Tyler Technologies replied on June 7, 2024. (Reply Br. in Supp. of Def. Tyler Technologies, Inc.'s Mot. to Dismiss ("Def. Tyler Technologies' Reply") (Doc. 111).)

- 18 -

On April 9, 2024, Defendant McFadden filed a Motion to Dismiss Plaintiffs' Second Amended Complaint, (Doc. 95), and a supporting memorandum, (Sheriff Garry McFadden's Mem. of Law in Supp. of His Mot. to Dismiss Pls.' Second Am. Compl. ("Def. McFadden's Mem.") (Doc. 96)). On May 7, 2024, Plaintiffs responded in opposition, (Pls.' Resp. in Opp'n to Sheriff McFadden's Mot. to Dismiss ("Pls.' Resp. to McFadden's Mot.") (Doc. 101)). Defendant McFadden replied on June 7, 2024. (Sheriff Garry L. McFadden's Reply to Pls.' Opp'n to His Mot. to Dismiss ("Def. McFadden's Reply") (Doc. 112).)

## III. **STANDARD OF REVIEW**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable" and demonstrates "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true, id., and draws all reasonable inferences in the plaintiff's favor, Ray,

- 19 -

948 F.3d at 226. However, this court does not accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

IV. **ANALYSIS**

All named Plaintiffs assert one claim of negligence[13] against Defendant Tyler Technologies, (SAC (Doc. 77) ¶¶ 237-46). Named Plaintiffs Fields, Nunez, and Hayward assert two claims against Defendant McFadden in his official capacity: 1) a claim of negligence, (id. ¶¶ 247-48, 251-57), and 2) a 42 U.S.C. § 1983 Monell claim, (id. ¶¶ 258-79). These claims are also brought independently against Defendant McFadden's official bond surety, Defendant John Doe Surety, pursuant to N.C. Gen. Stat §

---

[13] This court "must follow the choice-of-law rules of the state in which it sits." Smith v. Cessna Aircraft Co., Inc., 571 F. Supp. 433, 435 (M.D.N.C. 1983) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)). In tort actions, North Carolina courts employ the lex loci delicti test, applying the substantive law of the state where the injury occurred. Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722-23 (2010). All named Plaintiffs' injuries occurred in North Carolina; thus North Carolina law applies to Plaintiffs' negligence claims.

58-76-5. (Id. ¶¶ 297-99, 302, 304-07.)[14] Plaintiffs Spruill,
Chaplin, McNeil, Robertson, Jallal, Bradley, and Lassiter assert
two claims against Defendant Rowe in his official capacity: 1) a
claim of negligence, (id. ¶¶ 247, 249, 251-57), and 2) a 42
U.S.C. § 1983 Monell claim, (id. ¶¶ 280-96). These claims are
also brought independently against Defendant Rowe's official
bond surety, Defendant The Ohio Casualty Insurance Company,
pursuant to N.C. Gen. Stat § 58-76-5. (Id. ¶¶ 297-98, 300, 303-
307.)[15]

     Finally, all named Plaintiffs also bring a claim under 42
U.S.C. § 1983 for injunctive relief against Defendants Rowe and
McFadden, (id. ¶¶ 325, 328-336), requesting that both Rowe and
McFadden "adopt failsafe procedures that would prevent Fourth
and Fourteenth Amendment violations akin to those suffered by

---

     [14] Under North Carolina law, sheriffs are required to
"furnish a bond payable to the State of North Carolina for the .
. . faithful execution of his office as sheriff." N.C. Gen.
Stat. § 162-8. "Purchasing a sheriff's bond as required by N.C.
Gen. Stat. § 162-8 waives the sheriff's governmental immunity,
but only 'to the extent of the coverage provided.'" Butterfield
v. Gray, 279 N.C. App. 549, 559, 866 S.E.2d 296, 304 (2021)
(citation omitted). "To recover on the sheriff's bond, '[e]very
person injured by the neglect, misconduct, or misbehavior in
office of any . . . sheriff . . . may institute a suit or suits
against said officer or any of them and their sureties upon
their respective bonds for the due performance of their duties
in office in the name of the State . . . .'" Id. at 560 (quoting
N.C. Gen. Stat. § 58-76-5 (2019)).
     [15] See supra n.14.

Plaintiffs and the Injunctive Relief Class as alleged herein."
(Id. ¶ 335.)

A.    **Class Allegations against Tyler Technologies**

Defendant Tyler Technologies argues that "Plaintiffs' class allegations fail as a matter of law and should be dismissed on the pleadings," because "Plaintiffs cannot satisfy the Rule 23 requirements of commonality, typicality, and predominance as a matter of law." (Def. Tyler Technologies' Mem. (Doc. 91) at 9.)[16]

Federal Rule of Civil Procedure 23, which governs class actions, states: "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). "Several circuits have determined that 'Rule 23 permits defendants to file preemptive motions to deny certification before discovery is completed,'" Izzo v. Procter & Gamble Co., No. 2:23-CV-02125-BHH, 2024 WL 3970856, at *2 (D.S.C. Mar. 22, 2024) (citation omitted) (collecting cases), including the Fourth Circuit in an

---

[16] All named Plaintiffs bring a claim of negligence against Tyler Technologies "on behalf of themselves individually as well as any Class to which they belong." (SAC (Doc. 77) ¶ 238.) However, because Plaintiffs do not seek injunctive relief from Defendant Tyler Technologies, this court understands Plaintiffs to pursue negligence against Tyler Technologies on behalf of only the Wrongful Arrest and Overdetention Classes, and not the Injunctive Relief Class.

unpublished decision, see Strange v. Norfolk & W. Ry. Co., No. 85-1929, 1987 WL 36160, at *3 (4th Cir. Jan 12, 1987) (affirming district court's denial of class certification prior to close of discovery). District courts within this circuit hold similarly. See Izzo, 2024 WL 3970856, at *3-*4; Cnty. of Dorchester, S.C. v. AT & T Corp., 407 F. Supp. 3d 561, 565-66 (D.S.C. 2019); Williams v. Potomac Fam. Dining Grp. Operating Co., LLC, No. GJH-19-1780, 2019 WL 5309628, at *4-*5 (D. Md. Oct. 21, 2019); Layani v. Ouazana, No. CV ELH-20-420, 2021 WL 805405, at *39 (D. Md. Mar. 3, 2021).

The courts that permit pre-discovery efforts to dismiss class allegations "have coalesced around a broad understanding of when granting such motions is proper, holding that class allegations should generally be struck before the completion of discovery only when it is apparent from the face of the complaint that 'the requirements for maintaining a class action cannot be met.'" Williams, 2019 WL 5309628, at *5 (citation omitted). "The guidelines for making this assessment are provided by the familiar standard of review for motions to dismiss under Rule 12(b)(6)." Id. Accordingly, a pre-discovery motion to dismiss class allegations should only be granted where "the pleading makes clear that the purported class cannot be certified and no amount of discovery would change that

- 23 -

determination." Cnty. of Dorchester, 407 F. Supp. 3d at 565–66 (citation omitted). "Imposing this relatively low bar to proceed to discovery is consistent with the principle that 'a ruling on class certification should normally be based on 'more information than the complaint itself affords.'" Williams, 2019 WL 5309628, at *5 (citation omitted); see also Int'l Woodworkers of Am., AFL-CIO, CLC v. Chesapeake Bay Plywood Corp., 659 F.2d 1259, 1268 (4th Cir. 1981) ("It is seldom, if ever, possible to resolve class representation questions from the pleadings . . . ."); Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34 (1st Cir. 2013) ("[A] court should typically await the development of a factual record before determining whether the case should move forward on a representative basis.").

This court has previously expressed that its "general preference is to address the class action question after any motion to dismiss is resolved." (Doc. 36 at 2.) However, even assuming Defendant's pre-discovery motion to dismiss class allegations is an appropriate mechanism and applying the Rule 12(b)(6) standard, it is not clear from the pleadings that "the purported class cannot be certified and no amount of discovery would change that determination." Cnty. of Dorchester, 407 F. Supp. 3d at 565–66.

- 24 -

## 1. **Rule 23 Requirements**

Plaintiffs' putative class claim against Tyler Technologies is put forth pursuant to Federal Rule of Civil Procedure 23(b)(3), (SAC (Doc. 77) ¶ 229), and therefore, at this stage, Plaintiffs must have plausibly alleged the requirements of both Rule 23(a) and Rule 23(b)(3). See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 458 (4th Cir. 2003).

> Rule 23(a) requires that every class satisfy four basic prerequisites: numerosity of parties, common questions of law or fact, typicality of claims or defenses of the representative parties, and adequacy of representation. Along with these four explicit requirements, we have also required every class to satisfy Rule 23's implicit 'ascertainability' requirement, which precludes certification unless a court can readily identify the class members in reference to objective criteria.

Mr. Dee's Inc. v. Inmar, Inc., 127 F.4th 925, 930 (4th Cir. 2025) (internal quotation marks and citations omitted). Rule 23(b)(3) further requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Defendant Tyler Technologies does not challenge ascertainability nor numerosity but argues that "Plaintiffs cannot meet the Rule 23(a) requirements of commonality or typicality," (Def. Tyler Technologies' Mem. (Doc. 91) at 34),

and that "Plaintiffs cannot meet the more stringent Rule 23(b)(3) requirements," (id. at 38).

### i.  23(a): Typicality

Tyler argues that "[Plaintiffs'] claims lack typicality because each arrest or detention turns on a unique set of facts involving distinct legal inquiries." (Def. Tyler Technologies' Mem. (Doc. 91) at 36.) Typicality requires "the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir. 2001) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982)). And while typicality requires that the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of his own individual claim," typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." Deiter v. Microsoft Corp., 436 F.3d 461, 466–67 (4th Cir. 2006).

All named Plaintiffs of the Wrongful Arrest Class allege that they were arrested without legal authority because of Tyler Technologies' negligence in providing and maintaining allegedly defective software. (SAC (Doc. 77) ¶ 243.) All named Plaintiffs

- 26 -

of the Overdetention Class allege that their detention was extended without legal authority because of Tyler Technologies' negligence in providing and maintaining allegedly defective software. (Id.) These claims are "typical" of the Wrongful Arrest and Overdetention Classes, respectively, as they mirror the allegations of the putative class members. (See id. ¶ 229.) Further, both the named Plaintiffs and the putative class members' claims arise from the same "course of conduct," that is, Tyler Technologies' provision and maintenance of eCourts. Cf. Talley v. ARINC, 222 F.R.D. 260, 268 (D. Md. 2004) ("Plaintiffs' claims may differ factually and still be 'typical' of the claims of class members if the claims arise 'from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'").

### ii. 23(a): Commonality and 23(b)(3): Predominance

The question of commonality is a two-fold inquiry when a class is proposed under Rule 23(b)(3). First, Plaintiffs must establish that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Second, those common questions must "predominate over any questions affecting only individual members," such that "a class action is superior to other

- 27 -

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Accordingly, in analyzing these putative 23(b)(3) classes, this court must determine whether Plaintiffs have plausibly alleged that common questions of law or fact exist and predominate over individualized inquiries.

With respect to the negligence claim against Tyler Technologies, Plaintiffs allege that the following questions of law and fact are common to the putative classes:

    k. Whether Defendant Tyler Technologies owed a duty of
    care to Plaintiffs and the proposed Classes;

    l. Whether Defendant Tyler Technologies breached the
    duty of care it owes to Plaintiffs and the proposed
    Classes; and

    m. Whether Defendant Tyler Technologies' breach of its
    ordinary duty of care to Plaintiffs and the proposed
    classes has proximately caused damages.

(SAC (Doc. 77) ¶ 231.) Defendant Tyler Technologies does not dispute that there are common questions as to duty and breach but argues that "as to proximate cause and the separate required element of injury (which Plaintiffs do not mention), Plaintiffs ignore the significant individualized inquiries required. The inquiries would overwhelm any basic common questions on duty." (Def. Tyler Technologies' Mem. (Doc. 91) at 35.)

Plaintiffs have plausibly alleged that there are questions of law and fact common to the entire Wrongful Arrest and

- 28 -

Overdetention Classes. For example, the question of what duty Tyler Technologies owed to the individuals who were allegedly arrested and/or detained without legal authority because of alleged defects in Tyler's software is a legal question common to all members of both classes. As are the factual questions related to Tyler's alleged software defects, such as whether they occurred, when they occurred, and the processes and people they may have affected.[17] And the legal question of whether Tyler's response to any alleged defects was sufficient to satisfy any duty of care it may have owed also applies to all class members. At this stage, it appears that these questions may be capable of "generat[ing] common answers apt to drive the resolution of the litigation." EQT Prod. Co. v. Adair, 764 F.3d 347, 360 (4th Cir. 2014) (emphasis and citation omitted).

With respect to Rule 23(b), Tyler argues that common questions will not predominate because the question of injury will require a series of "mini-trials." (Def. Tyler Technologies' Mem. (Doc. 91) at 39.) With respect to injury,

---

[17] As to proximate cause, Defendant argues that this court "will also have to determine, for each hypothetical class member: whether a hypothetical class member's arrest or detention was in any way related to the eCourts system." (Def. Tyler Technologies' Mem. (Doc. 91) at 40.) But without the benefit of discovery, this court cannot ascertain whether this question will be a highly fact-intensive individualized inquiry that would predominate over common questions.

Tyler argues this court will need to decide for each class member whether or not their arrest or detention was in fact "unlawful." (Id. at 33.) According to Tyler, "there is nothing Plaintiffs could uncover in discovery that would alleviate the need for these individualized inquiries." (Id.) This court does not agree. As an initial matter, it is not clear that questions related to injuries will be so complex as to "predominate" over other common questions. The question of whether an arrest or detention was lawful may turn simply on the question of whether there was a valid warrant for the class member's arrest when they were arrested.[18] This would require individualized inquiries but would not be so complex as to qualitatively "predominate," over other common issues. Cf. In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig., 341 F.R.D. 128, 155 (D. Md.

_____

[18] In North Carolina, "[a] judicial official may issue a warrant for arrest only when he is supplied with sufficient information . . . to make an independent judgment that there is probable cause to believe that a crime has been committed and that the person to be arrested committed it." N.C. Gen. Stat. § 15A-304(d). The putative Wrongful Arrest Class does not allege that a judicial official improperly determined probable cause, which may be a complex and individualized inquiry, but rather allege that they were arrested or detained "pursuant to warrants that would not have been issued but for Defendants' adoption, implementation and design of eCourts," (SAC (Doc. 77) ¶ 229), and thus that this process never occurred. Accordingly, the inquiry may not be a fact-intensive question of whether or not probable cause existed, but rather the more easily discoverable question of whether or not the warrant was issued in accordance with North Carolina law.

2022), <u>vacated and remanded sub nom. In re Marriott Int'l, Inc.</u>, 78 F.4th 677 (4th Cir. 2023), and <u>reinstated by In re Marriott Int'l Customer Data Sec. Breach Litig.</u>, 345 F.R.D. 137 (D. Md. 2023) ("If the 'qualitatively overarching issue[s]' are common, a class may be certified notwithstanding the need to resolve individualized issues.").

Questions related to overdetention fare the same. Whether an alleged overdetention is considered "unlawful," may turn on a common question of statutory interpretation as to the temporal requirements of North Carolina law, which requires that jailers "effect . . . release" upon satisfaction that conditions of release have been met. N.C. Gen. Stat. § 15A-537. Although application of that legal rule would be individualized, without the benefit of discovery, this court cannot determine whether or not it would predominate over other common issues.[19]

Finally, and most importantly, even if injury and proximate cause are ultimately individualized questions that would predominate over any common questions, Federal Rule of Civil

---

[19] Defendant Tyler argues that "determining when 'the basis for detention ended' will require an individualized inquiry for every class member." (Def. Tyler Technologies' Reply (Doc. 111) at 18.) That may be true — but at this time, this court cannot determine whether this will be a fact-intensive inquiry as Tyler suggests or, rather, whether discovery will reveal records which alleviate any factual burden in ascertaining the time the basis for detention ceased to exist.

Procedure 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). In Gunnells v. Healthplan Services, Inc., the Fourth Circuit held that this rule could be used to certify certain claims for class treatment, provided that "within that claim or claims (rather than the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met." 348 F.3d at 441.[20] Courts in this circuit are instructed to "take full advantage of the provision in subsection (c)(4)." Id. (quoting In re A.H. Robins, 880 F.2d 709, 740 (4th Cir. 1989)).

Defendant's argument against certification at this early stage ignores the possible application of Rule 23(c)(4) to certify the class as to certain issues, such as what appears to be the common and critical issues of duty and breach. Courts within this circuit have used Rule 23(c)(4) to certify classes

---

[20] Although Gunnells specifically addressed the application of Rule 23(c)(4) to claims, it also notes that "[s]everal courts and a number of distinguished commentators have explicitly endorsed a broad issue specific predominance analysis of Rule 23." Gunnells, 348 F.3d at 441; see also Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co., 95 F.4th 181, 199 n.5 (4th Cir. 2024) (Wynn, J., concurring) ("In Gunnells, we focused on using Rule 23(c)(4) to split 'claims,' but we recognized that Rule 23(c)(4) permits a class action on 'particular issues' and approvingly discusses the approach of certifying a class with respect to individual issues.").

with respect to common issues in negligence actions. <u>See</u> <u>In re</u>
<u>Marriott</u>, 345 F.R.D. at 169 (limiting class certification to
issues of duty and breach explaining that "[p]laintiffs will use
the same evidence in their attempt to establish duty and breach
for their negligence and negligence per se claims"); <u>Good v. Am.</u>
<u>Water Works Co., Inc.</u>, 310 F.R.D. 274, 295-96 (S.D. W. Va. 2015)
(certifying class as to issues of fault and comparative fault
and stating that "the proposed liability issue certifications
provide an orderly means to resolve some of the central issues
in the case").

In accordance with the analysis set forth above, this court
finds that Plaintiffs have plausibly alleged the putative
Wrongful Arrest and Overdetention Classes against Tyler
Technologies, and that a factual record must be developed
"before determining whether the case should move forward on a
representative basis." <u>Cf</u>. <u>Manning</u>, 725 F.3d at 59.[21]

_____

[21] Additionally, this court is not persuaded by Defendant's
argument that the class should be dismissed because the question
of damages would be individualized. (<u>See</u> Def. Tyler
Technologies' Mem. (Doc. 91) at 38). The Fourth Circuit has
explained that "[c]ourts have routinely rejected this argument,
concluding, as we have in previous cases, that the need for
individualized proof of damages alone will <u>not</u> defeat class
certification." <u>Gunnells</u>, 348 F.3d at 429.

- 33 -

**B.**    **Negligence Claims**

A claim of negligence under North Carolina law requires a plaintiff to allege "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Fussell v. N. Carolina Farm Bureau Mut. Ins. Co., 364 N.C. 222, 226, 695 S.E.2d 437, 440 (2010) (citation omitted). In North Carolina, "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm." Id.; see also DeRose for Est. of DeRose v. DoorDash, Inc., 675 F. Supp. 3d 591, 602 (E.D.N.C. 2023).

**1.**    **Tyler Technologies**

All Plaintiffs allege that Defendant Tyler Technologies assumed "a duty of reasonable care to Plaintiffs and each Class to ensure that its eCourts system — which includes Odyssey and eWarrants — would operate properly such that the rights of Plaintiffs and members of each Class to be free from unlawful arrest and detention would and could be honored," when it "decided and agreed to develop the eCourts software applications on behalf of North Carolina and its citizenry." (SAC (Doc. 77) ¶¶ 239-40.)

Specifically, Plaintiffs allege that Defendant Tyler Technologies owed them the following duties:

- 34 -

a. The duty to supply accurate information to end-users (or to develop software applications that provide accurate information to end-users);

b. The duty to ensure that eWarrants and Odyssey communicated with one another so as to supply accurate information between and among the applications, as well as to end-users of each application;

c. The duty to ensure that eCourts and the end-users of eCourts properly utilized any data and information entered into eCourts;

d. The duty to ensure that end-users of eCourts were properly trained on how to use eWarrants and Odyssey;[22]

e. The duty to ensure that eCourts would be free of defects;

f. The duty to ensure that end-users were timely notified of any defects; and

g. In such further ways as may be shown by the evidence.

(Id. ¶ 241.) Further, Plaintiffs allege that Tyler Technologies, in its contract with NCAOC, warranted "that the Tyler Software [eCourts] will perform without Defects during the term of this Contract." (Id. ¶ 242 (quoting Pls.' Ex. B, Service Level Agreement (Doc. 77-2) at 18).)

---

[22] Defendant Tyler argues that to the extent Plaintiffs intended to allege a "separate claim for negligent training under North Carolina law, that claim fails." (Def. Tyler Technologies' Mem. (Doc. 91) at 18.) This court does not read the SAC to allege a separate claim for negligent training, but rather to allege that ensuring "end-users of eCourts were properly trained on how to use eWarrants and Odyssey," was a component of the due care Tyler should have exercised because of their duty to Plaintiffs.

- 35 -

Plaintiffs allege that Tyler Technologies breached these duties, as the software package is "replete with defects that led to the unlawful arrests and detentions suffered by Plaintiffs and each Class," and Defendant Tyler Technologies "knew or should have known" the defects "would lead to unlawful arrests and detentions." (Id. ¶ 243-44.)

As an additional theory of negligence, Plaintiffs allege that Tyler Technologies is liable because "it provided inadequate warning under N.C.G.S. § 99B-5," because the software "created an unreasonably dangerous condition that Tyler Technologies knew or should have known or became aware would pose a substantial — if not certain — risk of harm to a reasonably foreseeable claimant: namely, Plaintiffs and each Class." (Id. ¶ 246.)

Defendant Tyler Technologies has moved to dismiss the claim of negligence against it, (see Doc. 90), arguing that 1) it owed no duty to Plaintiffs as a software vendor, 2) that Plaintiffs cannot show proximate cause, and 3) that Plaintiffs' additional failure to warn theory fails. (Def. Tyler Technologies' Mem. (Doc. 91) at 8-9.)

**i.   Duty**

As will be explained, this court finds that Plaintiffs have sufficiently alleged the existence of a general duty between

- 36 -

Tyler Technologies and Plaintiffs to require that the motion to dismiss be denied at this stage of the proceedings. However, this court's findings as to duty are preliminary and based solely upon the complaint and the issues currently before the court. The analysis set forth herein should not be understood by the parties to establish, as a matter of law, the existence of a duty sufficient to establish the law of this case. The question of whether a duty existed, if at all, between Tyler Technologies and Plaintiffs cannot be determined until a later stage of this litigation.

The parties have not raised or sufficiently addressed issues that may be necessary to a final determination of the duties of Tyler Technologies to Plaintiffs, as this court is not able to determine, whether, for example, the public duty doctrine might apply.

Within Article IV of the North Carolina Constitution, § 15 states that "[t]he General Assembly shall provide for an administrative office of the courts to carry out the provisions of this Article." N.C. Const., art. IV, § 15. The legislature has carried out this constitutional requirement, establishing an Administrative Office of the Courts, supervised by a Director, see N.C. Gen. Stat § 7A-340, who is responsible for, inter alia, "[e]stablish[ing] and operat[ing] systems and services that

- 37 -

provide for electronic filing in the court system and further provide electronic transaction processing and access to court information systems," N.C. Gen. Stat. §7A-343(9a).

It is not clear to this court whether Plaintiffs could successfully maintain a negligence action against the Administrative Office for its failure to adequately perform this statutory duty.[23] In North Carolina, the "public duty doctrine" provides that "'governmental entities, when exercising their statutory powers, act for the benefit of the general public and therefore have no duty to protect specific individuals.' Accordingly, the governmental entity is not liable for negligence for failure to carry out statutory duties." Isenhour v. Hutto, 350 N.C. 601, 606-07, 517 S.E.2d 121, 125 (1999) (citations omitted); see also Strickland v. Univ. of N. Carolina at Wilmington, 213 N.C. App. 506, 508-13, 712 S.E.2d 888, 890-93 (2011) (providing a comprehensive history of this doctrine in North Carolina). There are limited exceptions to this rule, such as where there the government entity maintains a "special relationship" or a "special duty" to particular individuals. Stone v. N. Carolina Dep't of Lab., 347 N.C. 473, 479, 495 S.E.2d 711, 714 (1998).

_____

[23] This court notes that Plaintiffs have already dismissed their claims against the NCAOC Defendants in their official capacities. (See Docket Entry 02/26/2025.)

By contracting with Tyler Technologies to develop, implement, and host court-filing and warrant software, as well as respond to the software's defects, (see SAC (Doc. 77) ¶ 71), the Director of the NCAOC may have delegated his statutory duty to a private third party. Whether that statutory duty may be delegated, whether any accompanying liability can be imputed to the private party assuming the duty, and whether the private party acts as an agent of the government and may therefore receive the protections of the public duty doctrine, are all questions that have not been raised and will remain unanswered by this order and these motions to dismiss. Instead, it is possible that these issues, if applicable, may become ripe at later stages of this litigation[24] because North Carolina law provides that the public duty doctrine is an affirmative defense.

> Unlike the duty of care, which is an element of any negligence claim that a plaintiff must establish regardless of whether the claim is against a state agency under the State Tort Claims Act or a private party under the common law, see Stone, 347 N.C. at 479, 495 S.E.2d 711, the public duty doctrine is an affirmative defense to an otherwise valid negligence claim against the State, see Ray [v. N. Carolina Dep't of Transp.], 366 N.C. [1], 8, 727 S.E.2d 675; see also Myers [v. McGrady], 360 N.C. [460], 465, 628 S.E.2d 761 (describing the

---

[24] See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (explaining that "a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense").

- 39 -

public duty doctrine as "a separate rule of common law negligence that may limit tort liability, even when the State has waived sovereign immunity"). For that reason, while the public duty doctrine protects governmental entities from liability based upon a failure to carry out a statutorily created duty that is designed to protect the public at large rather than a specific individual, Isenhour, 350 N.C. at 606-07, 517 S.E.2d 121, and "operates to prevent plaintiffs from establishing the first element of a negligence claim—duty to the individual plaintiff," Ray, 366 N.C. at 5, 727 S.E.2d 675, the mere fact that the doctrine does not apply with respect to a particular set of facts does not, without more, determine whether the duty of care necessary to support the assertion of a negligence claim exists in the first place. Although the two legal doctrines are related, they are not identical, and the absence of one does not prove the existence of the other.

Cedarbrook Residential Ctr., Inc. v. N. Carolina Dep't of Health & Hum. Servs., 2022-NCSC-120, 383 N.C. 31, 74, 881 S.E.2d 558, 588 (2022).

The public duty doctrine and various other state law doctrines could apply to an analysis of Plaintiffs' negligence claims against Tyler Technologies, resulting in modifications to the analysis set forth hereafter, which is a limited application based on the present status of the case and does not establish, as a matter of law, the analysis of the negligence claim for purposes of summary judgment or trial.

Turning to the issue of duty as framed presently by the complaint and the parties' briefing, Defendant Tyler Technologies argues that it "owed no duty to protect Plaintiffs from the harm alleged — arrest and detention by state actors."

- 40 -

(Def. Tyler Technologies' Mem. (Doc. 91) at 14.) The crux of
Tyler's argument is that it did not personally inflict the
injuries alleged, and therefore, can only be held liable if a
special relationship existed that imposed an affirmative duty
upon it to protect Plaintiffs from harm imposed by third
parties. (Id.) Plaintiffs argue in response that Defendant Tyler
Technologies had a common law duty to Plaintiffs because the
harm that befell them at the hands of state actors was
foreseeable and "[t]he touchstone for the creation of a tort
duty is foreseeability." (Pls.' Resp. to Tyler Technologies'
Mem. (Doc. 103) at 8.)[25]

---

[25] Additionally, Plaintiffs argue that pursuant to a tort
theory of "assumption of duty," Tyler "assumed a positive legal
duty to Plaintiffs," when it entered into the software package
contract with NCAOC and warranted that the software would
perform without defects, a promise that Plaintiffs argue, "[t]he
State and general public relied" upon. (Pls.' Resp. to Tyler
Technologies' Mot. (Doc. 103) at 9-11.) Defendant replies,
arguing that the warranty provision does not create a duty to
provide a defect-free software, but "provides a warranty from
Tyler to NCAOC that provides an express procedure for addressing
any discovered defects," and further, that Plaintiffs cannot
pursue a claim of negligence under this warranty, because "North
Carolina preserves the privity requirement in actions based on
breach of warranty." (Def. Tyler Technologies' Reply (Doc. 111)
at 8-9.) Because this court finds that Plaintiffs have plausibly
alleged the existence of a general common law duty sufficient to
require that the motion to dismiss be denied, this court does
not find it necessary to resolve these related questions at this
stage.

- 41 -

<u>**Duty to Protect From a Third Party**</u>

Defendant Tyler Technologies argues that the general rule that "there is neither a duty to control the actions of a third party, nor to protect another from a third party," <u>Scadden v. Holt</u>, 222 N.C. App. 799, 802, 733 S.E.2d 90, 92 (2012), applies to the claim of negligence against it. (<u>See</u> Def. Tyler Technologies' Mem. (Doc. 91) at 14-17.) That rule does not apply, at this stage, to Plaintiffs' theory and the facts alleged. The rule applies when a plaintiff seeks to impose liability for a defendant's failure to stop a third party from injuring the plaintiff. <u>See</u> <u>Stein v. Asheville City Bd. of Edu.</u>, 360 N.C. 321, 328, 626 S.E.2d 263, 268 (2006) (applying this rule where "[t]here [was] no allegation defendant or its personnel encouraged, planned, or executed the [injury]; rather, plaintiffs rest their claims on the failure of . . . defendant, to take reasonable steps to frustrate the plans of [the individuals who harmed the plaintiff.]").

Here, Plaintiffs do not seek to impose liability upon Defendant Tyler for failing to protect them from the state actors who arrested and/or detained them, but rather for the affirmative acts of providing, implementing, and maintaining defective software that Plaintiffs allege caused their injuries. (<u>See</u> SAC (Doc. 77) ¶ 241); <u>cf.</u> <u>Stone St. Partners, LLC v.</u>

- 42 -

<u>Williamson</u>, No. 17 CVS 15265, 2018 WL 3619518, at \*6 (N.C. Super. July 26, 2018) (explaining the distinction between a case where a defendant is alleged to have failed to prevent harm caused by a third party and a case where a defendant's affirmative act harmed a third party). The fact that Tyler Technologies did not personally arrest or detain Plaintiffs does not necessarily mean they cannot be held liable for those injuries. See <u>Ballance v. Wal-Mart Stores, Inc.</u>, 178 F.3d 1282, 1999 WL 231653, at \*3 (4th Cir. Apr. 21, 1999) ("North Carolina law is clear that even if a third party . . . contributed to the injury, the original tortfeasor may still be liable so long as the injury was a reasonably foreseeable result of its actions.")

### General Common Law Duty

Plaintiffs allege that Defendant Tyler Technologies provided, implemented, and maintained, software "replete with defects," (SAC (Doc. 77) ¶ 243), to North Carolina courts and Sheriffs' Offices. Thus Plaintiffs have plausibly alleged that the general common law duty of ordinary care imposed upon "every person who enters upon an active course of conduct," is implicated here. See <u>Fussell</u>, 364 N.C. at 226, 695 S.E.2d at 440; <u>see also</u> <u>Council v. Dickerson's, Inc.</u>, 233 N.C. 472, 474-75, 64 S.E.2d 551, 553 (1951) ("The law imposes upon every person who enters upon an active course of conduct the positive

- 43 -

duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence. It is immaterial whether the person acts in his own behalf or under a contract with another.").

The finding of a general duty, however, does not conclude the analysis of Plaintiffs' negligence claim. Under North Carolina law, the general duty of ordinary care is proscribed by the foreseeability of Plaintiffs' injuries. See Bridges v. Parrish, 222 N.C. App. 320, 324, 731 S.E.2d 262, 266 (2012), aff'd, 366 N.C. 539, 742 S.E.2d 794 (2013) ("The duty of ordinary care . . . extends only to causes of injury that were reasonably foreseeable . . . .").

Defendant argues that foreseeability cannot create a standalone duty. (Def. Tyler Technologies' Reply (Doc. 111) at 7-8.) It is true that foreseeability does not impose a legal duty where none would otherwise exist. See Scadden, 222 N.C. App. at 804, 733 S.E.2d at 93-94. Plaintiffs, at this stage, are not relying upon foreseeability to create a standalone duty. Instead, as explained above, Plaintiffs have plausibly alleged a general duty of due care. The idea that "[n]o legal duty exists unless the injury to the plaintiff was foreseeable and avoidable through due care . . . is an accurate reflection of the general law on duty in a negligence action." Id. at 804, 93 (quotation

marks and citation omitted). In other words, the common law duty applicable here is proscribed by the foreseeability of the injuries alleged. Although courts in North Carolina have discussed "foreseeability of injury . . . both in terms of the duty owed and of proximate cause," Carsanaro v. Colvin, 215 N.C. App. 455, 461, 716 S.E.2d 40, 46 (2011) (citation and emphasis omitted), North Carolina courts have consistently used foreseeability to determine the scope of duty. See, e.g., Est. of Mullis by Dixon v. Monroe Oil Co., 349 N.C. 196, 205, 505 S.E.2d 131, 137 (1998) ("The orbit of the danger as disclosed to the eye of reasonable vigilance is the orbit of the duty." (quoting Palsgraf v. Long Island R. Co., 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928)) (cleaned up))).

This court finds that Plaintiffs have plausibly alleged that Tyler Technologies engaged in an active course of conduct such that the general common law would impose a duty of "due care." This court further finds that Plaintiffs have plausibly alleged that their injuries were reasonably foreseeable such that Tyler's duty of care extended to them. "In order to plead [reasonable foreseeability of injury] properly, a plaintiff must set out allegations showing that a man of ordinary prudence would have known that [plaintiff's injury] or some similar injurious result was reasonably foreseeable." Carsanaro, 215

N.C. App. at 461, 716 S.E.2d at 46 (citation and emphasis omitted).

Plaintiffs allege that Tyler Technologies "knew or should have known that these defects in eCourts would lead to unlawful arrests and detentions," (SAC (Doc. 77) ¶ 244), and that "[o]ver the last decade, similar software implementations by Defendant Tyler Technologies, Inc. . . . led to well-documented cases of overdetention, wrongful arrest, and the like," (id. ¶ 4).

Specifically, Plaintiffs allege that Defendant Tyler Technologies knew or should have known that the defects in eCourts would lead to unlawful arrests and detentions because its software had been associated with similar injuries in other states:

> b. That same year [(2011)], Merced County, California experienced a breakdown in communications between its criminal court and its jail after adopting Odyssey.
>
> c. In 2014, Cameron County, Texas struggled to track inmates in its jails after transitioning to Odyssey.
>
> d. In 2016, public defenders in Alameda County, California identified dozens of cases in which individuals had been wrongfully arrested; detained when they should have been released; or incorrectly told that they should register as sex offenders. The problems were so significant that Alameda opted not to use Odyssey for its civil, probate, or family matters. . . .
>
> e. Likewise, a 2016 class action against Shelby County, Tennessee officials, Tyler Technologies, and others alleged that a transition to Odyssey led to overdetention, wrongful arrest, and other harms. That

- 46 -

case, which was pending during North Carolina's RFP
process, settled in 2021 for a significant sum.

f. In 2021, Lubbock County, Texas officials admitted
that the county's switch to Odyssey had caused people to
be detained longer than necessary. . . .

(Id. ¶ 97.)

Additionally, Plaintiffs allege facts suggesting that Tyler

Technologies was aware of defects in the North Carolina-specific

eCourts software. For example, Plaintiffs allege that the

Mecklenburg County chief information officer stated publicly

that "Tyler Technologies continued to struggle with several

defects pushing the [launch] date for eWarrants back." (Id. ¶

74.)[26] Further, Plaintiffs allege that "[b]etween February 13,

2023 and April 21, 2023, NCAOC logged (and reported to Tyler

Technologies) more than 573 software application defects." (Id.

¶ 82.) As nearly all named Plaintiffs' injuries occurred

sometime after early March 2023, (see id. ¶¶ 104-06, 111-14,

---

[26] Defendant argues that the SAC does not link this
statement, which was made in August 2021, "to the live operation
of eCourts." (Def. Tyler Technologies' Mem. (Doc. 91) at 26.)
But the question of foreseeability only requires that an
individual of "ordinary prudence would have known that
[plaintiff's injury] or some similar injurious result was
reasonably foreseeable." Carsanaro, 215 N.C. App.at 461, 716
S.E.2d at 46 (emphasis omitted). Plaintiffs' factual allegations
that defects in eWarrants, a component of the eCourts software,
were known and documented in 2021 supports the idea that
subsequent defects, such as the defects Plaintiffs allege here,
were foreseeable.

119-123, 129-30, 134, 143, 152, 167, 174, 183, 194, 225),[27] the logged application defects that arose prior to each named Plaintiff's injury also bolsters the inference that it was foreseeable that Tyler Technologies' software would continue to encounter defects.

Plaintiffs have plausibly alleged that Tyler Technologies was aware or should have been aware that its software suffered from defects and the alleged injuries resulting from those defects were foreseeable. This court therefore finds that Plaintiffs have plausibly alleged that the wrongful arrests and overdetentions of the named Plaintiffs were reasonably foreseeable. Those of "ordinary prudence" would have known that the existence of defects in software used to manage court documents and warrants may lead to wrongful arrests and overdetentions. See Carsanaro, 215 N.C. App. at 461, 716 S.E.2d at 46.

Accordingly, based solely on the arguments presented by the parties and the issues as presently framed, this court finds

_____

[27] Plaintiff Robert Lewis was arrested in the fall of 2022. (SAC (Doc. 77) ¶ 215-16.) Although the NCAOC logged defects occurring in 2023 do not support the foreseeability of his injury, the alleged defects associated with Tyler's software in other states does — and those facts are sufficient to support the foreseeability of his injury and thus Defendant Tyler's duty to him.

- 48 -

that Plaintiffs have plausibly alleged that Defendant Tyler Technologies owed them a duty of reasonable care and that the injuries described were reasonably foreseeable.

## ii. **Proximate Cause**

A claim of negligence under North Carolina law requires a plaintiff to establish that his injury was "proximately caused" by the defendant's breach. <u>Fussell</u>, 364 N.C. at 226, 695 S.E.2d at 440.

> Proximate cause has been defined as "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed."

<u>Adams v. Mills</u>, 312 N.C. 181, 192–93, 322 S.E.2d 164, 172 (1984) (citation omitted). Notably, foreseeability, which, as discussed above, defines the scope of duty, "is also an element of proximate cause." <u>Stein v. Asheville City Bd. of Educ.</u>, 360 N.C. 321, 328, 626 S.E.2d 263, 268 n.5 (2006).

Defendant Tyler Technologies argues that Plaintiffs have not plausibly alleged that its conduct proximately caused their injuries. First, Tyler argues that "[t]he allegations here point to the conduct of many state actors — not Tyler." (Def. Tyler Technologies' Mem. (Doc. 91) at 20.) The upshot of this argument is that because Plaintiffs have, within the SAC, also attributed

- 49 -

their injuries to the actions of individuals other than Tyler, Tyler's actions could not have proximately caused those injuries. As Tyler argues, "[n]o well-pleaded allegation links any action by Tyler, as a software vendor, to Plaintiffs' harm." (Id. at 21.)

As an initial matter, "[i]t is well settled that there may be more than one proximate cause of an injury." Adams, 312 N.C. at 194, 322 S.E.2d at 172. The first negligent party will only be insulated from liability where "the intervening negligence of another . . . break[s] the sequence or causal connection between the negligence of the first party and the injury, so as to exclude the negligence of the first party as one of the proximate causes of the injury." Id. at 172–73. Accordingly, the fact that Plaintiffs allege both that Tyler Technologies' software defects proximately caused their harm and that the Sheriff Defendants' failures (i.e., failures to confirm the validity of warrants or to ensure individuals were not overdetained) proximately caused their harm poses no per se legal problem. And even if Plaintiffs intended to impose complete, mutually exclusive liability upon either Tyler or the Sheriff Defendants, that too is permissible at the motion to dismiss stage. See Fed. R. Civ. P. 8(a)(3) (explaining that pleadings must include "a demand for the relief sought, which

may include relief <u>in the alternative</u>" (emphasis added)); <u>see</u> <u>also</u> <u>Hayes v. Prudential Ins. Co. of Am.</u>, 60 F.4th 848, 855 (4th Cir. 2023) ("Federal Rule of Civil Procedure 8(a)(3) specifically permits pleading 'in the alternative[.]'").

Further, Defendant Tyler's argument that "[n]o well-pleaded allegation links any action by Tyler, as a software vendor, to Plaintiffs' harm," is plainly belied by the SAC.[28] As to the Plaintiffs Fields, Nunez, and Hayward, each alleges that their overdetention was caused by Defendants' adoption and implementation of eCourts, including an integration defect between Odyssey and eWarrants. (<u>See</u> SAC (Doc. 77) ¶¶ 108, 116, 125.) And this causal allegation is supported by specific facts alleged within the SAC. First, Plaintiffs allege that

> [d]uring the first four days following the launch of
> eCourts in Mecklenburg County, and due to these
> technological defects, approximately 66 people were
> detained well beyond the point their conditions of
> release were satisfied. Prior to eCourts, it would take
> anywhere from 2-4 hours for a detainee in Mecklenburg
> County to be released; but after eCourts, some people
> were held for 2-3 <u>days</u> despite having satisfied all
> conditions imposed on them by the justice system.

---

[28] Tyler's self-described status as a "software vendor" minimizes its role. Tyler, by its own admission, does not just sell the software, it also "assists in implementing that software so that its clients can operate it in live production, and provides maintenance and support to triage performance issues and answer end-user questions." (Def. Tyler Technologies' Mem. (Doc. 91) at 10-11.)

(Id. ¶ 92.) This allegation, which evinces a temporal nexus between the implementation of Tyler Technologies' software and instances of overdetention in Mecklenburg County, permits a plausible inference that Tyler Technologies' software caused Plaintiffs' overdetentions in Mecklenburg County.[29] Additionally, Plaintiffs have attached an October 17, 2023, email from the Mecklenburg County Chief Judge, in which she specifically states that she has become aware "of a known integration issue between eWarrants and Odyssey which impacts defendants whose conditions

---

[29] Defendant's argument that "[t]his allegation . . . lacks sufficient details," asks too much of Plaintiffs at the Rule 12(b)(6) stage. "Complaints need not give 'detailed factual allegations,' but a plaintiff must provide more than 'a formulaic recitation of the elements of a cause of action' or 'labels and conclusions' to avoid dismissal under Rule 12(b)(6). Withers v. BMW of N. Am., LLC, 560 F. Supp. 3d 1010, 1017 (W.D.N.C. 2021) (quoting Twombly, 550 U.S. at 555). This court finds Plaintiffs' allegation that "66 people were detained well beyond the point their conditions of release were satisfied" within four days of the implementation of the eCourts software in Mecklenburg County to satisfy Twombly and Iqbal's pleading directives. See supra Section III.

Additionally, this court does not find compelling the argument that "the SAC does not allege that Tyler was somehow responsible for these detentions." (Def. Tyler Technologies' Mem. (Doc. 91) at 26.) The fact that immediately following the implementation of Tyler's software, which Plaintiffs allege had experienced defects in the past, sixty-six people were detained for far longer than what was typical in the county makes plausible that Tyler's conduct caused the overdetentions, which is all that is needed on a motion to dismiss. Cf. City of High Point, N. Carolina v. Suez Treatment Sols. Inc., 485 F. Supp. 3d 608, 630 (M.D.N.C. 2020) ("Proximate cause is an inference of fact, to be drawn from other facts and circumstances.").

of release are modified in court and should be released." (Pls.'
Ex. D, Chief Judge Email (Doc. 77-4) at 2.) In this email, she
explains that "[i]n some cases, the information does not migrate
from eWarrants to Odyssey." (Id.) The email explains the way
"the integration is designed and expected to perform, what the
defect is and [the] local business practices for correcting it."
(Id.) She provides end-users with "two workarounds . . . to
correct these errors."[30] (Id. at 2–3.) This email, which
recognizes defects in the software "which impact[] defendants
whose conditions of release are modified in court and should be
released," was sent around the time that all three named
overdetention plaintiffs were allegedly overdetained. (Id. at
2.) Accordingly, this email provides factual support for the

---

[30] Defendant Tyler argues the following: "Plaintiffs also
highlight Judge Trosch's email to court personnel about an
alleged 'integration issue' in eCourts. SAC ¶ 91. But the email
states this was a problem only if magistrates and clerks do not
update the system, or if the magistrate fails to look under the
correct tab." (Def. Tyler Technologies' Mem. (Doc. 91) at 25–
26.) This misrepresents the contents of the email. Nowhere in
the email is there any indication that the errors were user-
created — rather the entirety of the email focuses on explaining
the way the software is supposed to function and how it was
failing to do so. The Chief Judge does not assert that the
problem only arises if magistrates and clerks fail to update the
system or check under the correct tab — instead, she proposes
manual "workarounds" to address the error. See Work-around,
Merriam-Webster, https://www.merriam-
webster.com/dictionary/work-around (last visited March 10, 2025)
("a plan or method to circumvent a problem (as in computer
software) without eliminating it").

- 53 -

allegation that Tyler Technologies' software proximately caused the named Plaintiffs' overdetentions.

Defendant Tyler further argues that the Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, Lassiter, Lewis, and Sifford have each failed to plausibly allege causation. Plaintiff Lewis, a resident of Guilford County, alleges that in 2016, he was the subject of a restraining order that was "quickly dissolved." (SAC (Doc. 77) ¶¶ 213–14.) Despite the order's dissolution, Plaintiffs allege that it remained "visible in eWarrants," and he was arrested for violating it in the fall of 2022. (Id. ¶ 215–16.) Defendant argues that Lewis, as a resident of Guilford County, "does not even live in a County where eCourts has gone live." (Def. Tyler Technologies' Mem. (Doc. 91) at 23.) But Plaintiffs allege that eWarrants, the component of the eCourts package implicated in Plaintiff Lewis' allegations, went live statewide in July 2022, and thus, according to Plaintiffs' allegations, was utilized at the time of Plaintiff Lewis' arrest. (SAC (Doc. 77) ¶ 74.) Further, Defendant argues that "[Plaintiff Lewis] objects to the failure of unnamed state defendants to dissolve a restraining order from 2016 — long before eCourts was implemented." (Def. Tyler Technologies' Mem. (Doc. 91) at 23.) Plaintiff Lewis does not so allege. He alleges that a dissolved restraining order remained

visible in Defendant Tyler's software system. It is plausible that this order remained visible in Defendant Tyler's system because of a software defect. Whether there are other plausible causes, such as failures of "unnamed state defendants," remains to be seen — but all that is required of Plaintiff on a motion to dismiss is to allege facts which permit a plausible inference of proximate cause. Plaintiff Lewis has done so.

Next, Tyler argues "Plaintiff Spruill alleges his detention was caused by the failure of the Wake County Sheriff's Office to correct an invalid warrant, not because of eCourts." (Id. at 23.) Plaintiff Spruill actually alleges that despite posting bond, "the warrant for his arrest remained marked as 'active' in eWarrants," which caused his subsequent arrest on the same warrant, and that even after a police officer called and asked the Wake County Sheriff's Office to confirm the warrant was invalid and to update the system accordingly, he was again arrested four days later. (SAC (Doc. 77) ¶¶ 128, 129–30, 132, 134.) Nowhere in these allegations does Plaintiff Spruill attribute the error to any failure of the Sheriff's Office to correct the invalid warrant. (See id.) While it is plausible that the error was the result of the deputy's failure to correct the warrant, it is equally plausible that the deputy did manually correct the warrant in the system, but the system

- 55 -

failed to reflect that correction, especially in light of other factual allegations that Tyler's software suffered from defects, including defects specifically linked to warrants, (see SAC (Doc. 77) ¶ 91 (alleging a "known 'integration issue' between eWarrants and Odyssey")). Plaintiff Spruill has plausibly alleged proximate cause.

Defendant Tyler argues that "Plaintiff McNeil attributes her detention to state actors entering a failure-to-appear charge in error . . . which does not involve Tyler." (Def. Tyler Technologies' Mem. (Doc. 91) at 23.) That is not what Plaintiff McNeil alleges. Rather, she alleges that after a court struck McNeil's erroneous failure to appear warrant on September 12, 2022, she was arrested on the same warrant on May 29, 2023, and informed by the Wake County Sheriff's Office that the warrant was valid. (SAC (Doc. 77) ¶¶ 149–50, 152, 154.) A Wake County Clerk's Office employee told McNeil "the failure to appear warrant should have been recalled from the electronic system." (Id. ¶ 157). While it is plausible that the failure to recall the warrant was the result of human clerical error, it is again, equally plausible, especially in light of the existence of other alleged defects with the software, that the system erroneously failed to reflect that the warrant had been stricken by the court. Plaintiff McNeil has plausibly alleged proximate cause.

Finally, Defendant Tyler argues that "the SAC alleges that the remaining Plaintiffs' [(Robertson, Jallal, Bradley, Lassiter, Sifford, and Chaplin)] injuries resulted from state actors . . . and not because of actions controlled by Tyler." (Def. Tyler Technologies' Mem. (Doc. 91) at 24.) This court disagrees.

Plaintiff Robertson alleges her court date was reset without her or her attorney's knowledge, and she was ultimately arrested as a result of her failure to appear on that date. (SAC (Doc. 77) ¶¶ 163-64, 166-67) She also alleges that "no one in the Wake County Clerk's Office or the District Attorney's Office has been able to explain how the date change occurred." (Id. ¶ 164.)

Plaintiff Jallal alleges that his case was "incorrectly designated as 'called and failed,'" (id. ¶ 172), and he was arrested on a warrant for this erroneous failure to appear, (id. ¶ 174).

Plaintiff Bradley alleges that although his charges were dismissed and his "dismissal paperwork was submitted to the court," Odyssey marked his case as "called and failed," and he was arrested for that "failure to appear." (Id. ¶¶ 179-83.)

Plaintiff Chaplin alleges that after the court dismissed a warrant for her failure to appear and her case was designated as

- 57 -

"resolved" in Odyssey, she was arrested on the dismissed warrant a month later, (SAC (Doc. 77) ¶¶ 141-43). As Plaintiff alleges, she "was rearrested because, although her case had been 'resolved,' Odyssey did not communicate that resolution to eWarrants, in contravention of the software's intended design." (Id. ¶ 144.)

Plaintiff Lassiter alleges that Odyssey displayed a "called and failed," for a court date that he had been present for, which led to his subsequent arrest on that warrant. (Id. ¶¶ 187, 190, 193-94.) He also alleges that a 2001 warrant that had been previously resolved was "revived" during the transition to eCourts. (Id. ¶ 198.)

Finally, Plaintiff Sifford alleges that an outstanding warrant against him was dismissed in 2022, but remained "active" in eWarrants, which led to his arrest. (Id. ¶¶ 224, 226-27.)

The crux of Tyler's argument appears to be that the named Plaintiffs' alleged wrongful arrests and alleged overdetentions could have been the result of clerical, human errors as opposed to any problems with the implementation and maintenance of Tyler Technologies' software. (See Def. Tyler Technologies' Mem. (Doc. 91) at 24.) It is true that Plaintiffs are not able to definitively state that software defects specifically were the source of their injuries. And it may be true that clerical

- 58 -

errors by end-users were the actual cause of those injuries, as opposed to any defects in Tyler's software. But it is unclear how, at this stage of litigation, without the benefit of discovery, Plaintiffs would be able to determine which of those possible causes was responsible for their injuries. And the possibility Tyler Technologies' development, implementation, and maintenance of the eCourts software is far from speculative, given the aforementioned allegations regarding defects in the technology and associated injuries.

In sum, this court is satisfied that all named Plaintiffs' causal allegations, supported by factual allegations of software defects and associated harms, permit the plausible inference that Tyler Technologies' software defects proximately caused their injuries.[31]

### 2. <u>Sheriff Defendants</u>

Plaintiffs also bring claims of negligence against Defendants McFadden and Rowe in their official capacities. (SAC (Doc. 77) ¶¶ 247-57.) In North Carolina, "a suit against a

---

[31] Because Plaintiffs do not respond to Defendant's arguments regarding their statutory failure to warn theory of negligence, (see SAC (Doc. 77) ¶ 246), this court finds that they have abandoned that theory. See Sawyers v. United Parcel Serv., Inc., No. 1:18-cv-1037, 2019 WL 4305771, at *3 (M.D.N.C. Sept. 11, 2019) ("This district and others within the Fourth Circuit agree that failing to respond to an argument constitutes an abandonment of a claim.").

- 59 -

sheriff in his official capacity is synonymous with a suit against the sheriff's department," White v. Cochran, 216 N.C. App. 125, 126, 716 S.E.2d 420, 422 (2011), here, the Mecklenburg County Sheriff's Office for Defendant McFadden, (see SAC (Doc. 77) ¶ 13), and the Wake County Sheriff's Office for Defendant Rowe, (id. ¶ 19). Plaintiffs allege that both Sheriff Defendants have "waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S § 153A-435, either by participating in a government risk pool or through purchasing commercial insurance that will indemnify him and his agents for any judgment against him or his agents named in this action," and through the purchase of an official bond. (Id. ¶ 17, 18). Neither Sheriff Defendant disputes that they have waived governmental immunity "to the extent of the coverage provided." Butterfield, 279 N.C. at 559, 866 S.E.2d at 304.

Plaintiffs Fields, Nunez, and Hayward, on behalf of themselves and the putative Overdetention Class, bring a claim of negligence against Sheriff McFadden in his official capacity. (Id. ¶ 248.) Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, and Lassiter, on behalf of themselves and the putative Wrongful Arrest Class, bring a claim of negligence against Sheriff Rowe in his official capacity. (Id. ¶ 249.)

- 60 -

Plaintiffs allege that all Sheriff Defendants had the

following duties:

> a. To identify warrants issued in their respective
> counties and appearing in eWarrants that were
> invalid;
>
> b. To not enforce warrants issued in their respective
> counties that they had identified as invalid;
>
> c. To confirm the validity of warrants in the Odyssey
> system before arresting individuals on a warrant; and
>
> d. To ensure that individuals are not held
> unnecessarily in the jails and other facilities they
> supervise.

(Id. ¶ 253.)

Plaintiffs further allege that the Sheriff Defendants

breached these duties in the following respects:

> a. They failed to identify in the eWarrants system
> those warrants issued in their respective counties
> that were invalid;
>
> b. They failed to confirm the validity of warrants
> prior to arresting individuals pursuant to a warrant;
>
> c. They repeatedly enforced and executed invalid
> warrants;
>
> d. They failed to implement systems to ensure that
> individuals ordered released or who had otherwise
> satisfied conditions of release, would be released in
> a timely fashion;
>
> e. They repeatedly detained individuals for over two
> hours beyond the time they had been ordered released
> or otherwise satisfied their conditions of release;
> and
>
> f. In such further ways as may be shown by the
> evidence.

- 61 -

(Id. ¶ 254.) Plaintiffs allege that "[t]he Sheriff Defendants, as the principals for their agents, are responsible under respondeat superior for negligence committed by their employees or agents in the course and scope of their employment." (Id. ¶ 255.)

### i. **Langford**

Defendant McFadden argues that Plaintiffs' claims of negligence against both Defendant McFadden and Defendant Rowe suffer from a Langford problem. (Def. McFadden's Mem. (Doc. 96) at 11.) In Langford v. Joyner, the Fourth Circuit affirmed the dismissal of a claim where the plaintiff had only made "collective allegations against all 'Defendants' without identifying how each individual Defendant personally interacted with [the plaintiff] or was responsible for [his injury]," explaining that it failed to satisfy Federal Rule of Civil Procedure 8(a)(2) and Twombly/Iqbal. 62 F.4th 122, 124-26 (4th Cir. 2023).

Plaintiffs have styled their negligence claims against all Sheriff Defendants in the aggregate, without specifying, within the paragraphs of the claim, which Sheriff committed which act of negligence. (See SAC (Doc. 77) ¶¶ 247-57.) However, Plaintiffs have specified which Plaintiffs are asserting negligence against which of the two Sheriff Defendants.

Plaintiffs specifically allege that "Plaintiffs Sarah Fields, Sayeline Nunez, and Thomas Hayward, on behalf of themselves individually and the Overdetention Class, bring this claim against Defendant Sheriff McFadden in his official capacity." (Id. ¶ 248.) Because Plaintiffs have provided, elsewhere in the SAC, that Fields, Nunez, and Hayward were subject to overdetention, this court is able to ascertain that those Plaintiffs allege negligence against Sheriff McFadden for his alleged failures to "ensure that individuals are not held unnecessarily in the jails and other facilities [he] supervise[s]." (Id. ¶ 253.)

Similarly, Plaintiffs specifically allege that "Plaintiffs Kevin Spruill, Timia Chaplin, Rotesha McNeil, Qiana Robertson, Yousef Jallal, Messiejah Bradley, and Dennis Keith Lassiter, on behalf of themselves individually and the Wrongful Arrest Class, bring this claim against Defendant Sheriff Rowe in his official capacity." (Id. ¶ 249.) Because Plaintiffs have provided, elsewhere in the SAC, that these named Plaintiffs were subject to wrongful arrests or detentions because of invalid warrants, this court is able to ascertain that those Plaintiffs allege negligence against Sheriff Rowe for his alleged failures "[t]o identify warrants issued in their respective counties and appearing in eWarrants that were invalid; . . . To not enforce

- 63 -

warrants issued in their respective counties that they had identified as invalid; [and] . . . To confirm the validity of warrants in the Odyssey system before arresting individuals on a warrant." (Id. ¶ 253.)

The SAC provides specific factual matter that identifies the alleged negligent actions of each Defendant. Although Plaintiffs' method of drafting the complaint makes it somewhat difficult to discern the claims, it does not suffer from the same infirmities as the complaint in Langford, which made only "collective allegations," that did not identify "how each individual Defendant personally interacted with [the plaintiff]." Langford, 62 F.4th at 125.

Accordingly, this court construes the SAC to allege the following: negligence against Defendant McFadden only for the alleged overdetentions of Plaintiffs Fields, Nunez, Hayward and the putative Overdetention Class, and negligence against Defendant Rowe only for the alleged wrongful arrests or detentions of Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, Lassiter and the putative Wrongful Arrest Class.

### ii.  Rowe

### Duty

Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, Lassiter and the putative Wrongful Arrest Class allege that Defendant Rowe, in his official capacity, had a duty 1) to identify, in the eWarrants system, warrants issued in Wake County that were invalid, 2) to not enforce those identified invalid warrants, and 3) to confirm the validity of warrants in the Odyssey system before arresting individuals on a warrant. (SAC (Doc. 77) ¶ 253.) Defendant Rowe argues that he did not owe the Plaintiffs these duties. First, he argues that North Carolina law requires sheriffs to serve facially valid warrants, and thus, Sheriffs cannot have the additional duty to "inquire into [the warrant's] validity." (Def. Rowe's Mem. (Doc. 89) at 7.) Second, he argues that "North Carolina law expressly denies any duty of the Sheriff to inquire as to the warrants [sic] validity." (Id. at 8.)

As explained above, in North Carolina, "[t]he law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." Fussell, 364 N.C. at 226, 695 S.E.2d at 440 (citation omitted). Law enforcement officers are not exempt from this general duty.

- 65 -

See Prior v. Pruett, 143 N.C. App. 612, 620, 550 S.E.2d 166, 172 (2001) ("In a negligence action, a law enforcement officer is held to the standard of care that a reasonably prudent person would exercise in the discharge of official duties of like nature under like circumstances.").

The Wake County Sheriff's Office and its deputies were engaged in an "active course of conduct" when they arrested Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley,[32] Lassiter and the putative Wrongful Arrest Class, and thus had a duty to exercise ordinary care. The fact that deputies are required to serve facially valid warrants pursuant to North Carolina law may be relevant to the question of whether they exercised ordinary care but does not abrogate that general duty.

North Carolina law provides that "[e]very sheriff, by himself or his lawful deputies, shall execute and make due return of all writs and other process to him legally issued and directed, within his county." N.C. Gen. Stat. § 162-14.

---

[32] This court notes that Plaintiff Messiejah Bradley alleges that his arrest was executed by a "police officer" and not a sheriff's deputy. (SAC (Doc. 77) ¶ 183.) It is not clear whether the individual who executed his arrest was under the control of Defendant Sheriff Rowe and the Wake County Sheriff's Office. However, because this court finds that the negligence claim against Rowe should be dismissed, it need not analyze this factual ambiguity.

- 66 -

Defendant argues that North Carolina law also "expressly denies any duty of the Sheriff to inquire as to the warrants [sic] validity," (Def. Rowe's Mem. (Doc. 89) at 8). In support of this argument, Defendant cites N.C. Gen. Stat § 15A-301(f), which reads:

> (f) Protection of Process Server. - An officer or other employee designated as provided in subsection (b),[33] and serving process as provided in subsection (b), receiving under this section or under G.S. 15A-301.1 criminal process which is complete and regular on its face may serve the process in accordance with its terms and need not inquire into its regularity or continued validity, nor does he incur criminal or civil liability for its due service.

N.C. Gen. Stat. § 15A-301(f). The parties did not cite, and this court has not been able to find, any cases purporting to interpret this statute. However, "[w]here statutory language is clear and unambiguous, [courts in North Carolina] do not 'engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language.'" Edwards v. Morrow, 219 N.C. App. 452, 455, 725 S.E.2d 366, 369 (2012) (citation omitted). This statute's language is clear — it abrogates criminal and civil liability for the due service of facially valid warrants and expressly disclaims any obligation

---

[33] Subsection (b) explains, in pertinent part, that "[w]arrants for arrest . . . must be directed to a particular officer, a class of officers, or a combination thereof, having authority and territorial jurisdiction to execute the process." N.C. Gen. Stat § 15A-301(b).

to inquire into the validity of warrants. In other words, the Sheriff's Office and its deputies have statutory immunity for claims of negligence related to the service of facially valid warrants. Cf. Henderson v. Charlotte-Mecklenburg Bd. of Educ., 253 N.C. App. 416, 801 S.E.2d 145 (2017) (finding statute that stated "[n]o liability shall attach to any board of education or to any individual board member for personal injury suffered by reason of the use of such school property pursuant to such agreements" to provide "boards of education with specific statutory immunity from any liability for personal injuries suffered by an individual participating in non-school related events and activities on school grounds"). This interpretation of § 15A-301(f) is consistent with the official commentary, which explains that the provision was "added to insure that an officer may execute criminal process promptly without fear or danger of encountering difficulty because of some deficiency not apparent to him." N.C. Gen. Stat. Ann. § 15A-301 (Commentary).

Statutory immunity is "an affirmative defense, [and] is available to a defendant only if he satisfies all of the requirements or elements defined in the relevant statutes." Land v. Whitley, 292 N.C. App. 244, 254, 898 S.E.2d 17, 24-25, review allowed, 900 S.E.2d 662 (2024). There is no dispute Defendant has satisfied all of the requirements of 15A-301(f) and is

entitled to its grant of immunity, because Plaintiffs do not
allege any conduct by Defendant beyond what is immunized by the
statute.[34] Plaintiffs have alleged Defendant Rowe owed them three
duties: 1) to identify invalid warrants, 2) to not enforce
invalid warrants, and 3) to confirm the validity of warrants
before arresting individuals. (SAC (Doc. 77) ¶ 253.) Any breach
of these duties would fall squarely within the zone of immunity
prescribed by the statute. Accordingly, because Defendant Rowe
has satisfied the elements of an affirmative defense of
statutory immunity, the claim of negligence against him in his
official capacity is dismissed, as is the claim of negligence

---

[34] Additionally, Plaintiffs do not argue against the
application of § 15A-301(f) in their brief in response to
Defendant Rowe's motion. (See generally Pls.' Resp. to Rowe's
Mot. (Doc. 102).)

against his surety, Defendant The Ohio Casualty Insurance

Company.[35] [36]

---

[35] This court recognizes that determining the applicability of an affirmative defense is generally not appropriate on a motion to dismiss. See Chisholm v. Mountaire Farms of N. Carolina Corp., 629 F. Supp. 3d 368, 373 (M.D.N.C. 2022). However, there is an exception to this general rule where "all facts necessary to the affirmative defense clearly appear on the face of the complaint." Id. (cleaned up) (quotation marks and citation omitted). The exception applies here because the actions alleged by Plaintiffs are precisely what is immunized by the statute and there are no further questions to determine the statute's applicability.

[36] In the SAC, Plaintiffs request that "should the Court grant any [motion to dismiss], Plaintiffs request that such dismissal be without prejudice and that they be granted an opportunity to amend to address the deficiencies identified in the Court's ruling." (SAC (Doc. 77) at 50.) Any such amendment would require "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "While leave may be freely granted, a 'request for a court order must be made by a motion,' which must state the grounds for seeking the order and the relief sought." Sullivan v. Lab'y Corp. of Am. Holdings, No. 1:17CV193, 2018 WL 1586471, at *13 (M.D.N.C. Mar. 28, 2018). And this district's local rules require that when a party is "required by the Rules to file a motion in order to seek leave to amend a pleading, the moving party shall attach the proposed amended pleading to the motion." LR15.1. Plaintiffs have not complied with the Local Rules, and thus this court declines to dismiss their claim against Defendant Rowe without prejudice. See Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 630–31 (4th Cir. 2008) (finding district court did not abuse discretion in denying leave to amend where "plaintiffs never filed a motion for leave to amend before the district court, nor did they present the district court with a proposed amended complaint").

### iii. **McFadden**

**Duty**

Plaintiffs Fields, Nunez, Hayward, and the putative Overdetention Class allege that Defendant McFadden, in his official capacity, had a duty "[t]o ensure individuals were not held unnecessarily in the jails and other facilities [he] supervised." (SAC (Doc. 77) ¶ 253.) Under North Carolina law, "[t]he sheriff shall have the care and custody of the jail in his county." N.C. Gen. Stat. § 162-22. And "[f]ollowing any authorization of release of any person in accordance with the provisions of this Article, any . . . law-enforcement officer or custodial official having the person in custody must effect the release of that person upon satisfying himself that the conditions of release have been met."[37] N.C. Gen. Stat. § 15A-

---

[37] Pursuant to North Carolina law, only judicial officials may "determine conditions of release of persons in proceedings over which thy are presiding." N.C. Gen. Stat. § 15A-532.

537(a).[38] "This is . . . mandatory, not optional[.]" <u>State v. Lemus</u>, 273 N.C. App. 155, 158, 848 S.E.2d 239, 242 (2020).[39] Additionally, Defendant McFadden and his deputies, engaged in the active course of detaining the named Plaintiffs, are held to the common law duty of ordinary care imposed upon all persons engaged in an active course of conduct. See <u>Baker v. Smith</u>, 224 N.C. App. 423, 428-29 737 S.E.2d 144, 148 (2012) (explaining that "the duties of the jailer are those prescribed by statute <u>and</u> those recognized at common law")).

---

[38] It also bears noting that although not discussed by the parties, it appears the public duty doctrine, as discussed with reference to Defendant Tyler Technologies' duty, may not apply here, because the statute charging law enforcement officers with effectuating the timely release of a person in custody is not for the benefit of the general public, but rather for the benefit of a circumscribed group: persons in custody who have met their conditions of release. <u>Cf.</u> <u>Multiple Claimants v. N. Carolina Dep't of Health & Human Servs.</u>, 176 N.C. App. 278, 288, 176 S.E.2d 666, 673 (2006) (finding public duty doctrine did not apply to statute directing Department of Health and Human Services to inspect jails because "this duty is for the benefit of the inmates and not for the general public").

[39] Section 15A-537(a) also states that "[n]o . . . officer, or custodial official may be held civilly liable for actions taken in good faith under this section." N.C. Gen. Stat. § 15A-537(a). It may be that this statute confers immunity for negligence actions, such as the statute implicated in the claim against Sheriff Rowe, <u>see</u> <u>supra</u> Section IV.B.2.ii. However, Sheriff McFadden did not raise such an argument in his briefs in support of his motion to dismiss, so this court declines to address the possibility of statutory immunity at this stage of the proceedings.

Defendant McFadden does not dispute that the Sheriff's Office had a duty to "timely free detainees who have satisfied the conditions of release," but argues that Plaintiffs have failed to plausibly allege that duty was breached or that the breach proximately caused their injuries. (Def. McFadden's Reply (Doc. 112) at 9.)

As discussed above, Plaintiffs have alleged that Defendant McFadden had a statutory duty to release detainees once satisfied that their conditions of release were met and a common law duty to act with ordinary care. Plaintiffs further allege that this duty was breached because the Mecklenburg County Sheriff's Office

> d. . . . [f]ailed to implement systems to ensure that individuals ordered released or who had otherwise satisfied conditions of release, would be released in a timely fashion; [and]
>
> e. . . . repeatedly detained individuals for over two hours beyond the time they had been ordered released or otherwise satisfied conditions of release[.]

(SAC (Doc. 77) ¶ 254.) Defendant McFadden argues that "Plaintiffs fail plausibly to allege factual support that Sheriff McFadden knew they had release orders, that he was aware they satisfied the conditions of their release, and still ignored that information, thereby breaching his duty to them." (Def. McFadden's Reply (Doc. 112) at 9.)

- 73 -

Here, the question of breach is two-fold. On the one hand, any breach of McFadden's statutory duty will turn on the meaning of N.C. Gen. Stat. § 15A-537(a) — what does it mean to require a custodial official to effect release "upon satisfying himself that the conditions of release have been met"? It seems a custodial official must take some action to "satisfy himself" that the conditions of release are met, and it is at least plausible that it would be a breach of that affirmative duty to not "implement systems to ensure that individuals ordered released or who had otherwise satisfied conditions of release, would be released in a timely fashion." (SAC (Doc. 77) ¶ 254.) It is also plausible that these failures constituted a breach of the duty of ordinary care. Cf. Doe v. United States, 381 F. Supp. 3d 573, 602 ("[W]hether the [defendant] used reasonable care in attending to the situation is generally a question for the jury.")

Plaintiffs' allegation of breach is bolstered by the fact that throughout the SAC, Plaintiffs have alleged that Defendant McFadden was on notice or should have been on notice of a pattern of overdetentions in his county during the time frame when the Plaintiffs Fields, Nunez, and Hayward were allegedly overdetained. (See SAC (Doc. 77) ¶ 92 ("During the first four days following the launch of eCourts in Mecklenburg County . . .

approximately 66 people were detained well beyond the point their conditions of release were satisfied."); id. ¶ 269 ("Sheriff McFadden was aware that because of an 'integration issue' between eWarrants and Odyssey, orders of release were not being communicated in a timely manner to officials at the MCDC."); id. ¶ 264 ("Sheriff McFadden was on notice of the likelihood of overdetentions based on lawsuits filed in other states,[40] the rollout of eCourts in the initial four pilot counties in North Carolina, and meetings with stakeholders in Mecklenburg County."); id. ¶ 273 ("In an interview just weeks

---

[40] Defendant McFadden argues that "allegations in other states [do not] put Sheriff McFadden 'on notice of the likelihood of overdetentions," (Def. McFadden's Mem. (Doc. 96) at 13), and that "it is questionable, at best, whether evidence of these other lawsuits would even be admissible at trial," because "any Tyler Technologies system for another state is necessarily different," (id. at 13 n.4). But "[w]hen prior incidents are admitted to prove notice, the required similarity of the prior incidents to the case at hand is more relaxed than when prior incidents are admitted to prove negligence. The incidents need only be sufficiently similar to make the defendant aware of the dangerous situation." Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1386 (4th Cir. 1995). At this stage, Plaintiffs have plausibly alleged that prior problems involving Tyler Technologies in other states was "sufficiently similar" to the problems alleged in this suit, as all involved court management or warrant software, notwithstanding any state-specific alterations.

after the roll out, Sheriff McFadden acknowledged that '[t]he wait times are much longer[.]'").)[41]

Plaintiffs have also plausibly alleged causation. The failure of Defendant McFadden to institute measures to ensure qualified individuals were timely released from detention is clearly causally tied to Plaintiffs' alleged overdetentions, as Defendant McFadden, in his official capacity, is an entity empowered with the authority to release individuals who have met their conditions of release. See N.C. Gen. Stat. § 15A-537(a). To the extent that Defendant McFadden argues against causation because Plaintiffs also allege that Defendant Tyler Technologies caused their injuries, (see Def. McFadden's Reply (Doc. 112) at 9) ("Plaintiffs repeatedly blame others . . . for being the proximate cause of their alleged over-detentions."), this

---

[41] Notably, key to the question of negligence is when Defendant McFadden was on notice that there may be difficulties with the new software such that his statutory duty to "satisfy himself" that conditions of release were met, or his common law duty of ordinary care may entail additional steps not previously taken. If Defendant McFadden did not, in fact, learn of the likelihood of overdetentions until Plaintiff Fields was overdetained on October 9, 2023, it will be difficult to prove that he breached his duty as to Plaintiff Fields. However, at this stage and based on Plaintiffs' allegations, it is at least plausible that Defendant McFadden was on notice of the likelihood of overdetentions earlier than October 9, 2023, because Plaintiffs allege that he was on notice "based on lawsuits filed in other states [and] the rollout of eCourts in the initial four pilot counties," (SAC (Doc. 77) ¶ 264), which occurred prior to the first named Plaintiff's overdetention.

- 76 -

argument is unavailing, for the same reason the converse argument by Tyler Technologies was rejected. See supra Section IV.B.1.ii. "It is well settled that there may be more than one proximate cause of an injury." Adam, 312 N.C. at 194, 322 S.E.2d at 172.

In accordance with the above analysis, Plaintiffs Fields, Nunez, and Hayward have plausibly alleged a claim of negligence against Defendant Sheriff McFadden, and by nature of N.C. Gen. Stat. § 58-76-5, his surety, Defendant John Doe Surety.[42]

### C.    Monell Claims against Sheriff Defendants

42 U.S.C. § 1983 provides that "[e]very person, who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §

---

[42] The parties dispute whether this court may take judicial notice of two exhibits to Plaintiffs' response to Defendant McFadden's motion to dismiss. (See Doc. 101-1; Doc. 101-2.) Because this court finds that Plaintiffs have plausibly alleged negligence against Defendant McFadden, even without the support of these documents, it need not consider whether the exhibits may be considered.

1983.[43] Neither Sheriff Rowe nor Sheriff McFadden dispute that the alleged actions taken by their deputies were under color of state law.

### i. Monell Claim Against Defendant Rowe

Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, and Lassiter allege that Defendant Rowe, in his official capacity, "through his policies, customs, practices, omissions, and failures to train, violated Plaintiffs' rights under the Fourth and Fourteenth Amendments," which protect their "right to be free from unlawful search, seizure and detention." (SAC (Doc. 77) ¶¶ 281, 283-84.) Because Plaintiffs pursue this claim against Defendant Rowe in his official capacity, it functions as a claim against the local entity of the Wake County Sheriff's Office. See supra n.43. In Monell v. Department of Social Services of City of New York, the Supreme Court held that "municipalities and other local government units [are] to be

---

[43] A § 1983 suit against defendants in their official capacities is, in effect, "a suit against the entity of which those officials are agents." Gantt v. Whitaker, 203 F. Supp. 2d 503, 508 (M.D.N.C. 2002). In North Carolina, a Sheriff is an agent of Sheriff's Office, which is a local entity. See Harter v. Vernon, 101 F.3d 334, 342-43 (4th Cir. 1996) (interpreting North Carolina law). Accordingly, Plaintiffs' Monell claims against Defendant Sheriff Rowe and Defendant Sheriff McFadden in their official capacities function as claims against the Wake County Sheriff's Office and the Mecklenburg County Sheriff's Office, respectively.

included among those persons to whom § 1983 applies." 436 U.S. 658, 690 (1978).

The Supreme Court has made clear that "municipalities may not be held liable [under Monell] unless action pursuant to official municipal policy of some nature caused a constitutional tort." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120-21 (1992) (internal quotation marks and citation omitted). Accordingly, this court first addresses whether Plaintiffs have alleged a constitutional violation. See Baker v. McCollan, 443 U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'").

Plaintiffs allege that, under the Fourth and Fourteenth Amendments of the United States Constitution, they had a right to be free from unlawful search, seizure, and detention. (SAC (Doc. 77) ¶¶ 283-84.) It is not entirely clear from the face of the complaint whether Plaintiffs invoke the Fourteenth Amendment because it renders the Fourth Amendment enforceable against state actors, see, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961), or whether Plaintiffs' invocation of the Fourteenth Amendment was intended to additionally assert that Defendant Rowe violated their due process rights. Regardless of Plaintiffs' intention, the constitutionality of arrests and pre-trial detention are

- 79 -

governed by the Fourth Amendment, not the Fourteenth. See Manuel v. City of Joliet, Ill., 580 U.S. 357, 365 (2017) ("The Fourth Amendment . . . establishes the minimum constitutional 'standards and procedures' not just for arrest but also for ensuing 'detention.'"). Accordingly, this court analyzes the Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, and Lassiter's Monell claim under the Fourth Amendment.

As relevant here, the Fourth Amendment protects "[t]he right of the people to be secure in their persons," prohibits "unreasonable searches and seizures", and requires that warrants may only be issued "upon probable cause." U.S. Const. Amend. 4. The crux of the Fourth Amendment is that it "prohibits government officials from detaining a person in the absence of probable cause." Manuel, 580 U.S. at 367. Plaintiffs have alleged that "Wake County Sheriff's Office deputies and other officers were arresting individuals on invalid Wake County warrants," (SAC (Doc. 77) ¶ 289), and that Defendant Rowe, in his official capacity, caused this practice through various omissions, (id. ¶¶ 291-94). As an initial matter, Plaintiffs do not allege that these warrants were invalid on their face, and in fact allege that they appeared as "active" in the eCourts software. (Id. ¶ 285.) Importantly, Plaintiffs also do not allege that the officers or deputies who executed these warrants

had any notice that they were invalid prior to executing them.[44] Accordingly, this court must address whether a law enforcement officer who executes an arrest or detention pursuant to a facially valid warrant has violated the Fourth Amendment.

"In defining the contours and prerequisites of a § 1983 claim . . . courts are to look first to the common law of torts." Manuel, 580 U.S. at 370; see also Brunson v. Stein, 116 F.4th 301, 307 (4th Cir. 2024). The Fourth Circuit has explained that "allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution." Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 182 (4th Cir. 1996); see also Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998) (explaining that an official who arrests an individual pursuant

---

[44] Accordingly, the facts as alleged here are distinct from Plaintiffs' cited case, McMurry v. Sheahan, 927 F. Supp. 1082 (N.D. Ill. 1996), because in that case, the plaintiff alleged that the officer who executed his warrant was on notice that the warrant system was "an utter failure and cannot be relied on." Id. at 1091.

to a facially valid warrant "can be pursued through a cause of action for malicious prosecution").[45]

"This Fourth Amendment claim requires 'that [1] the defendant ha[s] seized plaintiff pursuant to legal process that was not supported by probable cause and [2] that the criminal proceedings have terminated in plaintiff's favor.'" Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017) (quoting Massey v. Ojaniit, 759 F.3d 343, 356 (4th Cir. 2014)).[46] Here, Defendant Rowe does not dispute that criminal proceedings were terminated in Plaintiffs' favor. Rather, the key dispute is whether Plaintiffs' seizures were supported by probable cause.

> The probable-cause inquiry turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. A court should only consider the information the officers had at the time they sought the warrant. Yet the probable-cause inquiry examine[s] the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause.

_____

[45] Importantly, "a 'malicious prosecution' claim [(under § 1983)] . . . is simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution . . . . It is not an independent cause of action." Lambert v. Williams, 223 F.3d 257, 262 (4th Cir. 2000).

[46] To demonstrate a "favorable termination," "a plaintiff need only show that his prosecution ended without a conviction." Thompson v. Clark, 596 U.S. 36, 39 (2022).

Smith, 848 F.3d at 253 (internal citations and quotation marks omitted).

Plaintiffs fail to allege facts permitting an inference that the law enforcement officers who arrested them lacked probable cause. Plaintiffs do not allege that the officers sought the warrants in the absence of probable cause. Nor do Plaintiffs allege that the arresting officers themselves had notice of a pattern of invalid warrants, such that a reasonable and prudent officer would know not to rely on a facially valid warrant. All that is alleged is that those officers executed what appeared to them to be facially valid arrest warrants.

This court finds that the arresting officers who saw active, facially valid warrants in the warrant system acted with probable cause when they executed arrests pursuant to those warrants. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner . . . ." Smith, 848 F.3d at 255–56 (citation omitted). The Supreme Court has explained that

> we do not think a sheriff executing an arrest warrant is
> required by the Constitution to investigate
> independently every claim of innocence, whether the
> claim is based on mistaken identity or a defense such as
> lack of requisite intent. Nor is the official charged
> with maintaining custody of the accused named in the

- 83 -

warrant required by the Constitution to perform an
error-free investigation of such a claim. The ultimate
determination of such claims of innocence is placed in
the hands of the judge and the jury.

Baker, 443 U.S. at 145–46.

A finding that an officer who executes a facially valid
warrant without knowledge of the warrant's infirmities does not
violate the Fourth Amendment is supported by the jurisprudence
of the Fourth Circuit and district courts within it. See
Thurston v. Frye, 99 F.4th 665, 677 n.12 (4th Cir. 2024) ("[A]s
long as the previously issued warrant is not so facially
deficient . . . that the executing officers cannot reasonably
presume it to be valid, a warrant issued by a magistrate
normally suffices to establish that a law enforcement officer
has acted in good faith in executing it. That is because, [i]n
the ordinary case, an officer cannot be expected to question the
magistrate's probable-cause determination or his judgment that
the form of the warrant is technically sufficient." (quotation
marks and citations omitted)); McPhearson v. Anderson, 874 F.
Supp. 2d 573, 580 (E.D. Va. 2012) ("A facially valid arrest
warrant provides the arresting officer with sufficient probable
cause to arrest the individual identified in the warrant.");
Schiff v. McBain, No. CV PX-20-830, 2020 WL 1904705, at *2 (D.
Md. Apr. 17, 2020) ("Where an arrest occurs pursuant to a

- 84 -

facially valid warrant, the arrest is lawful even if, in the
end, the warrant was ultimately found to be flawed.").

Because Plaintiffs Spruill, Chaplin, McNeil, Robertson,
Jallal, Bradley, and Lassiter have failed to plausibly allege
that the arresting deputies violated their constitutional
rights, they cannot, as a matter of law, pursue Monell liability
under § 1983 against Defendant Rowe in his official capacity.
Monell requires a plaintiff to prove that "'action pursuant to
official municipal policy' caused their injury." Connick v.
Thompson, 563 U.S. 51, 60 (2011) (citation omitted). The
question of whether such an injury was caused by a municipality
becomes moot in the absence of an injury. See City of L.A. v.
Heller, 475 U.S. 796, 799 (1986) ("[I]f the [officer] inflicted

Case 1:23-cv-00423-WO-JLW    Document 116    Filed 03/31/25    Page 85 of 97

no constitutional injury on [the plaintiff], it is inconceivable that [the municipality] could be liable to [the plaintiff].").[47]

Because Plaintiffs have failed to plausibly allege that their Fourth Amendment rights were violated, the Monell claim against Defendant Rowe in his official capacity and against his surety, Defendant The Ohio Casualty Insurance Company, is dismissed.[48]

### ii. Monell Claim Against Defendant McFadden

Plaintiffs Fields, Nunez, and Hayward allege that Sheriff McFadden's "policies, customs, practices, omissions, and failures to train, as related to the adoption and implementation

---

[47] Plaintiffs argue that Mitchell v. Aluisi, 872 F.2d 577 (4th Cir. 1989), stands for the proposition that "'proof of an unconstitutional custom or practice' to execute invalid warrants — even if facially valid — may serve as the basis for Monell liability." (Pls.' Resp. to Rowe's Mot. (Doc. 102) at 2.) First, Mitchell was decided by reference to the Fourteenth Amendment due process clause, which is no longer understood to govern § 1983 claims regarding pre-trial arrest and detention. See Albright v. Oliver, 510 U.S. 266, 274 (1994) (holding Fourth Amendment, not Fourteenth Amendment, is the guide for "pretrial deprivations of liberty"). Second, this court reads Mitchell to hold that the arrest pursuant to a facially valid but recalled warrant did not constitute a due process violation, but that even if it did, there was no proof of a pattern of such violations such that it could give rise to municipal liability under Monell. See Mitchell, 872 F.2d at 579 (finding "no indication in the summary judgment record that, with regard to this recalled warrant, the sheriff . . . acted with anything approaching unconstitutional turpitude" and further, that "[t]here is also no proof of any impermissible policy here which would give rise to municipal liability.") This reading comports with Monell and Heller.
[48] See supra n.36.

of eCourts, caused Plaintiffs and members of the Overdetention Class to be detained after the time they were ordered released," violating their rights under the Fourth and Fourteenth Amendments. (SAC (Doc. 77) ¶¶ 262, 278.)

As explained above, the first step of any <u>Monell</u> claim is determining whether or not the plaintiff has plausibly alleged a constitutional violation. Defendant McFadden does not dispute that Plaintiffs' alleged overdetentions are cognizable constitutional injuries. Accordingly, for purposes of resolving this motion, this court will assume Plaintiffs Fields, Nunez, and Hayward have plausibly alleged that their constitutional rights were violated when they were not released upon the conditions of their release being satisfied.[49]

---

[49] This court notes, that although Plaintiffs have alleged that Sheriff McFadden "violated Plaintiffs' rights under the Fourth and Fourteenth Amendments of the United States Constitution," (SAC (Doc. 77) ¶ 262), courts have found that the constitutionality of the continued detention of a pre-trial detainee who has met the conditions of release is governed by the Fourteenth Amendment's substantive due process clause. See <u>West v. Prince George's Cnty., Maryland</u>, No. CV TDC-21-0863, 2022 WL 125936, at *4 (D. Md. Jan. 13, 2022); <u>Palmer v. Maryland</u>, No. CV 1:22-0899-CDA, 2024 WL 4349730, at *5 (D. Md. Sept. 30, 2024) (slip copy) ("Federal Courts have held, consistently, that the Fourteenth Amendment protects pretrial detainees."); <u>Wharton v. Danberg</u>, 854 F.3d 234, 247 (3d Cir. 2017) ("[T]he treatment of pretrial detainees is governed by the Due Process Clause."); <u>Lynch v. City of New York</u>, 335 F. Supp. 3d 645, 653 (S.D.N.Y. 2018) ("[F]ederal courts have generally used the rubric of substantive due process to analyze claims based on the delayed release of pre-trial detainees after the legal basis for detention has dissolved.").

- 87 -

However, a finding that Plaintiffs have plausibly alleged a constitutional violation does not end the inquiry. In order for the Mecklenburg County Sherriff's Office to be liable under Monell, Plaintiffs must plausibly allege that the constitutional torts alleged were done in "execution of a government's policy or custom." Monell, 436 U.S. at 694. As explained by the Fourth Circuit,

> [a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 533 (4th Cir. 2022) (citation omitted). A plaintiff must also "allege an affirmative causal link between the 'policy or custom,' and the particular injury suffered by the plaintiff." Washington v. Balt. Police Dep't, 457 F. Supp. 3d 520, 532 (D. Md. 2020).

Plaintiffs allege that Sheriff McFadden caused their overdetentions through his omissions, namely his "fail[ure] to adequately train his employees on the Odyssey and eWarrants systems and how to use those systems to ensure that individuals were timely released from detention," (SAC (Doc. 77) ¶ 277), and

- 88 -

his "fail[ure] to implement a failsafe system, such as a paper-based process to notify jail staff of a release order that could be transferred with inmates to the MCDC," (id. ¶ 266).

Plaintiffs may, in limited circumstances, hold municipalities liable for the constitutional torts of their employees in the face of inadequate training. See City of Canton, Oh. v. Harris, 489 U.S. 378, 389 (1989). However, "a failure to train can constitute a 'policy or custom' actionable under section 1983 only where the 'municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants.'" Jordan by Jordan v. Jackson, 15 F.3d 333, 341 (4th Cir. 1994) (quoting City of Canton, 489 U.S. at 388). "The specifically identified deficiency in training also must be shown to have in fact caused the ultimate violation." Id. In other words, "[s]ection 1983 liability may attach if the officers are not adequately trained 'in relation to the tasks the particular officers must perform,' and this deficiency is 'closely related to the ultimate injury.'" Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003).

To plausibly allege a Monell failure to train claim, a plaintiff must first allege "'a specific deficiency' in training, 'rather than general laxness or ineffectiveness in

training.'" <u>Washington</u>, 457 F. Supp. 3d at 533 (quoting <u>Spell v.</u> <u>McDaniel</u>, 824 F.2d 1380, 1390)). Plaintiffs have alleged a "specific deficiency" — a failure to train sheriff's deputies on how to use the Odyssey and eWarrants systems "to ensure that individuals were timely released from detention." (SAC (Doc. 77) ¶ 277.)[50]

Next, a Plaintiff must allege that this training deficiency evidences "deliberate indifference" by policymakers. <u>See</u> <u>City of</u> <u>Canton</u>, 489 U.S. at 388. The Supreme Court has explained that deliberate indifference

> is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. . . . A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.

<u>Connick</u>, 563 U.S. at 61–62 (internal citations and quotation marks omitted).

Plaintiffs have adequately alleged that Sheriff McFadden was aware of a pattern of unconstitutional overdetentions in

---

[50] Thus, this court rejects Defendant's argument that Plaintiffs "fail to identify any specific policy, or the absence thereof that proximately caused their alleged constitutional harm." (Def. McFadden's Mem. (Doc. 96) at 17.)

Mecklenburg County. Plaintiffs allege that "[d]uring the first four days following the launch of eCourts in Mecklenburg County, . . . approximately 66 people were detained well beyond the point their conditions of release were satisfied," (SAC (Doc. 77) ¶ 272),[51] and that "Sheriff McFadden knew that because of defects in eCourts, many defendants who had been ordered released were continuing to be held in custody," (id. ¶ 268). These allegations are sufficient to permit the reasonable inference that Defendant McFadden was on notice of a pattern of overdetention in Mecklenburg County.[52]

---

[51] Defendant argues that "Plaintiffs offer no factual support for this allegation, and conjecture is insufficient to support the imposition of Monell liability on Sheriff McFadden." (Def. McFadden's Mem. (Doc. 96) at 19.) The allegation that "[d]uring the first four days following the launch of eCourts in Mecklenburg County, . . . approximately 66 people were detained well beyond the point their conditions of release were satisfied" is a factual allegation. On a motion to dismiss, this court accepts the Plaintiffs' factual allegations as true. See Ray, 948 F.3d at 226.

[52] It is unclear how the 66 overdetentions in the first four days of Odyssey (October 9, 10, 11, and 12 of 2023) were spread out. This court notes that named Plaintiffs Fields and Nunez have alleged they were overdetained on October 9 and October 10 of 2023. At this stage of the proceedings, the allegation that 66 people were overdetained in the first four days is sufficient to permit a plausible inference that Defendant McFadden was on notice of a pattern of overdetentions even prior to Fields' and Nunez's detentions. However, as their overdetentions occurred near the start of the Odyssey implementation, establishing that Defendant McFadden was on notice of a pattern of overdetentions prior to theirs may pose a challenge later in the proceedings.

Finally, to state a <u>Monell</u> failure to train claim, a plaintiff must allege that the "identified deficiency in a city's training program [was] closely related to the ultimate injury." <u>City of Canton</u>, 489 U.S. at 391. Plaintiffs have alleged that software defects led to their overdetention. An allegation that the Sheriff's Office failed to adequately train its officers on how to use that software is closely related to the injury. Although it is possible that even armed with adequate training the deputies still would not have been able to counteract the alleged technical defects, it is equally plausible that had they better understood how to use the software, they may have been better equipped to identify defects and know where to look to seek confirmation of release conditions. This causal link is supported by Plaintiffs' allegation that Sheriff McFadden "attributed the delays [in release] to inadequate training for his staff as well as glitches and crashes in the system." (SAC (Doc. 77) ¶ 275.)

At this stage of litigation, it is plausible that <u>had</u> Defendant McFadden more adequately trained his officers on the eCourts systems and their attendant defects, the named Plaintiffs would not have been the subject of overdetention.

Accordingly, Plaintiffs have plausibly alleged a <u>Monell</u> claim against Sheriff McFadden.[53]

## V.    <u>INJUNCTIVE RELIEF</u>

All named Plaintiffs also seek permanent injunctive relief under § 1983 against Defendants McFadden and Rowe in their official capacities. (SAC (Doc. 77) ¶¶ 328-29.) Specifically, Plaintiffs ask that this court issue a "permanent injunction [which] should require the Injunctive Relief Defendants to adopt failsafe procedures that would prevent Fourth and Fourteenth Amendment violations akin to those suffered by Plaintiffs and the injunctive Relief Class as alleged herein." (<u>Id.</u> ¶ 335.)

Neither Plaintiff Sifford nor Plaintiff Lewis assert § 1983 claims against either Defendant McFadden or Defendant Rowe and therefore may not pursue § 1983 injunctive relief against them. <u>Cf.</u> <u>York v. City of Burlington</u>, 225 F. Supp. 3d 341, 350 (M.D.N.C. 2016) (holding that plaintiffs who failed to allege a constitutional injury under <u>Monell</u> lacked standing for injunctive relief).

---

[53] Because this court finds that Plaintiffs have plausibly alleged a <u>Monell</u> failure to train claim, it need not address alternative <u>Monell</u> theory, that "Sheriff McFadden failed to implement a failsafe system," (SAC (Doc. 77) ¶ 266), which, as an alleged omission is also governed by "deliberate indifference." <u>See</u> <u>Lytle</u>, 326 F.3d at 471 (explaining that <u>Monell</u> omission liability requires the omission "manifest[s] deliberate indifference to the rights of citizens").

Because Plaintiffs Spruill, Chaplin, McNeil, Robertson, Jallal, Bradley, and Lassiter have failed to allege a constitutional injury against Defendant Rowe, they have not alleged a § 1983 claim, and thus their claim for injunctive relief under § 1983 as to Defendant Rowe must also fail.

Plaintiffs Fields, Nunez, and Hayward have stated a _Monell_ claim against Defendant McFadden. Plaintiffs also request injunctive relief based on this _Monell_ claim. (SAC (Doc. 77) ¶¶ 328, 331.) Defendant McFadden argues that the injunction should fail because it "contains no factual allegations regarding any alleged wrongful or illegal conduct taken by Sheriff McFadden." (Def. McFadden's Mem. (Doc. 96) at 19.) But within Plaintiffs' claim for injunctive relief, they specifically "re-allege and incorporate the preceding paragraphs as if set forth herein," (SAC (Doc. 77) ¶ 325). Accordingly, Plaintiffs' allegation that "[u]nder 42 U.S.C. § 1983, the Injunctive Relief Defendants' administrative policies constitute a policy or custom of inaction and a policy or custom amounting to deliberate indifference . . ." is clearly a reference to the _Monell_ claim as alleged against Defendant McFadden. (See _id._ ¶ 331.) Because this court has already found that Plaintiffs Fields, Nunez, and Hayward have plausibly alleged a _Monell_ claim against Defendant McFadden, and in the absence of any additional arguments

- 94 -

challenging this request for injunctive relief on the same grounds, this court finds that those Plaintiffs have plausibly stated a claim for injunctive relief against Defendant Sheriff McFadden in his official capacity.[54]

## VI. __CONCLUSION__

Because this court finds that all named Plaintiffs have plausibly alleged that Defendant Tyler Technologies owed them a duty of due care and breached that duty, thereby causing their injuries, Plaintiffs have adequately stated a claim of negligence against Defendant Tyler Technologies.

Because this court finds that Defendant Rowe is entitled to statutory immunity for any alleged negligence associated with executing warrants, this court finds that Plaintiffs have failed

---

[54] It is worth noting that for purposes of injunctive relief, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." City of L.A. v. Lyons, 461 U.S. 95, 102 (1983) (citation omitted); see also Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) ("[B]ecause plaintiffs here seek . . . injunctive relief, they must establish an ongoing or future injury in fact.") "Courts generally are reluctant to find the requisite level of likelihood of future harm when standing is asserted based on repeat run-ins with the law or on being arrested again." Jones v. Murphy, 470 F. Supp. 2d 537, 550 (D. Md. 2007). Although, "[t]he existence of a class . . . could alter the analysis." Id. In order to obtain injunctive relief, Plaintiffs will need to show that "[a]t least one plaintiff [has] standing to seek each form of relief requested in the complaint." Town of Chester, N.Y. v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017). Because no party addressed the issue of injunctive relief standing, this court choose not to analyze it at this time.

to plausibly allege a claim of negligence against Defendant Rowe and accordingly, his surety, The Ohio Casualty Insurance Company. Plaintiffs Fields, Nunez, and Hayward have, however, stated a claim of negligence against Defendant McFadden and his surety, John Doe Surety, as they have plausibly alleged that Sheriff McFadden owed them a duty of care and breached that duty when they were overdetained.

Further, this court finds that Plaintiffs have failed to state a <u>Monell</u> claim as to Defendant Rowe and his surety, because they have not alleged that their arrests constituted a cognizable constitutional injury. Accordingly, their claim for injunctive relief on the same grounds also fails.

The Plaintiffs Fields, Nunez, and Hayward have stated a <u>Monell</u> claim against Defendant McFadden and his surety because they have plausibly alleged that their constitutional injury was caused by the Mecklenburg Sheriff's Office failure to train its deputies on how to use the eCourts software. Accordingly, those Plaintiffs' claim for injunctive relief against Defendant McFadden also survives.

For the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant Tyler Technologies' Motion to Dismiss, (Doc. 90), is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Sheriff Rowe's Motion to Dismiss, (Doc. 88), is **GRANTED.** Accordingly, the negligence claim and 42 U.S.C. § 1983 claim against both Sheriff Rowe and his surety, The Ohio Casualty Insurance Company, are **DISMISSED.**

**IT IS FURTHER ORDERED** that Defendant Sheriff McFadden's Motion to Dismiss, (Doc. 95), is **DENIED.**

This the 31st day of March, 2025.

_____
United States District Judge